No. 11-3

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

CHADRICK EVAN FULKS,

*Petitioner-Appellant,*

v.

UNITED STATES OF AMERICA,

*Respondent-Appellee.*

_____

On Appeal from the United States District Court
for the District of South Carolina
Criminal No. 4:02-992, Joseph F. Anderson, Jr., U.S.D.J.

_____

**INITIAL BRIEF OF APPELLANT**


Billy H. Nolas
Amy Gershenfeld Donnella
Assistant Federal Defenders
Federal Community Defender Office
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520

Attorneys for Petitioner-Appellant

Dated:      September 23, 2011

## PRELIMINARY STATEMENT REGARDING CITATIONS

All emphasis herein is supplied, unless otherwise indicated.

Parallel citations usually are omitted.

Internal quotation marks and citations may be omitted when to do so does not alter the meaning or significance of the quoted passage.

When quoting from the District Court's Order, citations to the record contained in the Order usually are omitted.

References to the possessive form of Appellant's last name (Fulks' or Fulks's) have been conformed to the former (Fulks').

The Joint Appendix is cited as "A" followed by the page number.

ii

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT REGARDING CITATIONS. . . . . . . . . . . . . . . ii

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

STATEMENT OF JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.     ARREST AND APPOINTMENT OF COUNSEL. . . . . . . . . . . . . . . . . . . . . . 3

II.    302 STATEMENTS AND GUILTY PLEA. . . . . . . . . . . . . . . . . . . . . . . . . 5

IV.    JURY SELECTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
       A.    The Jury Selection Process. . . . . . . . . . . . . . . . . . . . . . . . 6
       B.    Specific Jurors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
             1.    Goehring. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
             2.    Harvey. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
             3.    Allison. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

V.     CAPITAL SENTENCING. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
       A.    The Government's Case.. . . . . . . . . . . . . . . . . . . . . . . . . 15
       B.    The Defense Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
       C.    The Jury's Findings. . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

VI.    POST-TRIAL HEARING. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

VII.   DIRECT APPEAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

VIII.  SECTION 2255 PROCEEDINGS AND HEARING. . . . . . . . . . . . . . . . . 37
       A.    Regarding the 302 Statements and Guilty Plea. . . . . . . . . . . . 37
       B.    Regarding Jury Selection. . . . . . . . . . . . . . . . . . . . . . . . . 41

1.     In general. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
2.     Seating of pro-death jurors Goehring, Harvey and Allison. . . 43
3.     Failure to read juror Allison's questionnaire. . . . . . . . . . . . . 45

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

I.     TRIAL COUNSEL WERE INEFFECTIVE IN SELECTING THE CAPITAL SENTENCING
       JURY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
       A.     Counsel's Representation Was Deficient. . . . . . . . . . . . . . . . . . . 50
       B.     Appellant was Prejudiced. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
       C.     The District Court Erred. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

II.    APPELLATE COUNSEL WERE INEFFECTIVE FOR FAILING TO APPEAL THE TRIAL
       COURT'S UNCONSTITUTIONAL "TWO-STEP" MITIGATION JURY INSTRUCTION
       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
       A.     The Two-Step Mitigation Instruction Was Unconstitutional. . . . . . . 60
       B.     Appellate Counsel Were Ineffective. . . . . . . . . . . . . . . . . . . . . . 64
       C.     The District Court Erred. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

III.   TRIAL COUNSEL WERE INEFFECTIVE FOR ADVISING APPELLANT TO GIVE
       UNPROTECTED STATEMENTS TO THE GOVERNMENT AND PLEAD GUILTY
       WITHOUT OBTAINING ANY BENEFIT IN RETURN. . . . . . . . . . . . . . . . . . . 67
       A.     Counsel's Representation Was Deficient. . . . . . . . . . . . . . . . . . . 67
       B.     Appellant was Prejudiced. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72
       C.     The District Court Erred. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

IV.    APPELLANT'S DUE PROCESS AND EIGHTH AMENDMENT RIGHTS WERE
       VIOLATED BY THE GOVERNMENT'S USE OF INCONSISTENT THEORIES AT HIS
       CAPITAL SENTENCING AND AT THE TRIAL AND SENTENCING OF HIS CO-
       DEFENDANT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75
       A.     Underlying Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76
       B.     The Government's Use of Inconsistent Theories Was Unconstitutional
              . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

iv

C.      The District Court Erred. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

## TABLE OF AUTHORITIES

### Federal Cases

Abdul-Kabir v. Quarterman, 550 U.S. 233 (2007) ................................. 61, passim

Bell v. Jarvis, 236 F.3d 149 (4th Cir. 2000) ....................................... 64

Berger v. United States, 295 U.S. 78 (1976) ...................................... 81

Bradshaw v. Stumpf, 545 U.S. 175 (2005) ........................................ 80

Brewer v. Quarterman, 550 U.S. 286 (2007) ................................... 61, 67

Caldwell v. Mississippi, 472 U.S. 320 (1985) ...................................... 49

Drake v. Kemp, 762 F.2d 1449 (11th Cir. 1985) . .................................. 81

Eddings v. Oklahoma, 455 U.S. 104 (1982) ........................................ 60

Fisher v. Gibson, 282 F.3d 1283 (10th Cir. 2002) . ................................ 51

Florida v. Nixon, 543 U.S. 175 (2004) ....................................... 68, passim

Hill v. Lockhart, 474 U.S. 52 (1985) ................................................ 72

Jacobs v. Scott, 513 U.S. 1067 (1995) . ............................................ 80

Jones v. Page, 76 F.3d 831 (7th Cir. 1996) . .................................... 73, 75

Jones v. Polk, 401 F.3d 257 (4th Cir. 2005) .................................... 60, 61

Marzullo v. Maryland, 561 F.2d 540 (4th Cir. 1977) ............................. 48

McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. 548 (1984) . ......... 35

Meyer v. Branker, 506 F.3d 358 (4th Cir. 2007) .............................. 73, 74

Miller v. Pate, 386 U.S. 1 (1967) .......................................................................... 84

Mills v. Maryland, 486 U.S. 367 (1988) . ....................................................... 60, 63

Mu'Min v. Virginia, 500 U.S. 415 (1991) ........................................................... 49

Parker v. Dugger, 498 U.S. 308 (1991) . ............................................................. 54

Penry v. Johnson, 532 U.S. 782 (2001) .............................................................. 67

Penry v. Lynaugh, 492 U.S. 302 (1989) . ...................................................... 62, 67

Rosales-Lopez v. United States, 451 U.S. 182 (1981) . ........................................ 49

Simpson v. Polk, 129 Fed. Appx. 782 (4th Cir. 2005) ................................... 73, 74

Stumpf v. Houk, 2011 WL 3506101 (6th Cir., Aug. 11, 2011) . ..................... 80. 82

Smith v. Groose, 205 F.3d 1045 (8th Cir. 2000) ............................... 80, 81, 82, 83

Smith v. Robbins, 528 U.S. 259 (2000) . ............................................................. 64

Smith v. Texas, 543 U.S. 37 (2004) . .............................................................. 61, 63

Strickland v. Washington, 466 U.S. 668 (1984) . .................................... 48, passim

Tennard v. Dretke, 542 U.S. 274 (2004) . .................................................. 61, 63, 67

Tice v. Johnson, 647 F.3d 87 (4th Cir. 2011) ................................................. 48, 56

United States v. Basham, 561 F.3d 302 (4th Cir. 2009) ......................................... 2

United States v. Brown, 799 F.2d 134 (4th Cir. 1986) ......................................... 49

United States v. Chapman, 593 F.3d 365 (4th Cir. 2010) . ................................... 51

United States v. Curbelo, 343 F.3d 273 (4th Cir. 2003) ....................................... 55

vii

United States v. Higgs, 353 F.3d 281 (4th Cir. 2003) ......................... 65, 66, 79, 81

United States v. Jackson, 549 F.3d 963 (5th Cir. 2008) ................................. 65, 66

United States v. Tucker, 603 F.3d 260 (4th Cir. 2010) . ................................ 47, 48

**State Cases**

Knese v. State, 85 S.W.3d  628 (Mo. 2002) ......................................................... 50

State v. Dye, 784 N.E.2d 469 (Ind. 2003) . ......................................................... 50

**Federal Statutes and Rules**

18 U.S.C. § 2119 ...................................................................................................... 2

18 U.S.C. § 3591(a)(2)(D) ..................................................................................... 29

18 U.S.C. § 3592(c)(1) . ......................................................................................... 30

28 U.S.C. §§ 1291 & 2253 . .................................................................................... 1

28 U.S.C. §§ 2241 & 2255 . .................................................................................... 1

28 U.S.C. §2254(d) ................................................................................................ 74

28 U.S.C. § 2255 ......................................................................................... 2, passim

Fed. R. App. P. 32(a)(5) . ....................................................................................... 87

Fed. R. App. P. 32(a)(6) . ....................................................................................... 87

Fed. R. App. P. 32(a)(7)(C)(I) ............................................................................... 87

**MISCELLANEOUS**

ABA, Guidelines for the  Appointment and Performance of Defense Counsel in Death Penalty Cases, 31 Hofstra L. Rev. 913 (2003) .............................. 48, passim

viii

Andrea Lyon, Defending the Death Penalty Case: What Makes Death Different?, 42 Mercer L. Rev. 695 (1991) . ................................................................... 68. 71

Beecher-Monas, The Epistemology of Prediction, 60 Wash. & Lee L. Rev. 353 (2003) ................................................................................................................ 53

John Blume, Sheri Johnson & Scott Sundby, Competent Capital Representation: The Necessity of Knowing and Heeding What Jurors Tell Us about Mitigation, 36 Hofstra L. Rev. 1035 (2008) ............................................................................... 53

John Blume, The Dance of Death or (Almost) "No One Here Gets out Alive": The Fourth Circuit's Capital Punishment Jurisprudence, 61 S.C. L. Rev. 465 (2010) . 52

Sheri Johnson, Wishing Petitioners to Death: Factual Misrepresentations in Fourth Circuit Capital Cases, 91 Cornell L. Rev. 1105 (2006)  ....................................... 52

Sundby, War and Peace in the Jury Room: How Capital Juries Reach Unanimity, 62 Hastings L.J. 103 (2010) ................................................................................ 53

Sundby, The Capital Jury and Absolution: The Intersection of Trial Strategy, Remorse, and the Death Penalty, 83 Cornell L.Rev. 1557 (1998) . .................. 69, 71

Theodore Eisenberg, et al., Forecasting Life and Death: Juror Race, Religion, and Attitude Toward the Death Penalty, 30 J. Legal Stud. 277 (2001) . ................ 49, 53

Zalman & Tsoudis, Plucking Weeds from the Garden: Lawyers Speak about Voir Dire, 51 Wayne L. Rev. 163 (2005)  ................................................................... 50

Meghan Morgan, Standby Me: Self-Representation and Standby Counsel in a Capital Case, 16 Cap. Def. J. 367 (2004) . .......................................................... 49

ix

## STATEMENT OF JURISDICTION

The District Court had jurisdiction under 28 U.S.C. §§ 2241 & 2255. The District Court granted a Certificate of Appealability on the issues raised herein. Order at 175 (A100297). Thus, this Court has jurisdiction under 28 U.S.C. §§ 1291 & 2253. The District Court issued a final order denying relief on August 20, 2010, which it amended on August 25, 2010. On September 17, 2010, Appellant timely filed a Motion to Alter or Amend the Judgment. On January 13, 2011, the District Court denied the Motion to Alter or Amend. On March 2, 2011, Appellant timely filed a notice of appeal.

## STATEMENT OF ISSUES

1. Whether trial counsel were ineffective in selecting the capital sentencing jury?

2. Whether direct appeal counsel were ineffective for failing to appeal a preserved, meritorious Eighth Amendment challenge to the capital sentencing jury instructions?

3. Whether trial counsel were ineffective for advising Appellant to give unprotected inculpatory statements to the Government and to plead guilty without obtaining any benefit in return?

4. Whether Fulks' due process and Eighth Amendment rights were violated when the Government presented factually inconsistent and irreconcilable theories at Fulks' sentencing and at the separate trial of codefendant Basham?

## STATEMENT OF THE CASE

This is an appeal by Chadrick Even Fulks ("Fulks"), a death-sentenced federal prisoner who unsuccessfully moved for relief under 28 U.S.C. § 2255.

Fulks and Brandon Basham ("Basham") were indicted in the District of South Carolina on December 17, 2002. On April 23, 2003, the grand jury returned a superseding indictment charging Fulks and Basham with eight offenses and setting forth special findings supporting imposition of the death penalty on the first two counts: carjacking resulting in Alice Donovan's death, 18 U.S.C. § 2119, and kidnapping resulting in Donovan's death, § 3571. On September 12, 2003, the prosecution notified Fulks and Basham of its intent to seek the death penalty. On January 29, 2004, the District Court severed the cases for trial.[1]

On May 4, 2004, Fulks accepted counsel's advice and tendered guilty pleas to all eight counts in the superseding indictment. The District Court accepted the pleas on May 7, 2004.

On June 30, 2004, after a capital sentencing hearing, the jury recommended a death sentence. On December 20, 2004, the District Court denied Fulks' motion for a new trial and imposed sentence: death on the kidnapping count, a separate sentence of death on the carjacking count, and 744 months imprisonment on the remaining six counts, to run consecutively to the death sentences.

---

[1]Basham was sentenced to death. See United States v. Basham, 561 F.3d 302 (4th Cir. 2009). His § 2255 proceedings are pending in district court.

2

This Court affirmed. United States v. Fulks, 454 F.3d 410 (4th Cir. 2009), cert. denied, 551 U.S. 1147 (2010).

Fulks sought relief under § 2255. The District Court held an evidentiary hearing, denied relief, and granted a certificate of appealability on each issue raised herein. See Order (A100123). The District Court denied Fulks' Motion to Alter or Amend Judgment, declining to consider the affidavits Fulks filed therewith. See R59 Order (A100298).

## STATEMENT OF FACTS

Lead trial counsel John Blume is an experienced habeas corpus lawyer. However, he is *not* an experienced jury trial lawyer. While representing Fulks, Blume did a good job developing mitigating evidence, consistent with his habeas experience. However, consistent with his jury trial *inexperience*, Blume made substantial mistakes no reasonable capital trial lawyer would have made.

## I.    ARREST AND APPOINTMENT OF COUNSEL

Fulks was arrested on November 20, 2002, in connection with a "crime spree" that "spanned seventeen days and covered seven states, with thirteen identifiable victims (including two women [Alice Donovan and Samantha Burns] who were raped and killed ...)." Order at 12 (A100134).

Assistant Federal Public Defender William Nettles IV ("Nettles") was appointed on November 26, 2002. See DE#6 (A100011). Nettles had no capital case experience. A200994. John Blume ("Blume") was appointed on January 14, 2003.

See DE#38 (A100012). "Assisting Blume and Nettles on a *pro bono* basis was Sheri Lynn Johnson." Order at 11 (A100133). The "trial team" of Blume, Nettles and Johnson had some "assistance [from] Blume's associate ..., Keir Weyble." Order at 11 (A100133); A200718.

Blume was lead counsel throughout the trial court and direct appeal proceedings. A200718, A200794, A201321. As he and co-counsel explained at the § 2255 hearing, Blume was "CEO of th[e] operation," and "called the shots" throughout the proceedings. A200784, A200820, A200994, A200997, A201321.

Attorney and law proffessor Andrea Lyon, who testified at the § 2255 hearing "as an expert in the field of capital criminal defense," A200948, described Blume as "one of the finest habeas attorneys in the United States, a brilliant, educated man. *Not a trial lawyer* though." A200950.[2]

This was Blume's first (and last) federal capital trial. A200717, A200813. Nor did Blume have trial experience with non-capital federal prosecutions. Nor had Blume represented a federal prisoner in a post-conviction proceeding. A200717.

Blume also had limited experience with jury selection and jury trials in state court capital cases. At the trial level, "Blume has been involved in some fourteen state capital cases." Order at 41 (A100163). However, only *two* of those cases

---

[2]Lyon is a law professor and experienced capital litigator. She has practiced since 1976 and specializes in criminal defense, almost exclusively homicides and capital offenses. Order at 100 (A100222); A200941-48, A201613. She has testified as an expert in capital defense in "probably a dozen" cases. A200947.

4

(William Hunter (1988), Lino Delacruz (2001)) involved jury selection and jury sentencing. Order at 41-42 n.21 (A100163-64 n.21).

When questioned at the § 2255 hearing about his two jury cases, "Blume never testified that he was lead counsel, nor did he suggest that he played a key role in conducting voir dire or witness examination in those two state trials." R59 Order at 14 (A100311). The "lead attorneys" in those cases confirmed that "Blume's participation in [the] two state capital trials with them was of a limited nature." R59 Order at 8, 14 (A100305, A100311).

Blume has written and lectured on jury selection, but his focus has only been "on the sort of analytical basis on why you should be allowed to do certain things." A200897.

## II.    302 STATEMENTS AND GUILTY PLEA

"Upon being arrested on November 20, 2002 and for the five months that followed, [Fulks] gave no statement" to the authorities. Order at 76-77 (A100198-99). On April 21, 2003, however, three months after Blume was appointed, Fulks accepted counsel's advice and gave a "302 statement" to the FBI regarding the abduction and death of Alice Donovan. See A201893-9.[3] On September 8, 2003, Fulks accepted counsel's advice and gave a 302 statement regarding the abduction and death of Samantha Burns. See A400001-6.

Counsel had Fulks give the 302 statements without *any* protection for Fulks

---

[3]The statement is called a "302 statement" because it is on FBI Form FD-302.

against their use at trial and without any suggestion or offer from the Government that giving the statements would lead to a negotiated settlement of the case. A200726-27.

In January 2004, the District Court severed Basham's and Fulks' cases for separate trials. Order at 12 (A100134).

Shortly before Fulks' trial was to begin, defense counsel informed the District Court that Fulks had accepted counsel's advice to plead guilty. Order at 12 (A100134). On May 4, 2004, the District Court held a Rule 11 guilty plea colloquy, at which "the government ... agreed to accept the 302 in lieu of Fulks' oral confession." Order at 87 (A100209). On May 7, 2004, the District Court accepted the guilty plea. See Order at 89-90 (A100211-12).

## IV.    JURY SELECTION

**A.    The Jury Selection Process**: The Court "summoned a state-wide venire of 800 jurors. Each juror was mailed a standard questionnaire containing a total of fifty-eight questions to be returned to the court in advance of jury selection." Order at 114 (A100236). The questions involved, *inter alia*, education, occupation, family, hobbies, and past experience with crime and the legal system. See A201832-40.

Based upon this questionnaire, some potential jurors were dismissed for cause or hardship. See, e.g., DE#347, DE#367, DE#438 (A100026-27, A100031).

The remaining potential jurors were "given a supplemental questionnaire upon arrival at the courthouse to test [their] death penalty views on paper before one-on-one questioning by the court and counsel." Order at 114 (A100236).

In-court voir dire was conducted from May 10-21, 2004. Each prospective juror was "individually ... voir dire[d] by the government and Fulks' trial counsel." Order at 115 (A100237). "At least one assisting defense lawyer (if not two) was present at counsel table at all times to assist the lawyer questioning prospective jurors. Voir dire was conducted by Blume, Johnson, and Nettles," id., with Blume doing the bulk of the questioning. "Of those jurors seated, Blume conducted the voir dire of Sylvia Allison, Agnes Bryan, Richard Goehring, Lisa Harvey, Mary Ellen Huggins, Timothy Kurzwell, Anne Lee, and Karl Nations; Sheri Johnson conducted the voir dire of Pearl Gordon, Elizabeth Plyler, and Cynthia Steele; and Bill Nettles conducted the voir dire of Joni Novinger." Id. n.32.

Based upon the questionnaires and in-court testimony, the defense team rated each potential juror using the "Colorado Method of Jury Selection." Order at 113 (A100235). The Colorado Method "rate[s] potential jurors on a scale of 1 through 7 based on their views on the death penalty, with 1 being a juror who would never under any circumstances give death, and 7 being a juror who would always give death." Order at 113-14 (A100235-36).

Potential jurors with a 6 or 7 rating are described as follows:

> #6.    A killer. Escapes ADP [i.e., Automatic Death Penalty] challenge because she/he can listen to a "perhaps" mitigation scenario and judge saves them. Concrete backer of death penalty. Only argument against death penalty (really) is it's not used enough. Believes in personal economic burden to them of life sentence for defendant and others and deterrence. Head nodder with [prosecutor].

7

#7.    ADP.  If your client is convicted of first degree murder, they will then impose the death penalty.  Eye for an eye and everything else.  Life with parole at 40 years or no parole is not really an adequate sentence.  Mitigation to them is manslaughter or self-defense.  Hateful and proud of it.  They must be removed, hopefully, on cause, but at least with peremptory.

A202425-26; see also A200789 (Blume: ranking 7 is "a juror who would always give death and be happy about it").

At the conclusion of each potential juror's in-court testimony, the parties made motions to exclude for cause and the court ruled on the motions.  E.g., A300545-46, A300551.

After all potential jurors were questioned and the court ruled on all motions to strike for cause, the court gave the parties a list of the first 63 potential jurors (in chronological order of their questioning) who survived challenges for cause, for the parties to use in exercising peremptory strikes.  See A202437-39 (strike sheet); A302739-41, A302745-47.[4]

Each side was given 23 peremptory strikes – 20 for jurors and 3 for alternates. A302745, A302750.  Thus, after both sides used all strikes, there would be 17 people left on the list; the first 12 would become jurors and the last 5 alternates.  A302739.

The defense team created and used its own list of the 63 potential jurors, A202427-29, arranged in order of each potential juror's score on the 1-7 scale.  See

---

[4]A 64th person was on the list as "a cushion," but was not eligible for strikes or to be seated.  A302747.

8

Order at 114 (A100236); A200901. The scores on the defense list were the average of scores given by "four or five" defense team members. A200904-05. The best potential juror for the defense had a 2.00 score, while the worst score was 6.90. See A202427-29. The average score for all 63 potential jurors was 4.80.

The Government and the defense took turns striking potential jurors from the list of 63. See A302746-51. Each side used all 23 peremptory strikes.

Those struck by the Government (and their scores on the 1-7 scale), in order of the strike, were:

> Franklin Bowe (2.13);
> Glynis Lowry (4.19);
> Denise Pee (2.70);
> Joseph Quarles (4.00);
> James Kyser (3.06);
> Betty Judge (3.70);
> Stella Mason (2.00);
> Rebecca Parrott (3.50);
> Jean Simmons (4.40);
> Larry Jackson (2.40);
> Christopher Jones (4.10);
> Joe Scott (3.33);
> Deborah Burrows (5.11);
> Lorenzo Martin (4.63);
> Gail Gibson (5.13);
> Jessie Moore (3.00);
> Jimmy Moultrie (4.88);
> Alexander Bradley (4.00);
> Frankie Bass (6.38);
> Sara Howe (3.25);
> Marvella Easterling (4.33);
> Henry Christopher (3.70);
> Llewellyn Searson (5.70).

9

The average score for the Government strikes was 3.90.

The only Government strike with a score of 6 or above was Frankie Bass (6.38), an African American male. In response to a later <u>Batson</u> challenge, the Government explained that it struck Bass, despite his "clearly demonstrated pro-government positions on capital punishment," because his brother had been convicted of murder. A302719-21.

Those struck by the defense (and their scores on the 1-7 scale), in order of the strike, were:

Charles Paramore (6.70);
Constance Mitchum (5.90);
Janice Richards (5.80);
Jeffrey Cunningham (5.75);
John Hayes (5.75);
James Mills (5.25);
Kenneth Dean (5.17);
Anthony Vick (4.67);
Jay Edwards (5.63);
Wanda Burkett (5.30);
John Adams (5.13);
Deeberry Rowland (6.38);
Betty Howell (5.23);
Madison Martin (5.90);
Ralph Reeves (5.30);
David Edwards (4.20);
Kristin Morgan (6.44);
Willie Graham (5.00);
Albert White (6.48);
Steven Threatt (4.30);
Robert McCants (6.00);
Gary Miles (6.80);
Tina Boatwright (4.56).

10

The average score for the defense strikes was 5.55.

The selected jurors and alternates (and their rankings) were:

Karl Nations (5.25);
Pearl Gordon (4.88);
Richard Goehring (6.48);
Laura Pressley (4.25);
Elizabeth Plyler (4.30);
Anne Lee (4.00);
Lisa Harvey (6.90);
Joni Novinger (3.94);
Agnes Bryan (4.33);
Cynthia Steele (4.30);
Sylvia Allison (6.10);
Mary Huggins (4.20);
Timothy Kurzwell (5.25);
Jimmie James (5.00);
Jim Shaw (5.00);
Colleen Turner (6.50);
Alton Ewing (4.17).

The average score for selected jurors and alternates was 4.99.[5]

**B.    Specific Jurors**:  The three worst jurors on the 1-7 ranking system were Richard Goehring (6.48), Lisa Harvey (6.90) and Sylvia Allison (6.10).[6]  Harvey's 6.90 score was the worst of *any* potential juror.  Defense counsel used 18 of their 23 peremptory strikes against potential jurors with *better* scores than any of these three jurors who were seated.

_____

[5]One of the first twelve selected, Laura Pressley, was excused mid-trial for hardship, and replaced by the thirteenth selection, Timothy Kurzwell.

[6]Colleen Turner (6.50) was chosen as the fourth alternate.  She thus had little chance of actually sitting on the jury, and did not sit on the jury.

11

**1.**    **Goehring** stated on voir dire "that he would *automatically impose the death penalty* on a defendant who had committed a knowing and intentional murder." Fulks, 454 F.3d at 428 (A100109).  He gave this automatic death response four separate times.  See A300536-37.  When defense counsel pressed Goehring on whether mitigating evidence could ever affect his decision, Goehring said it would not have any effect unless the mitigation was "something that's outrageous," in which case he still would impose death "90 percent of the time."  A300538.  Goehring testified that if there were two bodies, the chances of any mitigation swaying him would "become less."  A300539.

The Government made a limited attempt to rehabilitate Goehring, prompting him to say "he would consider and 'process' mitigating evidence." Fulks, 454 F.3d at 428 (A100109).  The Government did not question Goehring about his previous assertions that he would vote for death "automatically" or "90 percent of the time."  The Government did not elicit information from Goehring that might soften his earlier statements that he was firmly in favor of death for any death-eligible defendant.  Goehring himself stated, "once I form an opinion, I tend to stick with it," A300541, and showed no signs of wavering from his initial opinions.

The defense rated Goehring at 6.48 on the 1-7 scale.  Defense counsel moved to excuse Goehring for cause on the grounds that he would automatically vote for death, he would improperly shift the burden to the defense to justify a life sentence, and his ability to consider mitigating evidence was impaired.  A300545-47.  The

12

District Court qualified Goehring over defense objection. A300551. Defense counsel did not use a peremptory strike against Goehring.  He became Foreman of the jury.

       **2.**     **Harvey** repeatedly testified that she would automatically impose death in any case where there was an intentional killing or where there were two victims in two separate incidents.  She stated that life without parole is not a sufficiently severe punishment under those circumstances.  A301475-76, A301479-80, A301482, A301484.  On leading questioning from the Government and Court, Harvey gave other answers indicating she could keep an open mind.  E.g., A201483 ("Q:  ... If you hear about the two deaths ... is that going to cause your mind to slam shut at that point?  A: No, sir."); A301488-90.

The defense rated Harvey at 6.90 on the 1-7 scale, the worst score for any potential juror.  Defense counsel moved to excuse Harvey for cause because she would automatically vote for death, at least in a case of two killings, and because she did not believe that life without parole was an adequate punishment.  A301494, A301496-97.  The District Court qualified Harvey over the defense objection, stating that it was "a close call," but "I think [Harvey] is qualified."  A301498.  Defense counsel did not use a peremptory strike against Harvey.  She sat on the jury.

       **3.**     **Allison**:  As stated above, each potential juror was required to complete a questionnaire, which included inquiries about past experiences with crime and the legal system.  Question 42 stated:

    42.    Have you or any close friend or relative been the victim of a

crime, whether it was reported to law enforcement authorities or not (including robbery, burglary, assault, kidnapping, sexual assault, domestic violence, etc.)?  _____ Yes ___ No

If yes, please explain the following for each incident:
a.     Type of crime: _____
b.     Who was the victim? _____
c.     What was the relationship between victim and the perpetrator?
_____
d.     Was the crime reported to the police? _____
e.     Was anyone charged with the crime? _____
f.     If someone was charged, what was the outcome of the prosecution?  _____
g.     Was the case handled well or poorly by law enforcement officials? _____
h.     Will this experience affect your ability to be impartial during this trial?  _____
If yes, please explain: _____

A201832-40.

Despite the fact that question 42 required a "yes" or "no" answer, Allison left it blank. Blume, who questioned Allison during jury selection, did not ask her why she failed to answer question 42, and did not inquire into the topics covered by question 42. Neither the Government nor the District Court asked about these matters either. See A302047-80.[7]

Based upon Allison's responses to questions she *did* answer on the questionnaires and in court, the defense rated her at 6.1 ("killer") on the 1-7 scale. A202429.

_____

[7]As described later, counsel learned post-trial that Allison's husband had been shot to death shortly after their marriage, while she was pregnant with their child.

14

Defense counsel moved to strike Allison for cause, arguing that she was "substantially impaired" against returning a life sentence because her "opinions were ... very pro death," and because she would go along with the majority even if she disagreed. A302078, A302082. The District Court qualified Allison over the defense objection, A302081, and the defense did not use a peremptory strike against her. She sat on the jury.

## V.    CAPITAL SENTENCING

**A.    The Government's Case**: The Government began its opening statement by telling the jury:

> When you were brought in as jurors ... you were advised that the defendant pleaded guilty ... [and] told that this would be a penalty-only trial. And then you were told the trial was probably going to take about a month. And you probably wondered how that is possible.
> In order for me to explain that to you, ... I want to introduce you to a concept called the "gentle art of confessing error." What is that? At least one person has defined the "gentle art of confessing error" this way. "We confess little faults in order to suggest that we have no big ones."

A400451.

The Government returned to this theme throughout its opening, telling the jury the Government's case would be lengthy because Fulks' 302 statements, rather than being an admission of guilt and acceptance of responsibility, were "the last desperate attempt of a desperate criminal to avoid the consequences of his own deadly choices," A400457, by falsely minimizing his own role in the offenses. For example:

15

"What does Chad Fulks say [in his statements]?  Let me reintroduce you to the gentle art of confessing error.  You confess small faults in order to suggest that we don't have big ones."  A400453;

"[T]he fact that they successfully concealed the remains allows Fulks to blame Basham.  To confess error gently, and in this case, to confess big faults in order to suggest that he doesn't have the biggest."  A400456;

"[T]his case will take four weeks to try because you need to hear all of the evidence to make a valid assessment of whether Chadrick Fulks' denial that he intended that anybody die makes any sense at all."  A400458;

"Fulks has pled guilty gently."  A400487;

"[O]ne of the things about the gentle part of confessing error is that it works best when you tell the government things that they already know"; asserting that Fulks' statements were given after he knew the Government's evidence. A400495-96, A400500.

The Government's evidentiary presentation began on June 2, 2004, and continued through June 22.  The Government introduced Fulks' 302 statements through FBI Special Agent Jeffrey Long, who was present at the interviews. Throughout Long's testimony, the Government emphasized that Fulks gave the statements on the advice and in the presence of his attorneys; suggested that Agent Long did not believe Fulks' statements to be true, to the extent that they minimized Fulks' culpability; and suggested that Fulks admitted only matters he knew the Government could prove from other sources, and only after he knew Basham was blaming him.  For example:

"Q. ... At the request of Mr. Fulks' lawyers, Mr. Blume, and Mr. Nettles, was the FBI ... willing to sit down and conduct an interview with Chad Fulks ...?"

16

A302865;

"Q. ... this request to interview him was made by his lawyers, and the fact his lawyers were present ...? ... Q. ... when you sat down to do this with his lawyers?" A302867;

"Q. ... his lawyers were present? ... "Q. ... he had, obviously, competent counsel, Mr. Blume and Mr. Nettles present ...?" A302867-68;

"Q. ... I want to be very clear, both of his lawyers were present, at that time? A. That is correct. ... Q. And, at the time Mr. Fulks wanted to consult with his lawyers, did you give him all the opportunity to consult with his lawyers if he so desired? A. Yes." A302869;

"Q. You were getting ready to discuss the interview ... with Mr. Fulks in the presence of his lawyers Mr. Blume, Mr. Nettles, and his private investigator, Mr. Skidmore ...?" A302876;

"Q. ...[T]here was an agreement between Mr. Fulks' lawyers and prosecutors with the U.S. Attorney's Office [about the scope of the statement] ...? A. That is correct. Q. That was the agreement between Mr. Fulks' attorneys and prosecutors, at that time? A. Yes." Id.

"Q. ... [A]ccording to Mr. Fulks, ... in the presence of his two lawyers and a private investigator, he claimed ...?"; "Q. ... [In this] interview with Mr. Fulks in the presence of his lawyers, if you didn't believe what Mr. Fulks was telling you, would you still write it down ...? A. Yes." A302894;

"Q. ... in the presence of his two lawyers, Mr. Fulks admits ...?" A302909

"Q. ... when you were taking this statement from Mr. Fulks in the presence of his lawyer ...?" A302956;

"Q. Present at that [interview] for Mr. Fulks was Mr. John Blume and [another] attorney?" A302973;

"Q. ... tell the jury what Mr. Fulks, in the presence of two of his lawyers, had

17

to tell you ..." A302972.

See also A302916-29, A302952-56 (discussing Fulks' pre-statement knowledge of Government's evidence and Basham's claims); A302820-21 (Government question to State Police Sergeant who was present at one interview: "Q. It was, I guess the best way to phrase it, would be an attorney-controlled interview ...?  A. Correct.").

The Government presented over 100 witnesses to fill gaps in Fulks' statements, bolster inculpatory parts of the statements and undermine exculpatory parts.  See Fulks, 454 F.3d at 413-17 (A100094-98) (describing evidence).

The Government gave its closing argument on June 29, 1994, continuing its theme that Fulks' statements and guilty plea were attempts to evade responsibility, rather than accept it.  For example:

"he is giving a statement in the presence of his lawyers," A303714-15;

asserting that Fulks admitted only as much as he knew the Government could already prove, A303717-18;

"[M]inimize and deny.  He knew what evidence was against him; he knew what the Government had on him," A303719-20;

"Chad Fulks minimizing, and Chad Fulks denying, and Chad Fulks putting all the blame on Brandon Basham."  A303720;

"again, the [gentle art] of confessing error, minimize, deny," A303736;

"There is a reason he minimized. ... He is minimizing to the police, in front of his lawyers .... It lessens his intent in the eyes of a jury, I suppose." A303737;

asserting that Fulks made more damning admissions to his brother "before he

18

is questioned by any cops, before any prosecutors get involved, before any defense lawyers get involved," A303760;

Fulks "has spun a web of deceit his entire life. ... He has cheated the truth every single time he has gotten in trouble with law enforcement." A303789;

"To minimize, to deny, to lie." A303791;

"The day before he is supposed to plead guilty, the day before the defense lawyers are going to argue, to show mitigating circumstance that he is admitting his guilt, he is lying. He is deceiving. He is manipulating, because that is Chad Fulks." A303793;

"And the defense lawyers want you to believe, and Chad Fulks wants you to believe that, for the first time in his entire life, for the first time, that he is telling you the truth." A303794;

asserting that Fulks' aim in giving statements was "putting it on" and "laying the blame on" Basham, while admitting only what the Government could already prove, A303795-97;

"Fulks' plan was, if he got caught, to confess error, to point all the blame at my partner, in the hope that 12 jurors, in deciding my fate, will accept my plan." A303801.

**B.     The Defense Case** commenced on June 22, 2004, and "spanned four days, including testimony by Fulks' friends and relatives ..., as well as various mental health and other experts." Order at 51 (A100173).

Several lay witnesses familiar with Fulks' life history "described his horrible childhood." Order at 51 (A100173). The witnesses "painted a compelling and empathetic picture of young Chad Fulks growing up in poor, crowded, filthy, and deplorable living conditions, raised by violently abusive, sexually deviant,

19

emotionally neglectful, and alcoholic parents who did not appear to care at all about their children's well being."  Id.[8]

Fulks' uncle, Kevin Holbrook, testified that Fulks' mother drank a lot of whiskey while she was pregnant with Fulks and had been at the bars the night Fulks was born; that Fulks' parents would "bare-knuckle fist fight" which usually resulted in Fulks' mother having a black eye and busted lip; that Fulks' father abused him and his brothers by hitting them, beating them with a belt, and kicking them; that Fulks' parents would sell their food stamps to buy beer; and that the Fulks' house was always "nasty," with "rats, and mice, and roaches, and cats, and dogs, and everything."  Holbrook testified to hearing Fulks' parents call their children "sons-of-bitches, fuckers, motherfuckers, ... cocksuckers," noting that there isn't a name they haven't been called."  He also said that while Fulks' parents regularly partied in their basement, he could not recall them having a birthday party for the kids.  He testified that Fulks' father had all the children tattooed; that the parents showed no interest in the children's education; that Fulks' father liked to watch pornographic movies and thought it was funny to let the children watch too.

Fulks' aunt, Gayle Beatty, testified about Fulks' alcoholic grandfather beating his mother in their poverty-stricken home, and described the poverty, hunger, and filth that she personally observed in the Fulks home, holes in the floor in front of the toilet looking down to the basement below, and Fulks' desperation to leave his parents and live with his aunt.  She told the story of arriving early one morning while

---

[8]See also id. at 33 (A100155) ("trial record is replete with" evidence of sexual abuse and "inappropriate sexual activity" in childhood home); id. at 60, 61-62 (A100182, A100183-84) (witnesses "gave compelling descriptions of the depravity of the conditions" in childhood home, and Fulks' "self-medication with drugs and alcohol"); id. at 144 (A100266) (witnesses described "Fulks' deplorable living conditions as a child, surrounded by constant violence, alcohol and drug abuse, and many instances of sexual depravity"); id. at 147 (A100269) ("compelling[]" evidence of "Fulks' tragic upbringing, the child abuse [he] suffered, [his] parents' alcoholism, and other unfortunate circumstances").

20

Fulks' parents were still asleep, and going to the kitchen to feed the hungry Fulks children:

> I could only find one bowl. ... I poured some cereal into the bowl and milk. There was a chip broke out of the top of the bowl ... Chad was having to tilt the bowl back a little bit so the milk wouldn't pour out. Ronnie Dale was telling him to hurry because he wanted some cereal.

She told of Fulks' sweetness in purchasing earrings from the gas station for her instead of buying himself candy with the money she gave him.

Fulks' Uncle Mark [Fulks] estimated that ninety percent of the time he saw Fulks' parents, they were drinking, and that they were alcoholics. He testified to Fulks' mother passing out several times, sometimes partially clothed. He said Fulks' parents would bare-knuckle fight, throw things at each other, and that Fulks' mother had once pulled out a shotgun and pointed it at Fulks' father's face. He described the physical and verbal abuse of the Fulks children by their parents, the filthy, bug-infested house, and the lack of food in the house.

Brian Messinger[, who lived with the Fulks family for about six months when Fulks was about eleven years old,] testified that the Fulks children were totally unsupervised; that the parents thought it was funny when the children stole or got into trouble with law enforcement; that the Fulks boys slept anywhere they could find; and that one of the boys, probably Chad Fulks, said he wanted to kill himself.

Lorie Messinger[, a friend of the family,] testified that the Fulks boys fought with each other and anybody; that Fulks' father made her uncomfortable and made suggestive comments about the size of her breasts and attempted to touch them; and she described the sexually graphic pictures on the walls and ceilings in the basement of the Fulks' house.

Linda Adkins[, a neighbor,] testified that Fulks' mother asked her for money for food, but then would use it to buy beer, and when she started giving Fulks' mother food instead of money, she stopped asking for help; that many times when Fulks' parents fought, the children would come to her house, including one morning, about 3:00 o'clock, when the Fulks children came running to her house, telling her that their mother had a two by four and was threatening to hit their father's van with it. They said "if she hits the van, daddy will kill her." She testified

21

that once when Fulks was three or four-years-old, no one could find him, and they eventually found him asleep on a pile of leaves in a corner of her garage. Cindy Harper, Fulks' kindergarten teacher, testified to Fulks once having bad diarrhea that soiled his jeans and shoes, but she testified that no parent picked him up, and that he missed thirty-five days of school that year.

\* \* \*

Sue Hatcher, a probation officer, told the jury about the lack of responsiveness when she contacted Fulks' mother to discuss some of her concerns about Fulks, and that she recommended that Fulks be removed from his home, but her recommendation was not followed.

Order at 52-55 (A100174-77).

"Gayle Wolfe, Fulks' fifth grade special education teacher," also provided mitigating evidence about his background. Order at 52 (A100174). Wolfe testified that Fulks had difficulty learning, but always tried to learn, and was her best student that year in terms of demeanor, cooperation and helpfulness. When she went to Fulks' house for a parent-teacher conference, she saw that the family lived in a very poor neighborhood and that their home very run-down and littered with garbage and debris. The first thing Fulks' parents did when Wolfe arrived was to offer her a beer. A30378-86.

Martha Floyd testified that she taught Fulks sixth grade in a self-contained behavioral disorder learning disability class. She testified to Fulks' poor upbringing; that she saw bruises on him; that he lacked school supplies and money for book rentals, special treats or snacks; that he did not have a coat in the tough West Virginia winters; that a teacher purchased shoes for him; that he was a follower; that he was a slow learner who tried really hard in school, and would sit in a rocking chair by himself. She testified that his parents were inaccessible, never came to school or responded to notices of meetings, and did not respond to

22

phone calls or notes sent home.

Ronnie Fulks testified that he and his brother Chad grew up in the same exact environment and household, one in which their parents drank "every day, all day," until they got staggering drunk and passed out. He testified that his parents grew and used marijuana, that they would fight every day, that his mother broke a ketchup bottle over his fathers [sic] head, used coffee pots and ashtrays and whatever was handy to beat his father, that his father beat his mother, that they both beat the children, and that his parents would curse at them. He testified that people were frequently in his parents' basement partying and fighting every night, and that if the police were called, the partygoers would "hear it go over the police scanner. Everybody would break up and go home, and come and do it the next night." Ronnie testified that as a six-year-old child, he would use alcohol and drugs along with the partygoers in the basement, that his brothers Chad and Dewayne would also drink and use drugs as children, that he would get high huffing gasoline and paint, that he would get in a lot of trouble as a kid stealing and beating and cutting people with a knife. He testified that his parents let him and his brothers do anything they wanted, that their parents never helped with their homework and did not care about their schooling. Ronnie told a story of his father smashing the windows of a car and tearing "the whole inside of the car up," and then asking Ronnie, who was then a teenager, to take the blame for it. Ronnie took the blame and left the state. He also testified that he stopped speaking to his mother after she refused to let him be paroled to her house, causing him to serve an additional fourteen months in an Ohio jail. He testified that his best memory of his childhood was leaving home at fourteen.

Order at 146-47 (A100268-69).

In its District Court submissions during the § 2255 proceedings, the Government itself acknowledged that the defense at trial presented mitigating evidence about Fulks' life history which was "exhaustive," "compelling," "emotionally powerful and humanizing," Gov. Opp'n to § 2255 Mot. at 36, 62, 157-8

23

(A200282, A200308, A200403-04), and which showed that Fulks grew up in "horrendous conditions" in an atmosphere of "neglect and abuse, which resulted in a childhood permeated with filth, violence, alcohol and substance abuse, and sexual depravity," id. at 35-42, 61-67, 157-59 (A200281-88, A200307-13, A200403-05).

Trial counsel also "call[ed] six experts to present Fulks' mental health case in mitigation." Order at 28 (A100150). These experts "presented a substantial mental health case." Id.

For example, Dr. Gur examined scans of Fulks' brain, and compared them with brain scans from normal, healthy people. A303114, A303162.

> Dr. Gur testified that Fulks has "a highly abnormal brain," and that "the abnormality in the brain structure and function explain a lot of the behaviors, and the cognitive and emotional deficits that have been documented in his case," especially the frontal lobe portion which is the "executive that decides what to do with all that information that comes from the back of the brain. ... [t]he one that tells you to stop, think about alternatives, particularly in relation to emotional situations." Dr. Gur testified that because of his abnormal brain, Fulks makes poor decisions.

Order at 30 (A100152). Dr. Gur found that Fulks' brain abnormalities are consistent with fetal exposure to alcohol. A303208.

Dr. Gur also testified that Fulks' IQ testing "comes up on the borderline, slightly above the cut of retardation," and that "a lot of the measures that go into that fruit salad [that make up I.Q.] are below [even] that, well below that threshold" for mental retardation. Order at 32 (A100154) (quoting trial testimony).

Dr. Gur also gave "compelling testimony ... about the effect of one's family

24

background on behavior," Order at 31 (A100153):

> [B]ehavior is, to a large extent shaped by your upbringing. It is not all biology. You can take the same kid and use the environment in order to give him a better executive. ... They like structure, and they realize there is something wrong in their own executive, so they are looking for guidance. If you guide them well, they can turn out being fine. If they are guided otherwise, they can turn out to be very difficult.

Order at 31 (A100153).

"Dr. Bachman confirmed Dr. Gur's assessment that Fulks has an abnormal brain, and testified that Fulks consistently failed to perform the tasks on the inhibition testing and the tasks requiring frontal lobe involvement." Order at 30-31 (A100152-53). "Dr. Bachman believed based on his neurological exam, brain imaging tests, and patient history that Fulks most likely had a fetal alcohol spectrum disorder," Order at 27 (A100149), and that Fulks' FASD was "exacerbated by [his] life of alcohol and drug abuse starting from a young age, which, together with his multiple head injuries, significantly impacted his cognitive ability." Order at 30 (A100152).

"Dr. Becker testified that persons with FASD have difficulty communicating with others and picking up on social cues, they do not learn from experience, they are impulsive, and they act before thinking." Order at 31 (A100153). Dr. Becker also explained that "Fulks' substance abuse, depression, and suicide attempt ... are secondary disabilities often arising as a result of the brain dysfunction caused by FASD." Order at 32 (A100154).

Dr. Evans testified that Fulks suffers from "brain damage," "cognitive

25

impairment," "borderline intelligence," and "other mental illnesses." Order at 27-28, 32 (A100149-50, A100154). Dr. Evans testified that Fulks' brain damage includes "a damaged frontal lobe, which causes him to act impulsively, learn slowly, [and] fail to plan ahead, and puts him at higher risk for criminal behavior." Order at 31 (A100153).

Dr. Bookstein described "brain imaging studies [which] help[ed] confirm the FASD diagnosis." Order at 27 (A100149). Dr. Bookstein reviewed MRI scans of Fulks' brain and measured the corpus callosum, which is sensitive to fetal alcohol damage and easy to measure. A303535, A303540. Comparing Fulks' scan with those of others suffering from fetal alcohol exposure, Dr. Bookstein opined that the odds were better than 600 to 1 that Fulks has FASD. A303555-56.

"Dr. Andrews testified at length to the negative influences and absent parenting in Fulks' childhood development." Order at 31 (A100153).

> Dr. Andrews found the major theme in Fulks' life to be chaos, with his parents constantly drinking and fighting and his lacking any proper supervision and care givers. ... She testified that the school principal, a police officer, and a probation officer recommended Fulks be removed from his home because he was not receiving adequate adult supervision.
>
> Dr. Andrews testified that Fulks was beaten by his father, that his mother walked around the house, while neighbors were present, in see-through gowns, and, on one occasion, naked, and sometimes she completely passed out from drinking. She presented the jury with testimony that Fulks' mother did not provide for him emotionally, even after she stopped drinking when she became "saved" when Fulks was twelve or thirteen years old, as she was away from home for long hours. She also testified that this caused an escalation in the fighting between

26

Fulks' parents, and Fulks' father left the home. During this time, Fulks got into more trouble at school, both behaviorally and academically and that just before he turned fourteen, Fulks took a large quantity of acetaminophen in an apparent suicide attempt. He lost consciousness and was taken to the hospital, and a subsequent psychiatric evaluation resulted in the hospital's offer to admit him to the adolescent treatment unit, which Fulks and his mother refused. Subsequent to his parents' divorce, Fulks moved to Indiana to live with his father and his step-mother, at a time when Fulks was drinking alcohol, smoking marijuana, and huffing gas on "a very regular basis." Fulks' school psychologist noted that he had been molested by an older man and that he had a sociopathic pattern. After the school psychologist's referral for Fulks to see a psychiatrist, he was diagnosed with major depression and prescribed an antidepressant. There is no record of any follow-up care, and Fulks' troubles continued. Fulks was charged with arson for setting fire to a wooden plaque hanging on a school wall, referred for alcohol and drug counseling, and sent to a group home around the age of fifteen. Fulks began living with a woman in her late twenties, and never returned home to live. He lived in group homes, was incarcerated, or stayed with different family members.

Dr. Andrews explained the impact on Fulks of having two alcoholic parents, explaining that they do not learn about the things a responsible parent teaches children:

> They don't want responsibility, they don't want respect for [sic] others, they don't learn to solve problems well. They don't learn to effectively communicate their needs or feelings. They don't learn impulse control. They don't learn to have hopes and aspirations for the future. They live day-by-day, sometimes hour-by-hour. And they don't learn to cope with difficult situations with stress or trauma that may happen in their lives.

Dr. Andrews testified as to the "profound," "constant," and "extreme" exposure Fulks had to the violence between his parents. Dr. Andrews testified that Fulks never learned to control his anger and developed low self-esteem and depression as a result of the exposure to domestic violence. Dr. Andrews surmised that Fulks was inflicted with multiple stressors and deprived of emotional attention, that he did not

have the resiliency or intellect to handle them, so he turned to alcohol, drugs, and other negative behavior to cope with the anxiety.

Order at 55-57 (A100177-79); see also id. at 31-32 (A100153-54) (describing testimony about parental abuse and neglect, substance abuse, depression, suicide attempt, low IQ); id. at 30 (A100152) (experts gave "insight into the psychological impairments and mental illness that elucidate Petitioner's behaviors"); id. at 32 (A100154) ("experts at trial fully explained" Fulks' "borderline range of intelligence"); id. at 38 (A100160) (defense presented evidence "that the criminal acts related to Fulks' brain damage, as evidenced by hard evidence such as diagnostic tests including CAT scans, PET scans, and EEGs").

In its District Court submissions during the § 2255 proceedings, the Government itself acknowledged that the defense at trial "presented a compelling mental health case in mitigation," through "extensive expert testimony regarding the effects of Fulks' brain damage, cognitive impairment, abused and neglected childhood, substance abuse, and depression"; the defense experts "integrated information regarding Fulks' damaged brain, his childhood of abuse and neglect, and his extensive substance abuse to present a compelling case in mitigation," "described the damage to Fulks' brain and carefully explained its impact on his thinking and behavior," and "provided jurors with in-depth information which could help them understand the pervasive effect of Fulks' brain injuries on his behavior." Gov. Opp'n to § 2255 Mot. at 27, 33-35 (A200273, A200278-81). The Government noted that the

28

defense expert testimony "very articulately explained the effect a person's family background has on his behavior." Id. at 35-42 (A200281-88). The Government summarized that this is a case with "truly mitigating evidence, including evidence of cognitive impairment, drug addiction, depression, low IQ, and neglectful and abusive parents" – "a powerful case in mitigation." Id. at 53 (A200299); see also id. at 157 (A200403) ("complete and exhaustive mitigation defense" from "mental health and other experts").

Counsel also presented testimony from "Don Romine, a former warden at several federal correctional institutions, who testified as an expert in prison management and prison security." Order at 52 (A100174). Romine, who "helped draft security policies for federal prisons," testified "that no one escapes from federal maximum security institutions," and "described the elaborate security apparatus and procedures in place at the institution at which Fulks would be housed if given a life sentence." Id. at 108 (A100230).

**C.** **The Jury's Findings**: The jury, with Richard Goehring as Foreperson, A303979, unanimously recommended a death sentence.

The jury found as a "threshold intent factor," 18 U.S.C. § 3591(a)(2)(D), that "Fulks intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to Alice Donovan, such that participation in the acts constituted a reckless disregard for human life, and Alice Donovan died as a direct result of the act." A303980, A303989-90.

The jury found one statutory aggravating factor, 18 U.S.C. § 3592(c)(1), that Alice Donovan's death "occurred during ... Fulks commission or attempted commission of, or during his immediate flight from, his commission of a kidnaping." A303980-81, A303990.

The jury found non-statutory aggravating factors that Fulks "escaped from a detention facility in Hopkins County..., where he was awaiting trial on several serious charges," after which he "participated in a carjacking and kidnaping that resulted in the death of Samantha Burns," "participated in a first degree burglary and other criminal conduct that resulted in the assault with intent to kill Carl Jordan," "participated in the kidnaping and carjacking of James Hawkins," "participated in a high-speed vehicle chase that resulted in endangering the lives and safety of Ohio State police officers," and "participated in additional uncharged murder, attempted murders, or other serious acts of violence"; he "would be a danger in the future to the lives and safety of other persons, including, but not limited to, inmates and correctional officers in an institutional correctional setting"; and "the effect of ... [the] offenses on Alice Donovan and her family." A303981-82, A303990-92.

The jury made mitigation findings on the verdict form, A201814-16, which the District Court read into the record, A303983-88, A303992-97.

All twelve jurors found the following mitigating circumstances:

> "Fulks' mother abused alcohol while she was pregnant with him."

> "Fulks suffered from learning disabilities as a child."

30

"Fulks was neglected by both of his parents."

"Fulks lived in a house that was often filthy and infested with roaches and ants."

"Fulks' parents did not provide him with adequate clothing or school supplies."

"Fulks' parents sold food stamps to get money for beer."

"Fulks was often left without supervision."

"Fulks was permitted to roam the streets as a young child."

"A principal, a police officer, and a probation officer all recommended ... Fulks be removed from the home at the age of nine, but he was not removed."

"Fulks' parents gave him little attention or affection."

"Fulks was subjected to emotional abuse as a child."

"Fulks was subjected to physical abuse as a child."

"Fulks grew up seeing his parents frequently fighting each other."

"Fulks grew up seeing heavy drinking and frequent fighting by other adults in his own house."

"Fulks grew up seeing graphic photographs of naked women papering the walls and ceiling of his basement."

"Fulks' father showed him pornographic movies as a young child."

"Fulks started drinking at the age of 9 and using marijuana at 11 or 12, and his parents made no effort to stop him."

31

"Fulks' brother taught him to inhale gasoline and paint as a young teenager."

"Fulks' mother ignored his stealing."

"Fulks' brother taught him to steal, fight, and break into cars."

"Fulks attempted suicide at age 13."

"Fulks pleaded guilty to kidnaping and carjacking, resulting in death."

Eleven jurors found the mitigating circumstance "that Fulks frequently went hungry or was uncertain whether he would get food as a child."

Ten jurors found the following mitigating circumstances:

"Fulks' parents cared so little for his education that they never helped him with homework and even left him at school with soiled pants."

"Fulks was diagnosed with depression, substance abuse, and possible sociopathic tendencies at age 14."

Nine jurors found the mitigating circumstance that "Fulks' brain was permanently damaged by his mother's drinking during her pregnancy."

Eight jurors found the mitigating circumstance that "no one has escaped from a high-security federal prison since 1993."

Six jurors found the mitigating circumstance that "Fulks' parents drank to excess almost every day."

Four jurors found the following mitigating circumstances:

"Fulks has an IQ between 77 and 79."

"Fulks learned at home that violence and fighting were a normal part of

relationships between men and women."

One juror found the following mitigating circumstances:

> "Fulks ability to control his impulses is impaired because he has Fetal Alcohol Spectrum Disorder."

> "other factors in ... Fulks' childhood, background, or character weigh against imposition of a sentence of death."

The jurors also failed to find several mitigating circumstances sought by the defense. No juror found the following mitigating circumstances:

> "Fulks' ability to process information is impaired because he has Fetal Alcohol Spectrum Disorder";

> "Fulks' ability to make good decisions is impaired because he has Fetal Alcohol Spectrum Disorder";

> "Fulks' ability to understand cause-and-effect and predict the consequences of his actions is impaired because he has Fetal Alcohol Spectrum Disorder";

> "Fulks' ability to learn from his mistakes is impaired as a result of his neurological damage";

> "Fulks tried hard in school but could never do well";

> "Fulks' mother was often half-dressed around the house";

> "Fulks was sexually abused as a child";

> "Fulks' father encouraged him to steal";

> "Fulks' capacity to conform his conduct to the requirements of law was impaired";

> "Fulks took part in the offenses under mental and/or emotional disturbance";

33

"Fulks was under the influence of alcohol and drugs at the time of his offenses."

A201814-16, A303983-88, A303992-97.

## VI.    POST-TRIAL HEARING

After the jury returned a death sentence, Juror Allison told a reporter that "she understands [the victims' families'] pain because *her husband was murdered* in 1971." A201820-22. Allison told the reporter, "At least, I had closure. These families did not get closure because they have no bodies." A304012.

Defense counsel learned of the murder of Juror Allison's husband when they read about it in the newspaper.

> On July 9, 2004, Fulks moved for a new trial, asserting that Allison's failure to disclose her husband's murder and the related circumstances demonstrated that she had been biased against him. The district court conducted a hearing on the issue on July 16, 2004, in order to ascertain whether Allison had been actually biased against Fulks or whether the circumstances surrounding her husband's murder and her failure to disclose it warranted a finding of implied bias.

Fulks, 454 F.3d at 431 (A100112).

At the hearing, Allison testified that her "first husband had been murdered in 1971, six weeks after the couple had been married and while she was pregnant with their child." Fulks, 454 F.3d at 420 (A100101). Allison testified that the killer "shot my husband between the eyes," was convicted of "manslaughter" and sentenced to fourteen years, but only "served seven," a sentence Allison believed was too lenient. A304010, A304014. She did not remarry for nineteen years. A304011.

34

Allison testified that she was "well aware" at the time of jury selection that her husband's murder was "important information [that] ought to be disclosed." A304014. She testified that her failure to disclose this information on the questionnaire was not intentional; she thought she *had* provided information about the murder on the questionnaire; she was "surprised" when she was selected because she "really thought [she] had put it on there" and "was sure that [information] was going to keep [her] off" the jury. A304018-19. She told at least two other jurors about her husband's murder before the jury began its deliberations. A304015.

After Allison testified, defense counsel Blume informed the District Court that, at the time of jury selection, he and the other defense lawyers had "missed" the fact that Allison had not answered the questionnaire on this topic. A304020. Blume acknowledged that counsel's failure was "clearly a potential issue of ineffective assistance of counsel." Id. The District Court stated that ineffectiveness issues should be raised in § 2255 proceedings, and the Government agreed. A304020-21.

On December 23, 2004, the District Court denied the motion for a new trial.

Applying the test established by the Supreme Court in McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. 548 (1984), the [District C]ourt first found that, had Allison fully answered Question 42, it would not have excluded her for cause. ... Based on its explicit finding that Allison honestly believed she had disclosed her husband's murder, the court further concluded that Fulks had failed to show that Allison was actually biased. Finally, the court ruled that the circumstances surrounding her husband's murder and her failure to disclose it were not extreme enough to warrant a finding of implied bias.

35

Fulks, 454 F.3d at 431 (A100112).

## VII.  DIRECT APPEAL

Trial counsel continued to represent Fulks on appeal.  Two issues raised on appeal are described below because they are significant to the current proceedings.

**A.** Counsel asserted on appeal that the District Court "abused its discretion in qualifying jurors Goehring, Harvey, and Allison, each of whom Fulks asserts were unconstitutionally prone to impose the death penalty."  Fulks, 454 F.3d at 421 (A100102).  This Court observed that appellate review was under a highly deferential "abuse of discretion" standard.  Id. at 427 (A100108) ("[B]ecause [the] inquiry turns in a large part on assessments of demeanor and credibility we cannot duplicate, we review for abuse of discretion the determination of whether a juror is excludable for cause."); id. at 429 (A100110) ("appellate courts provide the district courts substantial latitude on the qualification of trial jurors").  Applying this deferential standard, this Court found that the issues were "close," but deferred to the District Court's ruling.  Id. at 428-30 (A100109-11).

**B.** Counsel also asserted on appeal that the District Court "abused its discretion in denying Fulks a new trial on the basis of juror Allison's failure to disclose her husband's murder."  Fulks, 454 F.3d at 421 (A100102).  This Court again applied a highly deferential "abuse of discretion" standard, and affirmed.  Id. at 431-33 (A100112-14).

36

## VIII. SECTION 2255 PROCEEDINGS AND HEARING

Fulks timely filed a motion and amended motion for post-conviction relief under § 2255. The District Court held an evidentiary hearing.

### A. Regarding the 302 Statements and Guilty Plea

At the § 2255 hearing, Andrea Lyon testified that trial counsel's advice to give the 302 statements without any protection for Fulks "fell below the standards of reasonable care" for defense counsel in a capital case. A200956. The practice followed by reasonable capital counsel is "that before you would allow your client to speak to the prosecution or the police, ... you would get some kind of protection for him or her, especially if the defendant is facing the death penalty." A200951. "[A]t the very minimum, you want the conversation itself to be protected. And as a general rule this is the first step, at least in federal court, towards having a negotiated settlement to plead." A200953. Lyon was not aware of any other capital case where counsel had advised the client to speak to the prosecution without first securing a proffer agreement or equivalent protection. A200952, A200976.[9]

Blume testified that there were two rationales for advising Fulks to give the 302 statements without any protection: to get Fulks' version of the offense to the jury

---

[9]Lyon described a "proffer agreement" in a federal prosecution as being "where a defendant makes a statement to the government ..., generally as a part of a plea negotiation. ... The [proffer] agreement usually contains language that makes it so that the government cannot use the statement that the defendant gives against him at trial." A200948-49. Most states do not have an equivalent procedure. A200949.

37

without subjecting him to cross-examination; and to "demonstrate his acceptance of responsibility and remorse for acknowledging his role in the crimes, especially without asking for anything in exchange." Order at 79 (A100201); see generally Order at 78-82 (A100200-04) (describing Blume's testimony).

Lyon testified that neither rationale made counsel's actions reasonable under professional norms.

Lyon explained that getting Fulks' version out was "not enough of a benefit to take the huge risk that's involved, because you are then creating evidence against your own client, and where you are getting nothing in return." A200953. "There are other ways to [get the client's story to the jury], if that's your concern." A200953. For example, "if you are putting on a mental health expert," as counsel did here, "you have your client talk with the mental health expert" so that the client's "version of the events would be part of [the expert's] testimony." A200953.

Regarding counsel's desire to show acceptance of responsibility and remorse, Lyon testified that this rationale does not hold up in light of what is known about how capital sentencing juries decide cases:

> Q.    ... [D]oes a jury give a defendant credit for speaking to the government without asking for a proffer agreement, or some equivalent protection in exchange?
>
> A.    *No*.
>
> Q.    And why is that?

> A.    I think this is one of the places where lawyers, ... judges and prosecutors, do things a little differently than jurors do.  We consider – and [in] fact it's in the sentencing guidelines, that acceptance of responsibility or, you know, coming forward or talking to the prosecution is in itself a mitigating factor, whereas *jurors do not*.
>
> If you look at what we have learned from the capital jury project, which has interviewed ... something like 14 or 1500 jurors who actually sat on capital cases in many jurisdictions, including, I believe, South Carolina, you will see that *whether the defendant spoke with the police or not is not something that they consider to be mitigating at all*.

A200954.

Lyon explained that another reason why it was unreasonable for counsel to advise Fulks to give the 302 statements without any protection was that the defense thereafter had no leverage at all for plea negotiations – after Fulks gave the statements the Government lacked any motivation to offer anything to Fulks.  A200955.  Trial counsel acknowledged that their decision to have Fulks give the unprotected statements was, at the same time, a decision to have Fulks plead guilty.  A200729 (Blume:  counsel's decision to enter guilty plea was made at same time as decision to give statements; guilty plea "followed from the [302] statement," which "was essentially an admission of guilt"); A200731-32 (same); A201324 (Johnson: "That decision [to plead guilty] was made really at the same time that we made the decision about the 302.  We concluded that we wanted him to make the 302, understanding that was in our view tantamount to a guilty plea, so we made that decision at the same time.").

Counsel testified that Fulks was reluctant to plead guilty, and had to be

39

convinced by counsel to do so. A200732-33. Fulks' IQ is "just above the range for mental retardation," so counsel's discussions with Fulks about pleading guilty were rudimentary and consisted, essentially, of counsel telling Fulks it was the "best chance to try and save your life." A200733. After much urging from counsel, Fulks "eventually agreed with [counsel] that it was in his best interest to do it." A200732.

Lyon testified that counsel's decision to plead Fulks guilty, like their decision to have him give the unprotected statements from which the guilty plea flowed, was unreasonable under professional norms for capital defense. It often is professionally appropriate to plead guilty in "return for a negotiated settlement" of a sentence less than death. A200956-57. "In fact, the ABA Guidelines ... require[] that we seek a disposition that way, if we can." A200957. However, professionally reasonable capital defense lawyers – now and at the time of this trial – never advise a death-eligible defendant to plead guilty without death being taken off the table, no matter how strong the evidence of guilt. A200957, A200961, A200981-82.

Much is lost by entering a guilty plea, since it waives all the constitutional rights attached to a trial by jury. A200957-58, A200960. When, as here, the plea does not take death off the table, nothing is gained. As happened here, "you end up trying the guilt phase anyway in the penalty [phase] because [the government] would put all the guilt evidence on anyway." A200959.

In the early years of modern (post-1976) death penalty litigation, some lawyers believed juries would give a defendant mitigating "credit" for pleading guilty, but

40

experience soon showed that to be incorrect.  Reasonable capital defense lawyers "learned over the years," and knew at the time of this trial, that juries do *not* give a defendant "credit" for pleading guilty, A200961-62:

> I have attended a lot of conferences, I have spoken at them, I have talked to capital lawyers all over the country, and – in the beginning of the modern death penalty, there was some thought that [a guilty plea] might be a good way to smooth the way for a non-death sentence.  But I don't know of a single case where – where that has happened with a jury, where they haven't returned a death verdict ....
>
> Q.    As a result of ... what the practical application of that thinking has shown, has that school of thought been abandoned as to whether the jury might give some credit to a defendant for pleading guilty?
>
> A.    It has been.
>
> Q.    How long ago would you say that that's happened?
>
> A.    ... [I]n the modern death penalty, which I'm saying sort of post 1976, ... maybe five or six years into practice, something like that.
>
> &ast;   &ast;   &ast;
>
> [F]ive or six years into the modern death penalty, ... we all learned the hard way that pleading guilty without anything in exchange is a poor idea.

A200962, A200977-78.[10]

## B.    Regarding Jury Selection

**1.    In general**:  Andrea Lyon, the capital defense expert at the § 2255 hearing, testified that "Jury selection is ... probably the most important moment in trial, especially in a capital case."  A200946.  Lyon described Blume's questioning

---

[10]Consistent with Lyon's testimony, Appellant submitted declarations from Henderson Hill, Esq., and Federal Defender Mary Lou Newberger with his Rule 59 motion in the District Court.  See A202643-57, A202636-42.  When ruling on the Rule 59 motion, the District Court declined to consider these declarations.

of potential jurors as "some of the worst voir dire I have ever read in my life. ... [T]here's just pages and pages of [Blume] ... making speeches at the jurors, and then asking for the juror to say yes or no to a question that gets lost in the middle." A200969. See, e.g., A301921-23 (thirty line statement by Blume, with "Okay" response from potential juror; nineteen line statement by Blume, with "No" response); A302346-50 (forty-seven line statement by Blume, with "juror nods head in the affirmative" response; thirty-seven line statement by Blume, attempt by judge to clarify, one sentence response). Lyon testified that Blume had "conflate[d] the idea of educating a jury as to the issues in [the] case with speechifying at them," A200979, and that Blume's voir dire questioning did not meet the standard for effective assistance of counsel, A200969.

The District Court, during proceedings in co-defendant Basham's case, voiced a similar criticism of Blume's jury selection. See United States v. Basham, Cr. No. 4:02-992, Tr. Aug. 4, 2004 ("Tr.-Basham-8/4/04") (A400011-14). Discussing the upcoming jury selection in Basham, the District Court warned Basham's counsel to *avoid the approach Blume took*, because *it was harmful to Fulks' defense*. The District Court explained to Basham's counsel that Blume's lengthy statements during voir dire left the jurors "confused" and the "result was, I think Mr. Blume really paid a price with the jurors because it looked like he was trying to trick them, to be honest with you." Id. at 12-13 (A400012-13); see also id. at 14 (A400014) (District Court: "I think Mr. Blume really paid a price with the jury.").

**2.      Seating of pro-death jurors Goehring, Harvey and Allison**: Blume testified at the § 2255 hearing that there were "three" jurors – Goehring, Harvey and Allison – "who I believed were *sure votes for death*, who *I elected to put on the jury*." A200789-90.  These three jurors were "people who I would refer to, if we weren't here in court, as the stone cold killer" for capital sentencing purposes.  A200902; <u>see also</u> A200903 (defense believed Goehring was an "automatic death penalty" juror); A200903-04 (Goehring's answer to questionnaire on attitude toward death penalty "is a red flag for somebody who means they are going to give them the death penalty"; "that is the kind of answer that someone who is very pro death gives").  While seating these three "sure votes for death," counsel used 18 of their 23 peremptory strikes against people who would have been better defense jurors. Statement of Facts ("SOF") § IV.B.

Blume testified that counsel put these "sure votes for death" on the jury, rather than using peremptory strikes against them, because counsel believed the District Court should have granted the defense motions to strike these jurors for cause, and counsel believed "the only way to preserve the issue for appeal was to seat the juror." A200789-90; <u>accord</u> A200898-99.

Capital defense expert Lyon testified that the defense decision to seat three "sure votes for death" was unreasonable under prevailing professional norms for capital defense:

Q.    Are there any circumstances, based on your experience, in which it

would be appropriate to intentionally seat an ADP [i.e., automatic death penalty] juror?

A.    None.  I mean, I suppose if you can't get the cause challenge and you ran out of peremptory challenges and the judge won't give you any more, then you might get stuck with one, but that's the only circumstance.

Q.    If an attorney has remaining peremptory challenges, what would be a standard course of action in that case?

A.    *You have to excuse them*.  I mean, first you ask the judge to excuse them. If the judge won't do that, then you have to use the peremptory challenge.

\* \* \*

Q.    ... If an ADP juror had been challenged for cause and that challenge had been overruled, ... would preserving that ruling for appeal be sufficient reason to put an ADP juror on the jury intentionally?

A.    When you excuse that juror using a peremptory challenge, assuming you use all of your peremptory challenges in the course of the jury selection, that would preserve the issue.  You do not have to seat a juror who you have good-faith basis to believe is – should not have been qualified.

A200970-71.

Lyon described some of the reasons why seating these "sure votes for death" was harmful to the defense:

People who espouse those views [given by Goehring, Harvey and Allison] ... tend to be particularly hostile to mental health testimony, tend to belittle ... people who consider abject poverty or child abuse as a reason to choose a punishment other than death and often ... have very strong personalities and can push around jurors who might have some hesitancy to sentence someone to death.

In the federal sentence where, you know, one or two jurors who choose not to impose the death penalty would then result in a life sentence, that can be quite devastating.

44

A200987-88.[11]

**3.    Failure to read juror Allison's questionnaire**:  As stated above,

counsel admitted at the post-trial hearing that the defense "missed" the fact that juror

Allison failed to respond to the questionnaire about her husband's murder.  At the §

---

[11]Consistent with Lyon's testimony, Appellant submitted a declaration from attorney Henderson Hill with his Rule 59 motion in the District Court.  Hill stated:

> Failure to ... remove jurors who have a strong bias in favor of the death penalty ... will almost certainly result in a death sentence.  Not only are such strongly biased individuals virtually certain to vote for death, ... they are also jurors who exert great pressure during jury deliberations on less certain jurors.

>                    *    *    *

> [T]he rationale put forth by trial counsel – that they were seeking to preserve this issue for appeal – is inexplicable and objectively unreasonable[,] ... suggest[ing] an unreasonable focus on the intricacies of perfecting an appellate challenge which blinded them to their obligation to carry out the most critical task during capital voir dire: remove those venirepersons with a clear bias in favor of a death sentence.  Trading the most important issue at trial – who will sit in judgment of the defendant – for a potential appellate argument cuts against fundamental trial strategy, particularly where the necessary predicate for the appellate argument would be a death sentence for the client.  Moreover, trial counsel's stated reason for not exercising peremptory challenges against these jurors does not even make tactical sense from the standpoint of the relief that might later be possible on appeal; at best, a winning claim that the trial court erred by denying a for-cause challenge only would have resulted in a new sentencing proceeding .... Thus, trial counsel were willing to risk receiving a death verdict merely to get another chance to do what counsel should have done in the first place: strike any biased jurors during voir dire.

Decl. of Henderson Hill (A202646-48).  When ruling on the Rule 59 motion, the District Court declined to consider Hill's declaration.

45

2255 hearing, Blume reiterated that the defense "did miss the thing on Allison. ... I don't know how ... we missed it, but somehow we did." A200908; see also A200980, A200982 ("obviously I didn't see that at the time of the voir dire or I would have asked her about it"; "we missed it").

Blume further testified:

Q.    Would you have put her on the jury knowing that information?

A.    The default answer would be no. I think it probably would have depended on what she said during voir dire, what the government's response was, and whether the judge qualified her.

In other words, I could imagine a scenario under which I might have put her on the jury for the same reasons that I put ... Mr. Goehring on the jury and Ms. Harvey, if I felt like the Judge should have excluded her, that her answers revealed bias, then it is possible I may have put her on, but not because I would have thought she could be a fair and impartial juror.

As I recall, she was fairly high on our rating scales on her death views anyway. So, obviously it would have been a matter of concern. It would have been something that I would have voir dired her about. I'm sure I would have attempted to exclude her for cause based on that.

Whether I would have seated her ..., I honestly can't say, but [if we did] it would only have been for the purpose of trying to preserve the error.

A200982-83. Co-counsel Johnson testified:

Q.    Had you known that Ms. Allison had been the victim of a crime, would you have seated her on the jury?

A.    Oh, certainly not. Certainly not.

A201337.

46

## SUMMARY OF ARGUMENT

Several significant constitutional errors undermine this capital conviction and death sentence and require relief under § 2255.

First, counsel were ineffective during jury selection where they questioned jurors in a manner that likely antagonized the jurors; failed to question a juror about important information, revealed post-trial, concerning the murder of the juror's husband; and seated three jurors who counsel knew to be "sure votes for death."

Second, counsel were ineffective on direct appeal where they failed to raise a meritorious Eighth Amendment challenge to the jury instructions, a challenge counsel had preserved at trial because counsel recognized that the instructions prevented the jurors from giving effect to relevant mitigating evidence.

Third, counsel were ineffective when they advised Fulks to give unprotected statements to the Government and to plead guilty, without obtaining any benefit in return.

Fourth, Fulks' due process and Eighth Amendment rights were violated when the Government presented factually inconsistent and irreconcilable theories at Fulks' sentencing and at the separate trial of codefendant Basham.

## STANDARD OF REVIEW

This Court reviews *de novo* the District Court's legal conclusions and conclusions on whether counsel provided ineffective assistance. United States v. Tucker, 603 F.3d 260, 262 (4th Cir. 2010).

47

To establish ineffective assistance of counsel, Appellant must show: (1) deficient performance, i.e., "counsel's performance fell below an objective standard of reasonableness under prevailing professional norms"; and (2) prejudice, i.e., "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Tucker, 603 F.3d at 263 (quoting Strickland v. Washington, 466 U.S. 668 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.

**ARGUMENT**

When defense counsel are "constitutionally deficient in [a] discrete, though crucial" part of the proceedings, the Sixth Amendment right to effective counsel is violated even if counsel are "highly respected and most capable" and their assistance in other parts of the proceedings was "laudably effective and competent." Tice v. Johnson, 647 F.3d 87, 99, 106, 111 (4th Cir. 2011). Appellant's "highly respected" counsel made very serious mistakes in crucial parts of these proceedings.

**I.    TRIAL COUNSEL WERE INEFFECTIVE IN SELECTING THE CAPITAL SENTENCING JURY**

The Sixth Amendment guarantees the right to effective assistance of counsel at all critical stages of a criminal prosecution, including jury selection. Strickland v. Washington, 466 U.S. 668 (1984); Marzullo v. Maryland, 561 F.2d 540, 545-47 (4th Cir. 1977) (finding counsel ineffective at jury selection).

"Jury selection is important ... in any criminal case." ABA, Guidelines for the

48

Appointment and Performance of Defense Counsel in Death Penalty Cases, 31 HOFSTRA L. REV. 913, 1051 (2003) ("ABA GUIDELINES"). It "plays a critical function," both in removal for cause of "prospective jurors who will not be ... impartial[]," and in informing "the defendant's right to exercise peremptory challenges." Rosales-Lopez v. United States, 451 U.S. 182, 188 (1981); accord Mu'Min v. Virginia, 500 U.S. 415, 431 (1991) (voir dire "serves the dual purposes of enabling the court to select an impartial jury and assisting counsel in exercising peremptory challenges"); United States v. Brown, 799 F.2d 134, 135 (4th Cir. 1986) (adequate jury selection requires "intelligent exercise of challenges by counsel").

"In capital cases, [jury selection] is all the more critical." ABA GUIDELINES at 1051. The jury's role in capital sentencing differs dramatically from its role in non-capital cases because, "[u]nlike most decisions a jury is called upon to make, capital sentencing is [a] *highly discretionary*" decision, Theodore Eisenberg, et al., Forecasting Life and Death: Juror Race, Religion, and Attitude Toward the Death Penalty, 30 J. LEGAL STUD. 277, 282 (2001), in which the jury makes a "*highly subjective* ... judgment regarding the punishment that [the defendant] deserves," Caldwell v. Mississippi, 472 U.S. 320, 340 n.7 (1985). Accordingly, jury selection "arguably constitutes the most important component of a capital murder trial." Meghan Morgan, Standby Me: Self-Representation and Standby Counsel in a Capital Case, 16 CAP. DEF. J. 367, 381 (2004).

Fulks was denied his Sixth Amendment right to effective representation in

49

selection of the capital sentencing jury.

### A.    Counsel's Representation Was Deficient.

First, counsel Blume alienated and antagonized jurors during voir dire, with his lengthy and confusing "questions." See SOF § VIII.B.1.  As the District Court stated a month after Fulks' trial, "Blume really paid a price with the jurors because it looked like he was trying to trick them." Tr.-Basham-8/4/04 at 12-14 (A400012-14).  See Zalman & Tsoudis, Plucking Weeds from the Garden: Lawyers Speak about Voir Dire, 51 WAYNE L. REV. 163, 417 (2005) ("antagonizing a juror ... may inject a direct and personal bias into that juror's perception of the case and it may carry over into jury deliberations").

Second, counsel did not ask Juror Allison about the critical question she left unanswered on her questionnaire, and thus failed to discover during jury selection that Allison's husband had been murdered six weeks after their marriage, while she was pregnant with their child.  See SOF § VIII.B.3; Knese v. State, 85 S.W.3d 628, 632-33 (Mo. 2002) (counsel ineffective for failing to read juror questionnaires, where exploration of information on questionnaires would have revealed pro-death penalty views of jurors); State v. Dye, 784 N.E.2d 469, 476 (Ind. 2003) (counsel ineffective for failing to question juror about pertinent information on questionnaire).

Finally, counsel failed to use peremptory strikes against three jurors (Goehring, Harvey and Allison) who *counsel knew were "sure votes for death*." A200789-90; see SOF § VIII.B.2.  No reasonable counsel would have left these "sure votes for

50

death" on the jury.  Id.

At the § 2255 hearing, counsel gave a "strategic" reason for seating three "sure votes for death" on the capital sentencing jury – counsel said he believed the District Court should have stricken them for cause and wished to preserve the issue for appeal.  SOF § VIII.B.2.  The District Court found this was counsel's strategy.  Order at 120-21 (A100242-43).

Under the Sixth Amendment, however, the "proper measure of attorney performance ... [is] *reasonableness* under prevailing professional norms," i.e., the court "must judge the *reasonableness* of counsel's challenged conduct."  Strickland, 466 U.S. at 688, 690.  Thus, "incantation of strategy does not insulate attorney behavior from review. ... [Counsel's] strategic choices are still subject to the standard of *reasonableness*."  Fisher v. Gibson, 282 F.3d 1283, 1305 (10th Cir. 2002) (citing Strickland); accord United States v. Chapman, 593 F.3d 365, 369 (4th Cir. 2010) ("The reasonableness of the tactical decision actually made by counsel is of course subject to challenge").

Counsel's decision to seat three "sure votes for death" was unreasonable under prevailing professional norms for capital defense, which required use of peremptory strikes against them.  See SOF § VIII.B.2.  Several factors highlight the unreasonableness of counsel's decision.

Counsel's strategic choice was unreasonable because *nothing would be gained by success of the strategy*, and all lost by failure.  Had counsel's strategy been

51

*successful*, i.e., had counsel won the issue on appeal, the remedy would have been a sentencing jury without the "sure votes for death" that sat on this jury. But that is exactly what counsel would have achieved by using peremptory strikes against the "sure votes for death" in the first place.

In any event, there was no real chance that counsel's strategy would succeed, i.e., no realistic hope of success on appeal, because of the highly deferential appellate review for "abuse of discretion" that applies when, as here, a district court qualifies jurors after in-court questioning. See SOF § VII (describing this Court's deferential appellate review on direct appeal, where this Court found the issues "close" but deferred to the District Court). Defense counsel themselves believed there was no chance of success on appeal – counsel Blume and Johnson have said of this Court: "the Fourth Circuit ... [is] the 'black hole of capital litigation.'" Sheri Johnson, Wishing Petitioners to Death: Factual Misrepresentations in Fourth Circuit Capital Cases, 91 CORNELL L. REV. 1105, 1107 (2006) (quoting 1998 statement by Blume); see also id. at 1156 ("[A]fter I had presented this Article at ... [a] Symposium ..., I still doubted whether I should publish it, because I worried that it might hurt my clients in the future. When I shared this concern with ... John Blume, he laughed. How, he asked, could my chances of winning a case go below zero?"); John Blume, The Dance of Death or (Almost) "No One Here Gets out Alive": The Fourth Circuit's Capital Punishment Jurisprudence, 61 S.C. L. Rev. 465 (2010) (expressing Blume's view that Fourth Circuit is a highly unfavorable forum for capital defendants).

52

Counsel also knew that putting three "sure votes for death" on the jury essentially guaranteed a death sentence. Counsel Blume and Johnson have recognized that, "[i]n thinking about picking a jury that will be most receptive to the case for life, it is critical for the defense attorney to realize ... that *every* juror chosen matters." John Blume, Sheri Johnson & Scott Sundby, Competent Capital Representation: The Necessity of Knowing and Heeding What Jurors Tell Us about Mitigation, 36 HOFSTRA L. REV. 1035, 1054 (2008) (emphasis in original). This is true because of the dynamics of the jury deliberation process, where the presence of even a small number of pro-death jurors is likely to "push the final verdict heavily toward death." Forecasting, 30 J. LEGAL STUD. at 279, 304-05; see also SOF § VIII.B.2 (same); Beecher-Monas, The Epistemology of Prediction, 60 WASH. & LEE L. REV. 353, 399-401 (2003) (social science research shows that "group decisions tend to coalesce around an extreme position rather than around the middle of antecedent positions"; this is especially likely for a group, such as a deliberating jury, which is "isolated from outside influences" and operating under "stressful conditions"); Sundby, War and Peace in the Jury Room: How Capital Juries Reach Unanimity, 62 HASTINGS L.J. 103, 148 (2010) (counsel choosing capital jury must recognize "the critical importance that one vote might make in tipping the jury towards life or death"); id. at 121 ("[T]he certainty [of pro-death jurors] worked to shore up support for a death sentence among those jurors who were not initially strong in their opinion either for death or for life. ... These 'swing voters' ...

frequently stated that they became more sure in their support of a death sentence in part because the other jurors were so certain that a death sentence was correct.").

In sum, counsel's strategic decision to seat three "sure votes for death" on the capital sentencing jury, in order to preserve an appellate issue that counsel believed would not succeed, was unreasonable because it would provide no benefit even if successful, it had no chance of success, and it essentially guaranteed a death sentence.

### B.    Appellant was Prejudiced.

Fulks was prejudiced by counsel's errors in jury selection – those errors "undermine confidence" in the death sentence. Strickland, 466 U.S. at 694.

A jury very reasonably could have returned a life sentence in this case. The defense presented an extensive mitigation case that spanned four days and included over twenty witnesses. See SOF § V.B. The *Government itself* acknowledges that the life history and mental health-related mitigating evidence presented to the sentencing jury was "compelling," "powerful," "humanizing" and "truly mitigating." E.g., Gov. Opp'n to § 2255 Mot. at 27, 32, 36, 53, 62-67 (A200273, A200278, A200282, A200299, A200308-13). This is the type of mitigation case that *does* convince juries to vote for life. See, e.g., Parker v. Dugger, 498 U.S. 308, 310, 314-15 (1991) (jury recommended life sentences for triple homicide after hearing mitigating evidence that defendant had "a difficult childhood, including an abusive, alcoholic father" and was "under the influence" of alcohol and various drugs during the offenses).

54

Unfortunately for Appellant, the jury that sat in judgment of his life included three jurors (Goehring, Harvey and Allison) whom counsel "elected to put on the jury" despite counsel's knowledge that they were "sure votes for death." A200789-90. The presence of these three "sure votes for death" on the jury undermines confidence in the resulting death verdict, since it directly impacted "the adjudicators themselves." United States v. Curbelo, 343 F.3d 273, 282 (4th Cir. 2003) (holding that seating eleven person jury is structural error). Given the compelling mitigation case, there is a "reasonable probability" that a jury untainted by counsel's errors would have returned a life sentence.

The District Court believed these jurors were not "sure votes for death." However, when this Court on direct appeal reviewed the District Court's denial of defense challenges for cause with respect to these jurors, this Court found it was a "close" question as to whether these jurors were so problematic that they *should have been stricken for cause* because of their pro-death attitudes. Fulks, 454 F.3d at 428-30. This Court so found even without knowledge of these jurors' actual ratings, which highlight their pro-death attitudes. Counsel struck several potential jurors who were far less pro-death than these. Even if it is assumed that these jurors were not "sure votes for death," they were at least very close to being so.

The cumulative effect of counsel's seating *three* strongly death-inclined jurors – one of whom (Goehring) was the Foreperson – undermines confidence in the death sentence. Counsel's error disrupted the sentencing determination, especially in light

55

of the § 2255 testimony that such death-inclined jurors will push other, more open-minded, jurors toward a death sentence.  SOF § VIII.B.2; see also supra (citing research making similar observations about effect of seating pro-death jurors).  Regardless of whether the District Court abused its discretion in seating these jurors, their presence surely undermines confidence in the result – there is a reasonable probability that a jury without these three would have voted for life imprisonment.

## C.    The District Court Erred.

The District Court began its discussion of these jury selection issues by generally touting Blume's experience, writings and lectures.  Order at 113 (A100235).

Actually, Blume's jury selection experience was not as impressive as the District Court suggests.  This was Blume's first (and last) federal capital trial; he had played only a minor, limited role in jury selection in two state court cases; and his academic work on jury selection has focused on the theoretical/doctrinal reasons why defense lawyers should be allowed to use certain types of jury selection practices, rather than on the actual practice of selecting a jury.  See SOF § I.

In any event, the issue of counsel's ineffectiveness *vel non* is judged by an objective consideration of counsel's performance in the case at hand, and even the most experienced and respected lawyers can make errors constituting ineffectiveness under the Sixth Amendment.  Tice, 647 F.3d at 99, 106, 111 ("highly respected and most capable" lawyers, whose work "throughout both trials and the first appeal was

56

otherwise laudably effective and competent" were nevertheless ineffective in discrete area). Under the applicable objective standard, counsel were ineffective in this case.

Regarding Blume's antagonizing and alienating jurors during voir dire, the District Court wrote: "This court presided over Blume's voir dire ...[,] has reviewed the transcript of the jury selection process," and "is constrained to disagree with Petitioner's contention" that Blume's approach was ineffective. Order at 116. However, this is contrary to what the District Court stated just a month after Fulks' trial, when the District Court told Basham's counsel that "Blume *really paid a price with the jurors* because it looked like he was trying to trick them." A400012-14; see SOF § VIII.B.1. The District Court's nearly contemporaneous assessment is the better gauge of Blume's performance.

Regarding counsel's decision to seat three "sure votes for death," the District Court held counsel's representation was not deficient because counsel's decision "was based on a reasonable strategy of preserving an issue for possible reversal." Order at 120-21 (A100242-43). The District Court erred for the reasons stated above – counsel's strategy was *not* reasonable. Morever, as to Juror Allison, counsel's strategic decision was unreasonable because it was *uninformed* – when counsel decided to seat Allison counsel had not inquired about her failure to answer an important question on the juror questionnaire and, therefore, counsel did not know Allison's husband had been murdered.

Finally, the District Court erred when it held that Appellant cannot show

57

prejudice because the District Court at trial rejected defense motions to strike the jurors for cause, and this Court (using a highly deferential standard of review) affirmed on direct appeal. Order at 118-20 (A100230-31). For the reasons already stated, the District Court's approach to prejudice is erroneous, at least under the circumstances of this case, where there were *three* death-inclined jurors left on the jury, including the Foreperson; where this Court on direct appeal found the question of whether each of the three should have been struck for cause to be a "close" one, but denied relief under an abuse of discretion standard (which is more stringent than the Strickland "reasonable probability" standard applicable here); and where there was a substantial mitigation case from which jurors very reasonably could have voted for life. Under these circumstances, the Court cannot have the confidence in the death sentence that is required by the Sixth Amendment in a capital case, and prejudice is established.

## II.   APPELLATE COUNSEL WERE INEFFECTIVE FOR FAILING TO APPEAL THE TRIAL COURT'S UNCONSTITUTIONAL "TWO-STEP" MITIGATION JURY INSTRUCTION

At the Government's request and over defense objection, see Order at 68-69 (A100190-91), the District Court gave the following "two-step" jury instruction on how to find and consider mitigating factors:

> As to the mitigating factors asserted by the defendant, ... the law provides that there is, essentially, no limit on the number of factors or things that the jury may consider in mitigation. As to each of the factors submitted by the defendant, and which I am about to list, *you must, essentially, engage in a two-step process in determining whether any*

58

*one or more of them have been proven*.

Specifically, you must first determine if the evidence that you heard establishes the existence of the factor by a preponderance of the evidence.

Secondly, if you determine that the factor has been proven, *you must determine whether the fact is mitigating, as I have defined that term for you*. That is, it tends to suggest that life in prison without parole and not death is the appropriate punishment.

A303943.

A similar two-step instruction was given on the verdict form, A201814, which provided a list of the 43 mitigating factors proffered by the defense and instructed: "For each of the following Mitigating Factors, indicate in the space provided the number of jurors who have found it proved by a preponderance of the evidence *and* that it is mitigating."

The Government, knowing the Court would give the two-step instruction, asserted to the jury in closing argument:

> [I]f it involves a fact that you heard from the witness stand, just because the fact is true, doesn't mean you have to accept it as a mitigating factor. ... When a defense lawyer ... argues to you about all that they perceive to be mitigating factors, the fact that they may be testified to, the fact that they may be facts in evidence, doesn't mean you jurors have to accept it as mitigating, as lessening his culpability.

A303770. The Government told the jury the defense evidence was not mitigating, even if proved, because there was no proof of "cause-and-effect," i.e., no proof that the childhood trauma and brain dysfunction "make people commit violent crimes."

59

A303798-99. The Government told the jury that the defense evidence of childhood trauma, even if true, was not "relevant" to mitigation because Fulks was 25 years old and the offense was not "retaliatory" against those who abused him. A303899-900.

Fulks' "trial counsel objected to the [two-step] instruction on mitigating factors, *but did not appeal the adverse ruling*." Order at 69 (A100191). Counsel were ineffective for failing to raise this preserved issue on direct appeal.

## A.    The Two-Step Mitigation Instruction Was Unconstitutional.

Under the Eighth Amendment, the capital "sentencer ... may determine the weight to be given relevant mitigating evidence. But [the sentencer] may not give it no weight by excluding such evidence from [its] consideration" in the weighing process. Eddings v. Oklahoma, 455 U.S. 104, 114-15 (1982); accord Mills v. Maryland, 486 U.S. 367, 374-75 (1988) ("sentencer may not refuse to consider ... any relevant mitigating evidence"); Jones v. Polk, 401 F.3d 257, 263 (4th Cir. 2005).

This Eighth Amendment rule is clear: If the defendant proves a fact to be true, and that fact constitutes "relevant mitigating evidence," the sentencer *must* weigh it in deciding the sentence.

It is also clear that the evidence presented by the defense at sentencing was "relevant mitigating evidence" with the meaning of Eighth Amendment.

Under the Eighth Amendment, "relevant mitigating evidence" is defined "in the most expansive terms" as any "evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to

60

have mitigating value." Tennard v. Dretke, 542 U.S. 274, 284 (2004) (quoting McKoy v. North Carolina, 494 U.S. 433 (1990)).

The evidence presented by the defense fit squarely within the *core* of "relevant mitigating evidence" under the Eighth Amendment, as even the Government acknowledges.    See SOF § V.B (describing defense evidence and quoting Government's statements in District Court that mitigation case was "compelling," "powerful," "humanizing" and "truly mitigating").    The defense evidence was the type of evidence the Supreme Court repeatedly has recognized to be "relevant mitigating evidence" in a capital case.    See, e.g., Brewer v. Quarterman, 550 U.S. 286, 290 (2007) (relevant mitigating evidence includes that defendant "had been abused by his father; that he had witnessed his father abuse his mother; and that he had abused drugs"); Abdul-Kabir v. Quarterman, 550 U.S. 233, 239-40 (2007) ("unhappy childhood" and expert witness testimony about its effects on defendant's mental health are relevant mitigating evidence); Smith v. Texas, 543 U.S. 37, 44-45 (2004) ("IQ score of 79 ... constitutes relevant mitigation evidence," as does evidence of "troubled childhood"); Tennard, 542 U.S. at 287-88 ("impaired intellectual functioning is inherently mitigating"; IQ of 79 or 82 is "obviously" mitigating); see also Jones, 401 F.3d at 263 ("unhappy and violent upbringing" is mitigating).

Since the evidence proffered by the defense *was* "*relevant mitigating evidence*," as a matter of Eighth Amendment law, the Eighth Amendment *required* the jurors to weigh that evidence, *if credited*, in the sentencing decision.    The two-

61

step instruction, however, told the jurors *not* to weigh the evidence at all, *even if credited*, unless the jurors decided for themselves that the evidence was "mitigating." Accordingly, "there is a reasonable likelihood that the trial judge's instructions ... prevented jurors from giving meaningful consideration to constitutionally relevant mitigating evidence," and the instructions violated the Eighth Amendment. Abdul-Kabir at 237.

Two features of this trial make it especially likely that the jury understood the two-step instruction in this Eighth-Amendment-violating way.

First, much of the defense evidence, including evidence of childhood trauma, brain damage and effects of Fetal Alcohol Spectrum Disorder, "functioned as a 'two edged sword,' because it 'may diminish the blameworthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future.'" Abdul-Kabir at 255 (quoting Penry v. Lynaugh, 492 U.S. 302, 324 (1989)). "When the evidence proffered is double edged," as it was here, "in the absence of an appropriate instruction directing the jury to consider fully" the evidence as *mitigating*, a reviewing court "cannot be sure that [the jury] did so." Id. at 255 (quoting Penry).

The prosecutor's argument also made it more likely that the jury would understand and apply the two-step instruction in an unconstitutional manner. As stated above, the prosecutor told the jury it should not find evidence to be mitigating, even if it credited the evidence, unless the jury also found a direct "cause and effect" relationship between the evidence and the offense. The prosecutor thus urged the jury

62

to define "relevant mitigating evidence" in a narrow way that is contrary to Supreme Court precedent, which forbids requiring "any link or nexus between his troubled childhood or his limited mental abilities and this capital murder." Smith, 543 U.S. at 45; accord Tennard, 542 U.S. at 287 ("impaired intellectual functioning is inherently mitigating" without showing "that his crime was attributable to his low IQ"); Abdul-Kabir, 550 U.S. at 245 (Eighth Amendment forbids "'screening test' for determining the 'constitutional relevance' of mitigating evidence," such as requiring "nexus" between "troubled family background" and offense).

One or more jurors failed to find and weigh 21 of the 43 mitigating factors proffered by the defense. SOF § V.C. It is impossible to know with any certainty whether this happened because jurors failed to credit the defense evidence as a factual matter, or if they credited the evidence but failed to give it any mitigating effect because of the two-step instruction. Accordingly, there is a constitutionally unacceptable risk that the two-step instruction prevented weighing of relevant mitigating evidence, and the Eighth Amendment was violated. Mills, 486 U.S. at 376-77 ("With respect to findings of guilt ..., the Court consistently has followed the rule that the jury's verdict must be set aside if it could be supported on one ground but not on another, and the reviewing court was uncertain which of the two grounds was relied upon by the jury .... In reviewing death sentences, the Court has demanded even greater certainty that the jury's conclusions rested on proper grounds."). A reviewing court on direct appeal would not have deemed this error harmless, given

63

the substantial mitigation case that was presented by the defense.

**B.    Appellate Counsel Were Ineffective** for failing to raise this claim, which they preserved at trial.

Claims of appellate counsel's ineffectiveness are governed by the Strickland standard.  Smith v. Robbins, 528 U.S. 259, 285 (2000).

In assessing whether appellate counsel acted reasonably in not raising an issue in a non-capital case, this Court generally presumes counsel was "'[w]innowing out weaker arguments on appeal and focusing on' those more likely to prevail." Bell v. Jarvis, 236 F.3d 149, 164 (4th Cir. 2000) (quoting Jones v. Barnes, 463 U.S. 745 (1983)).  That general presumption is overcome here, however, because counsel expressly testified that he did not "winnow out" this claim in favor of other claims, and had *no* tactical or strategic rationale for failing to raise it.  A200910 (Blume: "I'm not a Jones v. Barnes appellate lawyer," i.e., Blume does not "winnow out and drop" what he believes are weaker claims in order "to focus on some others"; instead, he raises everything that he thinks is "potentially meritorious"); A200797-98 (Blume's testimony that there was no tactical or strategic reason for failing to raise this claim on appeal); A200900 (Johnson:  "Q. Were there any issues that you weeded out [on appeal] because you thought other issues were better or more meritorious?  A. No.").

Moreover, no reasonable lawyer would have "winnowed out" this issue in this *capital* case.

"Winnowing" issues in a capital appeal can have fatal consequences.

64

> Issues abandoned by counsel in one case, pursued by different counsel in another case and ultimately successful, cannot necessarily be reclaimed later. When a client will be killed if the case is lost, *counsel should not let any possible ground for relief go unexplored or unexploited*.

ABA GUIDELINES at 1083. See also id. at 1079 (appellate counsel "should seek to *litigate all issues ... that are arguably meritorious* under the standards applicable to high quality capital defense representation").

Counsel here plainly found the challenge to the two-step instruction "arguably meritorious." *Counsel objected to the instruction* precisely because counsel believed "it set up the possibility that a juror could find mitigating circumstances but nevertheless refuse to give it any weight whatsoever," and thus violated the Eighth Amendment. A200798 (Blume). Counsel's failure to raise this issue on appeal was deficient representation.

Fulks was prejudiced because, for the reasons stated above, there is a reasonable probability that this Court would have reversed on direct appeal had counsel raised the issue.

## C.    The District Court Erred.

The District Court rejected this claim because it believed the instruction was constitutional under United States v. Higgs, 353 F.3d 281 (4th Cir. 2003), and United States v. Jackson, 549 F.3d 963 (5th Cir. 2008). Order at 67-73 (A100189-95). The District Court erred. Higgs and Jackson are inapposite.

First, neither Higgs nor Jackson involved challenges to *jury instructions*.

65

Instead, each defendant argued that the *properly instructed* jury should have found a mitigating circumstance (that a purportedly "equally culpable" codefendant was sentenced to life) which the defendant claimed was supported by "uncontradicted evidence." Higgs, 353 F.3d at 327; Jackson, 549 F.3d at 982-83. Since neither case involved a jury instruction challenge, language in the opinions that may be read as undercutting Appellant's claim is dicta.

Second, in both cases the defendant's claim that the mitigating factor was "uncontradicted" was found to be erroneous. While it was undisputed that the codefendant was sentenced to life, the question of whether the codefendant was "equally culpable" was disputed. Higgs, 353 F.3d at 327 ("Equal culpability was simply not established by uncontradicted evidence"); Jackson, 549 F.3d at 983 (jury "could have rationally concluded that [codefendant] was not equally culpable"). Thus, Higgs and Jackson do not actually determine the Eighth Amendment question of whether a properly instructed jury must find and weigh an uncontradicted mitigator.

Third, Higgs relied in part on the fact that the "government did not tell the jury that it should disregard the proffered mitigating factor" as a matter of law but, instead, only argued that the jury should find as a factual matter that the codefendant was not "equally culpable." 353 F.3d at 331. In Appellant's case, the prosecutor *did* tell the jury it should not find Appellant's evidence to be mitigating, even if factually true.

Finally, this Circuit should be hesitant to accept guidance from Jackson

66

because the Fifth Circuit repeatedly has been unduly narrow in its views on mitigating evidence and types of jury instructions necessary to convey an Eighth-Amendment compliant understanding to the jury. See, e.g., Abdul-Kamir, Brewer, Tennard, Penry v. Johnson, 532 U.S. 782 (2001), and Penry v. Lynaugh, 492 U.S. 302 (1989) (all reversing Fifth Circuit decisions on mitigating evidence jury instruction issues).

## III. TRIAL COUNSEL WERE INEFFECTIVE FOR ADVISING APPELLANT TO GIVE UNPROTECTED STATEMENTS TO THE GOVERNMENT AND PLEAD GUILTY WITHOUT OBTAINING ANY BENEFIT IN RETURN

Three months after Blume was appointed, he had Fulks give the first of two inculpatory statements to the Government. Counsel did this without any protection against the Government's use of the statements and without any expectation that giving the statements would lead to a negotiated settlement of the case. Counsel then convinced Fulks to plead guilty without any suggestion from the Government that a guilty plea would result in a non-death sentence. See SOF § II. This was not the effective assistance of counsel required by the Sixth Amendment.

### A. Counsel's Representation Was Deficient

At the § 2255 hearing, capital defense expert Lyon gave unrebutted testimony that it was professionally unreasonable for trial counsel to have Fulks give unprotected 302 statements and plead guilty without any indication that death would be taken off the table. SOF § VIII.A.

Lyon's § 2255 testimony was not developed for this case alone. She said *the*

67

*same thing* in a 1991 law review article that has been cited with approval by the Supreme Court:  "The author assumes that *no attorney would plead his client guilty on a death penalty case without a guarantee from the judge or an offer from the prosecutor*."  Andrea Lyon, Defending the Death Penalty Case: What Makes Death Different?, 42 MERCER L. REV. 695, 709 n.15 (1991), cited with approval in Florida v. Nixon, 543 U.S. 175, 191-92 (2004).

Relying in part on Lyon's law review article, the Supreme Court in Nixon similarly recognized that

> pleading guilty without a guarantee that the prosecution will recommend a life sentence *holds little if any benefit* for the defendant.  Pleading guilty not only relinquishes trial rights, it increases the likelihood that the State will introduce aggressive evidence of guilt during the sentencing phase, so that the gruesome details of the crime are fresh in the jurors' minds as they deliberate on the sentence.

543 U.S. at 191 n.6 (omitting citations to ABA GUIDELINES at 1045, and Goodpaster, The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases, 58 N.Y.U.L.REV. 299, 331 (1983)).

Neither Nixon nor the authorities the Supreme Court cites therein contemplate that entering a guilty plea is sound strategy absent the prosecution's recommendation of a non-death sentence.  To the contrary, the Nixon Court and the authorities on which it relied, including Lyon's article, assume that any reasonable lawyer *would try the guilt phase* if not given assurance that death would be taken off the table in exchange for a guilty plea.  See, e.g., 543 U.S. at 181 (when prosecution was

68

unwilling to recommend a non-death sentence in exchange for a guilty plea, Nixon's counsel was "[f]aced with the *inevitability of going to trial*"); id. at 191 (when "[u]nable to negotiate a guilty plea in exchange for a life sentence, defense counsel must strive *at the guilt phase* to avoid a counterproductive course" (citing Lyon, 42 MERCER L.REV. at 708)); id. at 192 ("counsel's sentencing-phase presentation" should not be "logically inconsistent with the *guilt-phase defense*" (citing Sundby, The Capital Jury and Absolution: The Intersection of Trial Strategy, Remorse, and the Death Penalty, 83 Cornell L.Rev. 1557, 1589-91 (1998))); Sundby, 83 CORNELL L.REV. at 1595 ("strategically unwise to enter a guilty plea during the guilt-innocence phase and thereby move the trial directly into the penalty phase" because, *inter alia*, "a guilty plea concentrates all of the aggravating evidence into the penalty phase rather than allowing the jury to hear at least the crime evidence at the guilt stage, which may help diminish its impact by the time the penalty phase takes place"; a "guilt-innocence trial also may enable the defense to introduce mitigating evidence, such as the defendant's mental impairment, earlier in the proceeding," which "adds an additional humanizing dimension to the image of the defendant as a two-dimensional, cold-hearted killer – an image the jurors are otherwise likely to form prior to the penalty phase").

In Nixon itself, the defendant had given the police a confession in which he "described in graphic detail how he had kidnaped [the victim], then killed her," and the State had then "gathered overwhelming evidence establishing that Nixon had

69

committed the murder in the manner he described." 543 U.S. at 179-80. After

investigating the case, Nixon's counsel

> concluded, given the strength of the evidence, that Nixon's guilt was not
> subject to any reasonable dispute. [Counsel] thereupon commenced plea
> negotiations, hoping to persuade the prosecution to drop the death
> penalty in exchange for Nixon's guilty pleas to all charges.
> Negotiations broke down when the prosecutors indicated their
> unwillingness to recommend a sentence other than death.

Id. at 180-81.

Having failed to obtain a negotiated settlement, Nixon's counsel did *not* enter

a guilty plea anyway; instead, counsel did what reasonable capital defense lawyers

do – he took the case to trial. 543 U.S. at 181. Because counsel advised Nixon to

plead not guilty,

> Nixon retained the rights accorded a defendant in a criminal trial. ... The
> State was obliged to present during the guilt phase competent,
> admissible evidence establishing the essential elements of the crimes
> with which Nixon was charged. That aggressive evidence would thus
> be separated from the penalty phase, enabling the defense to concentrate
> that portion of the trial on mitigating factors. ... Further, the defense
> reserved the right to cross-examine witnesses for the prosecution and
> could endeavor, as [counsel] did, to exclude prejudicial evidence. ... In
> addition, in the event of errors in the trial or jury instructions, a
> concession of guilt would not hinder the defendant's right to appeal.

Id. at 188.

To be sure, the Nixon Court recognized, and reasonable capital defense lawyers

know, that the guilt-phase defense should *not be inconsistent* with the penalty phase,

and avoiding such inconsistency may require that counsel concede guilt, in part or in

70

whole, during the guilt phase proceedings, as Nixon's counsel did.  See, e.g., id. at

191 (citing Lyon, 42 MERCER L.REV. at 708).

> Not pleading guilty, therefore, does not necessarily mean that the defendant's acceptance of responsibility will be undermined .... [T]he most effective defense at the guilt-innocence phase might be as simple as a tacit guilty plea that expressly establishes a theme of accepting responsibility.  Alternatively, the defendant may find it best to use a more forceful defense that raises doubts about his intent or role.  In short, the key is for the defense to structure the guilt-innocence presentation in a way that harmonizes with the mitigation theme during the penalty stage.

Sundby, 83 CORNELL L.REV. at 1595-96.

In short, reasonable capital defense lawyers at the time of this trial did not

advise their clients to plead guilty without obtaining the benefit of, at least, a

Government recommendation for a life sentence.  Fulks' trial counsel were deficient

under the Sixth Amendment.

Fulks' counsel were especially unreasonable under the circumstances of this

case.  Counsel advised Fulks to give unprotected statements to the Government just

three months after Blume entered the case, when the defense investigation was not

far along and counsel were unable to make an informed decision about the best lines

of defense for guilt or penalty.  Having Fulks give the statements so early in the

process also gave the Government a lengthy period in which to use those statements

as a roadmap for its case, developing evidence that would reinforce the statements to

the extent that they were inculpatory and counter them to the extent that they were

71

exculpatory. Predictably, the Government did exactly that at Fulks' sentencing.

Counsel knew that Fulks was under the influence of drugs during the offenses, and reasonable counsel would have suspected that Fulks had other mental and emotional disturbances, all of which would have alerted reasonable counsel that any statements Fulks gave to the Government likely would be inaccurate. Predictably, the Government also took advantage of this at capital sentencing, using discrepancies in the statements to argue that Fulks was lying.

Reasonable counsel also would have known that the jury would not give Fulks significant mitigating credit for the statements, both because juries rarely do so and because the Government would spin the statements as an attempt to evade responsibility rather than accept it. Reasonable counsel knew that when jurors are given the chance to express their outrage by voting for a conviction at the guilt phase, the jurors, or at least one juror, will be freer to give full effect to mitigating evidence by returning a vote for life. Since counsel had Fulks plead guilty, what otherwise would have been the Government's guilt-phase evidence – more than 100 witnesses – was presented at the penalty-phase; this gave the jury less opportunity to separately assess the full weight of the mitigation case.

### B.    Appellant was Prejudiced

To establish prejudice in this context, "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59

72

(1985). That showing is made here. Trial counsel testified that Fulks was very reluctant to plead guilty and agreed to plead guilty only after counsel spent significant time urging him to do so. SOF § VIII.A. Thus, there is a "reasonable probability" that Fulks would not have pled guilty absent counsel's unreasonable advice to do so.

### C.    The District Court Erred.

The District Court held that trial counsel made a reasonable strategic decision to advise Fulks to give unprotected statements and plead guilty, with the hopes that it would get Fulks' version of the offense to the jury and the jury would view the statements and plea as mitigating because they showed acceptance of responsibility and remorse. Order at 79-83, 100-01 (A100201-05, A100222-23). The District Court erred because, as set forth above, counsel's approach was unreasonable.

The District Court "reject[ed] Lyon's opinion on the categorical illegitimacy of pleading guilty when death remains on the line," because the Court believed Lyon's testimony was inconsistent with Nixon and with Lyon's own law review article that was cited in Nixon. Order at 100-01 (A100222-23). Actually, Lyon's testimony was *consistent* both with her own prior writing and with the Supreme Court, which relied on that writing, as stated above.

The District Court cited three other cases that purportedly show the reasonableness of unprotected statements and guilty pleas in a capital cases – Meyer v. Branker, 506 F.3d 358 (4th Cir. 2007); Simpson v. Polk, 129 Fed. Appx. 782 (4th Cir. 2005); Jones v. Page, 76 F.3d 831 (7th Cir. 1996). Order at 79 (A100201).

73

Actually, these cases support Appellant.

First, in each case the defendant was *sentenced to death by a jury* after pleading guilty. Meyer pled guilty in 1988 and was sentenced to death; Simpson pled guilty in 1985 and was sentenced to death; Jones pled guilty in 1979 and was sentenced to death. Meyer at 363; Simpson at 786; Jones at 835. Thus, the cases confirm Lyon's testimony that, at least by the time of Fulks' 2004 trial, experience had taught reasonable capital defense counsel that it was a very bad idea to plead guilty with the hope that a jury would give the defendant mitigating credit for the plea.

Second, none of the cases actually addressed the issue of whether it is a reasonable strategy to plead guilty in the hope that a jury will return a life sentence. Instead, in each case the defendant claimed his plea was involuntary for other reasons, and any language in the opinions regarding the reasonableness *vel non* of such a strategy is dicta. In the proceedings below, the District Court agreed with the defense that Meyer is "not on point" for this reason. A201418. Moreover, Meyer and Simpson were habeas proceedings brought by state prisoners, in which this Circuit reviewed state court rulings under the highly deferential standards of 28 U.S.C. § 2254(d), rather than the de novo standard that applies here. Meyer at 364; Simpson at 788.

Third, Meyer's dictum about the advantage of a guilty plea rested in part on the assumption that a guilty plea "lessens the exposure of jurors to the often dramatic evidence of the crime." Id. at 370. To the extent that may ever be true, it was not true

74

here, where the guilty plea instead caused the "dramatic evidence of the crime" to be presented at the penalty phase.

Finally, Jones contradicts the District Court's belief that it is good strategy to plead guilty and proceed to capital sentencing by a jury, and confirms Appellant's position that counsel acted unreasonably here.

In Jones, counsel

> developed a strategy that was perfectly reasonable ...: Jones would plead guilty, *waive his right to a jury sentencing*, and *testify before Judge Hoban at sentencing*, showing remorse for the killings. Unfortunately, [however], Jones *thwarted this strategy* by opting for *jury* sentencing and by refusing to testify, contrary to [counsel's] advice.

76 F.3d at 845. Thus, Jones is consistent with capital defense expert Lyon's testimony that a *judge* may see a guilty plea as evidence of remorse and acceptance of responsibility, at least when accompanied by the defendant's testimony, but a jury is unlikely to have the same view, especially when the defendant does not testify.

**IV.  APPELLANT'S DUE PROCESS AND EIGHTH AMENDMENT RIGHTS WERE VIOLATED BY THE GOVERNMENT'S USE OF INCONSISTENT THEORIES AT HIS CAPITAL SENTENCING AND AT THE TRIAL AND SENTENCING OF HIS CO-DEFENDANT.**

The Government argued inconsistent versions of the facts at Fulks' sentencing from those it argued at the trial and sentencing of co-defendant Basham. The Government insisted at Fulks' sentencing that Fulks was the mastermind and Basham the "puppet," A303735, while at Basham's trial, the Government asserted that Basham was the great manipulator. At each trial, the Government asserted

75

different versions of which co-defendant struck the "fatal blow."[12]

### A.    Underlying Facts

On November 28, 2002, Basham and the attorneys originally appointed to represent him accompanied law enforcement officers in an attempt to locate Alice Donovan's body.  A400529-32.  Basham rode in a van with his lawyers and law enforcement officers, including Brunswick County Sheriff Ronald Hewett and FBI Agent Jeff Long.  Id.

On Highway 17, a doe jumped in front of the van.  Seeing this, Basham said to Sheriff Hewett, "You know, I could never even kill a deer and here I have ...."  Basham was stopped from completing his sentence by his attorney, Bruce Littlejohn.  A400543-44.

After several hours, the van stopped at a cemetery where Basham and Fulks had been observed by witnesses on the day of the crime.  While the remainder of the group, including Basham's lawyers, were talking amongst themselves, Basham walked to the edge of the cemetery with Sheriff Hewett and two Conway Police officers.  A400210, A400227.  According to Sheriff Hewett's testimony at Basham's trial, during their conversation outside the presence of defense counsel Basham demonstrated for Hewitt how he had killed Donovan with a purse strap and how he then threw the strap into the woods.  A400210, A400572-73.

---

[12]Basham was tried after Fulks was sentenced to death.  The District Court addressed this claim on its merits.  A100246-52.

Fulks gave a statement to the FBI on April 21, 2003, consistent with Hewett's testimony that Basham had struck this fatal blow. A201893-98. In his statement, he confessed to a substantial involvement in the carjacking and kidnapping of Donovan but denied having killed her. Id.[13]

During Fulks' capital sentencing, defense counsel sought to introduce the "deer statement" as a declaration against Basham's penal interest or, alternatively, as an excited utterance. A400508-12. Counsel argued that this statement was evidence that Basham, not Fulks, was the person who actually killed Donovan, consistent with Fulks' earlier statements to the FBI.

The Government argued against admission. It asserted the defense was taking the statement "out of context," that the statement had "no meaning," that it was not an admission to killing Donovan, and that Basham could have meant many things, for example, "I helped Chad hide these bodies." A400512-13. The Government argued vehemently that the statement "doesn't say he killed her, it doesn't say that," and that Basham "could have been talking about anything." A400515.

The Government also argued, under the doctrine of completeness, that it would be unfair to allow the deer statement in without allowing the Government to put in all of the statements Basham had made that inculpated Fulks. In response to Fulks' argument that all other statements made that day by Basham had been offered in the

_____

[13]Fulks has never wavered from his insistence that he was not the person who "dealt the fatal blow."

form of hypotheticals proposed by Basham's own counsel hours after the deer statement, A400515-16, the Government protested, "Remember Sheriff Hewitt [sic] demonstrating how Brandon Basham said *that Chad Fulks took the purse strap and strangled.* So [the deer statement] was not the only *statement* that was provided by Brandon Basham to law enforcement." A400517.

The District Court ruled the deer statement inadmissible.

In its opening statement to the jury, the Government ridiculed Fulks' defense, repeatedly referring to the "gentle art of confessing," explaining "[w]e confess little faults in order to suggest that we have no big ones," A400451, A400484, A400487, or, "in this case, . . . confess big faults in order to suggest that he doesn't have the biggest." A400456-57. The Government continued this theme in closing, and concluded by asserting that Fulks' "plan" had been "to confess error [and] point all the blame at [his] partner." A303801.

Three months later, at Basham's trial, the Government's position was strikingly different. There, the Government introduced the deer statement against Basham, through the testimony of Sheriff Hewett. A400543. There, the Government expressly argued that the deer statement was an admission by Basham that *Basham*, not Fulks, killed Donovan:

> Do you remember what Brandon Basham's comments were? He sees that doe and he says to himself, spontaneously, "here I couldn't even kill a deer, and I have, and his lawyer, Mr. Littlejohn stops him. "Here, I couldn't even kill a deer and here I have" - what do you think he is thinking about? Here I have smoked a joint? Here I have stolen a car?

A400648.

At Basham's trial, the Government also presented the testimony of Sheriff Hewett, who said that Basham made, with the purse strap, a demonstrative confession of how he (not Fulks) had strangled Donovan. A400572-73. At closing argument at guilt phase of Basham's trial, the Government argued, "Sheriff Hewitt says he [Basham] didn't *say* I killed Alice Donovan. Sheriff Hewett said to you in this courtroom in front of you, the jury, no, he *demonstrated* it." A400649. The Government then told the jury that Sheriff Hewett's testimony was one of the two most important pieces of evidence in the case, evidence that "seal[ed] the deal." A400652.

The Government came back to this theme at Basham's sentencing:

> What does Mr. Basham say in the presence of Sheriff Hewitt? It is not really what he says, it is what he does. He is shackled, he describes a purse strap, and he demonstrates, he demonstrates to Sheriff Hewitt how Alice Donovan was strangled . . .. You saw Sheriff Hewitt stand up there and show.

A400695. The Government submitted, "*He [Basham] killed Alice Donovan.*" A400700.

### B.    The Government's Use of Inconsistent Theories Was Unconstitutional.

"Due process may be violated if 'an inconsistency ... exist[s] at the core of the prosecutor's cases against the defendants for the same crime.'" United States v. Higgs, 353 F.3d 281, 326 (4th Cir. 2003)

79

The Supreme Court examined this issue in Bradshaw v. Stumpf, 545 U.S. 175, 189-90 (2005), where the defendant had brought a due process challenge to both his conviction and death sentence because the prosecution argued at his trial that he had actually killed the victim but later argued at his codefendant's trial that the killing was committed by his codefendant. The Supreme Court reversed the Sixth Circuit's grant of relief on guilt/innocence on the basis that the identity of the triggerman was immaterial to the conviction for aggravated murder under an accomplice theory. However, the Court remanded the case so the Court of Appeals could resolve an ambiguity as to whether the sentencing relief it had ordered was still appropriate, given the Supreme Court's reversal of the guilt phase relief. See id. at 187-88. In a concurring opinion, Justice Souter observed:

> Stumpf's position was anticipated by Justice Stevens's observation 10 years ago that 'serious questions are raised when the sovereign itself takes inconsistent positions in two separate criminal proceedings against two of its citizens,' and that '[t]he heightened need for reliability in capital cases only underscores the gravity of those questions ... .' Jacobs v. Scott, 513 U.S. 1067, 1070 (1995).")

Id. at 189-90 (Souter, J., concurring). On remand, the Sixth Circuit reaffirmed that the government's use of inconsistent theories violated due process, requiring vacation of Stumpf's death sentence. Stumpf v. Houk, 2011 WL 3506101 (6th Cir., Aug. 11, 2011). See also Smith v. Groose, 205 F.3d 1045 (8th Cir. 2000) (use of inconsistent theories "renders convictions unreliable, given that '[the s]tate's duty to its citizens does not allow it to pursue as many convictions as possible without regard to fairness

80

and the search for truth.'"); Drake v. Kemp, 762 F.2d 1449, 1479 (11th Cir. 1985) (Clark, J., concurring) (the use of inconsistent theories is "inherently unfair").

The principle that the use by the sovereign of inconsistent theories against co-defendants is a constitutional violation is a subset of the long-held due process concern that, "[a]lthough the prosecutor must prosecute with earnestness and vigor and 'may strike hard blows, he is not at liberty to strike foul ones.'" Smith, 205 F. 3d at 1049. In Berger v. United States, 295 U.S. 78, 88 (1976), the Supreme Court made clear that the Government's mandate is not that it shall win a case at any cost "but that justice shall be done."

The Government employed inconsistent theories in Fulks' and Basham's cases and used evidence at the two trials that was "factually inconsistent and irreconcilable." Higgs, 353 F.3d at 326. The theory and evidence used by the Government in Basham's trial would have supported Fulks' defense against imposition of a death sentence. Fulks denied that he had committed the killing. At Fulks' trial, the Government repeatedly told the jury that Fulks' denial lacked all credibility. The Government also specifically told the court that Basham had demonstrated to Sheriff Hewett that Fulks had strangled Alice Donovan. Yet no part of the deer statement or Sheriff Hewett's testimony about the purse strap demonstration, or the arguments used by the Government *at Basham's trial* about them, can be construed as anything less than a concession by the Government that Brandon Basham had strangled and killed Alice Donovan.

81

The jury at Fulks' sentencing unanimously found twenty-two mitigating factors; eleven jurors found an additional two; ten jurors found two more. Had the Government been consistent in this fundamental regard, and not prevented the jury from learning that the Government itself believed that Basham, not Fulks, had strangled Alice Donovan, it is likely that at least one juror would have voted to impose on Mr. Fulks a sentence of life without possibility of parole, rather than a sentence of death.

This Circuit has not had occasion to articulate the standard it believes appropriate in order to adjudicate a due process violation stemming from inconsistent Government theories employed to obtain death sentences in codefendants' cases. While this has all the hallmarks of structural error and should require no separate finding of prejudice, we submit that under any standard of analysis, Fulks is entitled to relief. Under the Sixth Circuit's approach in the capital sentencing context in Stumpf, there is "a reasonable probability that [the jury] would not have sentenced [Fulks] to death had the prosecution not employed inconsistent and irreconcilable theories.'" Stumpf v. Houk, 2011 WL 3506101 at *9 (granting capital sentencing relief on the basis of inconsistent theories/due process claim). Under the Eighth Circuit's guilt/innocence analysis in Groose, the Government's "manipulation of the evidence" deprived Fulks of due process and "rendered his trial fundamentally unfair." Groose, 205 F.3d at 1051. As in Groose and Stumpf, absent the Government's "actions, the outcome of the trial probably would have been different."

82

Id. at 1052.

## C.    The District Court Erred.

Because this claim presents a mixed question of fact and law, this Court reviews it *de novo*. The District Court's analysis of this claim was flawed.

In the context of the capital sentencing determination Fulks' jury was called upon to make, the Government's use of factually inconsistent theories went to the heart of Fulks' defense against imposition of death. At Basham's trial, the Government introduced Sheriff Hewett's testimony that, although Basham did not say he had strangled Donovan, he showed that he had done so. The District Court suggests in its Order that Sheriff Hewett's answers on cross-examination at Basham's trial used the "passive tense," A100249, and, therefore, left room for speculation, quoting the following exchange:

> Q.    There is nothing in your notes, nor is there anything in Lieutenant Crocker's notes that indicate that Brandon Basham told you that he used the strap, is there?
>
> A.    No, sir. He did not tell me he used the strap. He demonstrated, though.
>
> Q.    He demonstrated?
>
> A.    Yes, sir.
>
> Q.    [Neither] your notes, nor Lieutenant Crocker's notes say that he did that, isn't that true?
>
> A.    That is true because he didn't say. He showed.

A400572 (quoted in Order at 127 (A100249)). Even if the District Court is correct

83

that this testimony left some room for speculation as to what Hewett meant at Basham's trial, in Fulks' case, the Government *specifically* told the court that the demonstration by Basham of the use of the purse strap was to show that *Fulks* strangled Donovan. A400517. There was nothing speculative in this assertion. It was on the basis of this assertion that Fulks was also precluded from introducing the deer statement, which would have supported the credibility of his confession.

This Court should also note that, with regard to the deer statement, in contrast to the view expressed in its final Order, the District Court noted pretrial that the deer statement was strong evidence pointing to Basham as a killer. When Basham's defense team argued that the deer statement should be excluded as evidence against Basham because it was "speculative" and its prejudicial effect outweighed its probative value, the District Court disagreed, saying it was *"very powerful evidence. They were out looking for a body, a deer runs across the road, and [Basham] says, 'I have never killed a deer, but I can't believe I have –' unfinished sentence."* A400348-49.

The Constitution does not tolerate a criminal conviction obtained by the knowing use of inaccurate evidence, Miller v. Pate, 386 U.S. 1, 7 (1967); no more should it tolerate a capital sentence obtained by factually inconsistent theories. Fulks' death sentence is unconstitutionally unreliable under the Eighth and Fourteenth Amendments. This Court should grant relief.

84

## CONCLUSION

For the reasons stated, this Court should reverse the District Court and remand with directions to grant relief under § 2255 in the form of a new trial and/or a new capital sentencing proceeding.

Respectfully submitted,

/s/ Billy H. Nolas
Billy H. Nolas
Amy Gershenfeld Donnella
Assistant Federal Defenders
Federal Community Defender Office
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520

Attorneys for Petitioner-Appellant

## CERTIFICATE OF SERVICE

I, Billy H. Nolas, hereby certify that on this date I served the foregoing Initial Brief of Appellant on all parties or their counsel of record through the CM/ECF system, and I served six (6) paper copies of the foregoing upon the Clerk of the Court via United States Mail, postage prepaid.


s/ Billy H. Nolas
BILLY H. NOLAS

Counsel for Petitioner-Appellant


Dated:       September 23, 2011

86

## CERTIFICATE OF COMPLIANCE

I, Billy H. Nolas, hereby certify that the foregoing Initial Brief of Appellant contains 21,334 words, excluding the portions exempted by Fed. R. App. P. 32(a)(7)(C)(I). The type volume of this brief exceeds by 334 words this Court's September 19, 2011, Order granting Appellant leave to file an opening brief not in excess of 21,000 words. An appropriate motion will be filed forthwith.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using WordPerfect, version X4, in 14-point font, type style Times New Roman.

s/ Billy H. Nolas
BILLY H. NOLAS

Counsel for Petitioner-Appellant

Dated:       September 23, 2011

87