No. 11-3

IN THE UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

_____

UNITED STATES OF AMERICA,

Appellee,

v.

CHADRICK E. FULKS,

Appellant.

CAPITAL CASE

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

BRIEF FOR THE UNITED STATES

WILLIAM N. NETTLES
United States Attorney

ROBERT F. DALEY, JR.
Assistant U.S. Attorney
District of South Carolina

LANNY A. BREUER
 Assistant Attorney General

GREG D. ANDRES
 Acting Deputy Assistant
 Attorney General

SCOTT N. SCHOOLS
 Associate Deputy
 Attorney General

THOMAS E. BOOTH
 Attorney
 Criminal Division
 Department of Justice
 Washington, D.C.  20530
 (202) 514-5201
 Thomas.Booth@usdoj.gov

**TABLE OF CONTENTS**

JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES.. . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE.. . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . 3

      A.   The Offense Conduct.. . . . . . . . . . . . . . . . 3

      B.   The Trial Proceedings.. . . . . . . . . . . . . . . 7

      C.   The Jury Verdict. . . . . . . . . . . . . . . . . . 10

      D.   The Section 2255 Motion.. . . . . . . . . . . . . . 13

SUMMARY OF ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . 14

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      I.   FULKS RECEIVED THE EFFECTIVE ASSISTANCE OF
          COUNSEL.. . . . . . . . . . . . . . . . . . . . . . . 18

          A.   Standard of Review.. . . . . . . . . . . . . 19

          B.   General Legal Principles.. . . . . . . . . . 19

              1.   Counsel Were Effective In Advising
                   Fulks To Make Pretrial Statements
                   And To Plead Guilty Without A
                   Government Benefit. . . . . . . . . . . . 21

                   a.   Factual Background.. . . . . . . . 22

                        1.   Counsel's Pretrial Strategy.. . 22

                        2.   Fulks's Pretrial Statements.. . 26

                        3.   The Advice to Plead Guilty. . . 28

                        4.   The Section 2255 Hearing. . . . 30

                        5.   The District Court's Rulings. . 31

                   b.   Legal Principles.. . . . . . . . . 32

       c.   Discussion.. . . . . . . . . . . . 34

  2.  Counsel Was Effective During Voir Dire. . 41

       a.   Factual Background.. . . . . . . . . 41

           1.   Pretrial Strategy.. . . . . . . 41

           2.   Voir Dire.. . . . . . . . . . 44

               i.   Goehring.. . . . . . . . . 45

               ii.  Allison. . . . . . . . . . 45

               iii. Harvey.. . . . . . . . . 46

           3.   Post-Trial Developments.. . . . 47

               i.   The New Trial Motion.. . . 47

               ii.  The District Court's
                   Remarks at Basham's
                   Trial. . . . . . . . . . . 48

           4.   Direct Appeal.. . . . . . . . 49

           5.   The Section 2255 Hearing. . . . 50

           6.   The District Court's Rulings. . 52

       b.   Legal Principles.. . . . . . . . . 53

       c.   Discussion.. . . . . . . . . . . . 55

           1.   Blume's Voir Dire Methods.. . . 55

           2.   Allison's Omitted Information
              On the Jury Questionnaire.. . . 60

           3.   The Appeal of the Denial of the
              Challenges for Cause       60

  3.  Counsel Were Effective On
    Appeal. . . . . . . . . . . . . . . . . . 66

       a.   FactualBackground. . . . . . . . . 66

1.   The Trail Evidence. . . . . . . 66

2.   The Prosecutor's Closing
     Argument. . . . . . . . . . . . 67

3.   The Jury Instructions.. . . . . 68

4.   Fulk's Direct Appeal. . . . . . 69

5.   The District Court's
     Rulings.. . . . . . . . . . . . 70

          b.   Legal Principles.. . . . . . . . 71

          c.   Discussion.. . . . . . . . . . . 76

II.  THE GOVERNMENT PRESENTED CONSISTENT THEORIES
     AT THE TRIALS OF FULKS AND BASHAM.. . . . . . . . . 81

     A.   The Standard of Review.. . . . . . . . . . . 81

     B.   Factual Background.. . . . . . . . . . . . . 82

          1.   Pretrial Rulings. . . . . . . . . . . . 82

          2.   Fulks's Trial.. . . . . . . . . . . . . 84

          3.   Basham's Trial. . . . . . . . . . . . . 85

     C.   The District Court's Ruling. . . . . . . . . 88

     D.   Legal Principles.. . . . . . . . . . . . . . 89

     E.   Discussion.. . . . . . . . . . . . . . . . . 90

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . 94

CERTIFICATE OF COMPLIANCE.. . . . . . . . . . . . . . . . . . 95

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . 96

-iii-

**TABLE OF AUTHORITIES**

**FEDERAL CASES**

Adbul-Kabir v. Quarterman, 550 U.S. 233 (2007). . . . . . . 72, 78

Ayers v. Belmontes, 549 U.S. 7 (2006).. . . . . . . . . . . 72, 80

Bell v. Evatt, 72 F.3d 421 (4th Cir. 1995). . . . . . . . . . . 33

Bobby v. Van Hook, 130 S. Ct. 13 (2009).. . . . . . . . . . 20, 71

Boyd v. Allen, 592 F.3d 1274 (11th Cir. 2010).. . . . . . . . . 76

Boyde v. California, 494 U.S. 370 (1990). . . . . . . . . . 72, 74

Bradshaw v. Stumpf, 545 U.S. 175 (2005).. . . . . . . . . . . . 89

Brown v. Payton, 544 U.S. 133 (2005). . . . . . . . . . . . . . 75

Buchanan v. Angelone, 522 U.S. 269 (1998).. . . . . . . . . 72, 73

Burger v. Kemp, 483 U.S. 776 (1987).. . . . . . . . . . . . . . 73

Castro v. Ward, 138 F.3d 810 (10th Cir. 1998).. . . . . . . . . 73

DeLozier v. Sirmons, 531 F.3d 1306 (10th Cir. 2008).. . . . . . 53

Donnelly v. DeChristoforo, 416 U.S. 637 (1974). . . . . . . . . 74

Enmund v. Florida, 458 U.S. 782 (1982). . . . . . . . . . . . . 10

Exxon Shipping Co. v. Baker, 554 U.S. 471 (2008). . . . . . . . 57

Fairbank v. Ayers, 650 F.3d 1243 (9th Cir. 2011). . . . . . 34, 57

Fields v. Brown, 503 F.3d 755 (9th Cir. 2007).. . . . . . . . . 54

Gardner v. Ozmint, 511 F.3d 420 (4th Cir. 2007).. . . . . . 53, 54

Green v. French, 143 F.3d 865 (4th Cir. 1998).. . . . . . . . . 38

Harrington v. Richter, 131 S. Ct. 770 (2011). . . 20, 57, 73, 76

Harvey v. Warden, 629 F.3d 1228 (11th Cir.),

cert. denied, No. 11-295 (Nov. 14, 2011). . . . . . . . . 33, 37

Herring v. United States, 422 U.S. 853 (1975).. . . . . . . . . 74

Hill v. Lockhart, 474 U.S. 52 (1985). . . . . . . . . . . . . . 21

Holder v. Palmer, 588 F.3d 328 (6th Cir. 2009). . . . . . . . 53

Hughes v. United States, 258 F.3d 453 (6th Cir. 2001).. . . . . 63

Johnson v. Texas, 509 U.S. 350 (1993).. . . . . . . . . . . . . 72

Jones v. Barnes, 463 U.S. 745 (1983). . . . . . . . . . . 71, 77

Jones v. Page, 76 F.3d 831 (7th Cir. 1996). . . . . . . . . . . 39

Jones v. United States, 527 U.S. 373 (1999).. . . . . . 60, 74, 79

Koon v. United States, 518 U.S. 81 (1996).. . . . . . . . . . . 65

Lawrence v. Branker, 517 F.3d 700 (4th Cir. 2008).. . . . . . . 71

Maggio v. Fulford, 462 U.S. 111 (1983). . . . . . . . . . . . . 37

Meyer v. Branker, 506 F.3d 358 (4th Cir. 2007). . . . . . . 33, 41

Miller-El v. Cockrell, 537 U.S. 322 (2003). . . . . . . . . . . 62

Moody v. Polk, 408 F.3d 141 (4th Cir. 2005).. . . . . . . . . . 73

Morgan v. Illinois, 504 U.S. 719 (1992).. . . . . . . . . . . . 54

Murray v. Carrier, 477 U.S. 478 (1986). . . . . . . . . . . . . 82

Nguyen v. Lindsey, 232 F.3d 1236 (9th Cir. 2000). . . . . . . . 90

Nixon v. Florida, 543 U.S. 175 (2004).. . . . . . 32, 33, 37, 38

Penry v. Johnson, 532 U.S. 782 (2001).. . . . . . . . . . . . . 59

Pinkerton v. United States, 328 U.S. 640 (1946).. . . . . . . . 29

Post v. Bradshaw, 621 F.3d 406 (6th Cir. 2010),
   cert. denied, 131 S. Ct. 2902 (2011). . . . . . . . . . . . . 34

Premo v. Moore, 131 S. Ct. 733 (2011).. . . . . . 21, 33, 34, 39

Puckett v. United States, 556 U.S. 129 (2009).. . . . . . . . . 78

-v-

Rhoades v. Henry, 638 F.3d 1027 (9th Cir.),
   cert. denied, No. 11-5211 (Oct. 11 2011). . . . . . . . . . . 76

Rivera v. Illinois, 129 S. Ct. 1446 (2009). . . . . . . . . . 54

Sims v. Brown, 425 F.3d 560 (9th Cir. 2005),
   cert. denied, 549 U.S. 833 (2006).. . . . . . . . . . . 75, 79

Skilling v. United States, 130 S. Ct. 2896 (2010).. . . . . . 53

Smith v. Murray, 477 U.S. 527 (1986). . . . . . . . . . . . . 71

Smith v. Robbins, 528 U.S. 259 (2000).. . . . . . . . . . . . 71

Stout v. Netherland, 1996 WL 496601 (4th Cir. 1996).. . . . . 33

Strickland v. Washington, 466 U.S. 668 (1984).. . . . . . passim

Stumpf v. Houk, 653 F.3d 426 (6th Cir. 2011). . . . . . . . . 90

Teague v. Scott, 60 F.3d 1167 (5th Cir. 1995).. . . . . . . . 53

Tennard v. Dretke, 542 U.S. 274 (2004). . . . . . . . . . . . 72

Thompson v. Altheimer & Gray, 248 F.3d 621
   (7th Cir. 2001).. . . . . . . . . . . . . . . . 53, 61, 63, 64

Tison v. Arizona, 481 U.S. 127 (1987).. . . . . . . . . . . . 10

Treesh v. Bagley, 612 F.3d 424 (6th Cir. 2010),
   cert. denied, 131 S. Ct. 1678 (2011). . . . . . . . . . . . 54

United States v. Barnette, 211 F.3d 803 (4th Cir. 2000).. . . 61

United States v. Barnette, 390 F.3d 775 (4th Cir. 2005),
   reversed on other grounds, 546 U.S. 803 (2005). . . . . . . 61

United States v. Basham, 561 F.3d 302 (4th Cir. 2009),
   cert. denied, 130 S. Ct. 3353 (2010). . . . . . . . . . passim

United States v. Bell, 137 F.3d 1274 (11th Cir. 1998).. . . . 29

United States v. Cabrera-Beltran, 660 F.3d 742
   (4th Cir. 2011).. . . . . . . . . . . . . . . . . . 53, 54, 65

United States v.  Davis, 609 F.3d 663 (5th Cir. 2010),
   cert. denied, 131 S. Ct. 1676 (2011). . . . . . . . . . . . 73

United States v.  Fell, 372 F. Supp. 2d 766
  (D. Vt. 2005), affirmed on other grounds,
  531 F.3d 197 (2d Cir. 2008).. . . . . . . . . . . . . . . . . 55

United States v. Fell, 531 F.3d 197 (2d Cir. 2008),
  cert. denied, 130 S. Ct. 1880 (2010). . . . . . . . . . . 75, 80

United States v. Frady, 456 U.S. 152 (1982).. . . . . . . . . . 82

United States v. Frye, 489 F.3d 201 (5th Cir. 2007).. . . . 89, 93

United States v. Fulks, 454 F.3d 410 (4th Cir. 2006),
  cert. denied, 551 U.S. 1147 (2007). . . . . . . . . . . . passim

United States v. Guadagno, 970 F.2d 214 (7th Cir. 1992).. . . . 35

United States v. Hansen, 434 F.3d 92 (1st Cir.),
  cert. denied, 127 S. Ct. 203 (2006).. . . . . . . . . . . . . 89

United States v. Hickman, 626 F.3d 756 (4th Cir. 2010),
  cert. denied, No. 11-6404 (Oct. 17, 2011).. . . . . . . . . . 29

United States v. Higgs, 353 F.3d 281
  (4th Cir. 2003).. . . . . . . . . . . . . . . . . . 73, 89, 92

United States v. Johnson, 366 F. Supp. 2d 822
  (N.D. Iowa 2005). . . . . . . . . . . . . . . . . . . . . . . 56

United States v. Johnson, 495 F.3d 951
  (8th Cir. 2007).. . . . . . . . . . . . . . . . . . . . . 54, 61

United States v. Lawrence, 555 F.3d 254 (6th Cir. 2009),
  cert. denied, 130 S. Ct. 1879 (2010). . . . . . . . . . . . . 73

United States v. Martinez-Salazar, 528 U.S. 304 (2000). . 54, 57

United States v. Moussaoui, 591 F.3d 263 (4th Cir. 2010). . . . 39

United States v. Nelson, 347 F.3d 701 (8th Cir. 2003).. . . . . 61

United States v. Nicholson, 611 F.3d 191 (4th Cir. 2010). . . . 19

United States v. Paul, 217 F.3d 989 (8th Cir. 2000).. . . . . . 89

United States v. Robinson, 485 U.S. 25 (1998).. . . . . . . . . 74

United States v. Rodriguez, 581 F.3d 775 (8th Cir. 2009),
  cert. denied, 131 S. Ct. 413 (2010).. . . . . . . . . . . 75, 80

United States v. Sampson, 486 F.3d 13 (1st Cir. 2007).. . . . .  37

United States v. Smith, 640 F.3d 580 (4th Cir.),
   cert. denied, No. 11-6133 (Oct. 11, 2011).. . . . . . . . . .  19

United States v. Whitten, 610 F.3d 168 (2d Cir. 2010).. . . . .  80

United States v. Williams, 610 F.3d 271 (5th Cir. 2010).. . . .  10

United States v. Young, 470 U.S. 1 (1985).. . . . . . . . . .  78

Uttecht v. Brown, 551 U.S. 1 (2007).. . . . . . . . . . . . 53, 56

Walton v. Arizona, 497 U.S. 639 (1990). . . . . . . . . . . 73, 78

Wiggins v. Smith, 539 U.S. 510 (2003).. . . . . . . . . . . .  75

Wong v. Belmontes, 130 S. Ct. 383 (2009). . . . . . . . . . 75, 76

Yarborough v. Gentry, 540 U.S. 1 (2003).. . . . . . . . . . .  76

**FEDERAL STATUTES**

18 U.S.C. §371. . . . . . . . . . . . . . . . . . . . . . .   2

18 U.S.C. § 922(g)(1).. . . . . . . . . . . . . . . . . . .  2

18 U.S.C. § 924(o). . . . . . . . . . . . . . . . . . . . .  2

18 U.S.C. § 2119. . . . . . . . . . . . . . . . . . . . . .  2

18 U.S.C. § 2312. . . . . . . . . . . . . . . . . . . . . .  2

18 U.S.C. § 3571. . . . . . . . . . . . . . . . . . . . . .  2

18 U.S.C. 3591(a)(2)(A).. . . . . . . . . . . . . . . . . 7, 18

18 U.S.C. 3592(a).. . . . . . . . . . . . . . . . . . . . .  72

18 U.S.C. § 3593(b)(2)(A).. . . . . . . . . . . . . . . 3, 18, 84

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . .  1

28 U.S.C. § 1331. . . . . . . . . . . . . . . . . . . . . .  1

28 U.S.C. § 2253. . . . . . . . . . . . . . . . . . . . . .  1

28 U.S.C. § 2255. . . . . . . . . . . . . . . . . . . . 1, 3, 13

Fed. R. Civ. P. 59(e).. . . . . . . . . . . . . . . . . . . . . 57

Fed. R. Crim. P. 24(b). . . . . . . . . . . . . . . . . . . . . 63

Fed. R. Evid. 106.. . . . . . . . . . . . . . . . . . . . . . . 84

Fed. R. Evid. 801(d)(2).. . . . . . . . . . . . . . . . . 18, 90

**MISCELLANEOUS**

2003 ABA, <u>Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases</u>, § 10.9.2. . . . . . . . 37

<u>Commentary,</u> 31 Hofstra L. Rev. 913, 1045
   (2003 ABA Guidelines).. . . . . . . . . . . . . . . . . . . . 37

Lyon, <u>Defending the Death Penalty Case: What Makes Death Different</u>, 42 Mercer L. Rev. 695, 708 (1991). . . . . . . . . . 38

Matthew Rubenstein, <u>Overview of the Colorado Method of Capital Voir Dire</u>, <u>www.nacdl.org</u> (November 2010)
   (last visited December 9, 2011).. . . . . . . . . . . . . . . 42

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

No. 11-3

_____

UNITED STATES OF AMERICA,

Appellee,

v.

CHADRICK E. FULKS,

Appellant.

_____

CAPITAL CASE

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

_____

BRIEF FOR THE UNITED STATES

_____

JURISDICTION

This is an appeal from a final judgment denying a motion to vacate a sentence under 28 U.S.C. § 2255. The district court, which had jurisdiction under 28 U.S.C. § 1331 and § 2255, issued its order and entered judgment on August 20, 2010. The district court issued a clarifying order on August 25, 2010, and denied a motion to amend the judgment on January 13, 2011. Fulks filed a timely notice of appeal on March 2, 2011. This Court has jurisdiction under 28 U.S.C. § 1291 and 28 U.S.C. § 2253.

1

STATEMENT OF THE ISSUES

1.  Whether Fulks was denied the effective assistance of counsel during the pretrial and guilty plea stages of his capital trial, during jury selection before the penalty phase, and on direct appeal.

2.  Whether the government presented inconsistent theories at Fulks's trial and at the separate trial of his accomplice Brandon Basham.

STATEMENT OF THE CASE

In the United States District Court for the District of South Carolina (Anderson, J.), Fulks pleaded guilty to carjacking resulting in death, in violation of 18 U.S.C. § 2119; kidnapping resulting in death, in violation of 18 U.S.C. § 1201(a); conspiracy to commit carjacking and kidnapping, in violation of 18 U.S.C. § 371; interstate transportation of a stolen vehicle, in violation of 18 U.S.C. § 2312; conspiracy to use firearms in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(o); use of a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A); being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1); and possession of stolen firearms, in violation of 18 U.S.C. § 922(j).

A jury was empaneled to determine whether Fulks should be sentenced to death on the carjacking and kidnapping counts. See

2

18 U.S.C. § 3593(b)(2)(A).  After a five-week penalty hearing, the jury unanimously determined that Fulks should be sentenced to death on both capital counts.  In accordance with the jury's verdict, the district court sentenced Fulks to death on each capital count.  Fulks was also sentenced to 744 months of imprisonment on the remaining counts.  <u>United States</u> v. <u>Fulks</u>, 454 F.3d 410 (4th Cir. 2006), cert. denied, 551  U.S. 1147 (2007).[1/]

In 2008, Fulks filed a motion to vacate his sentence under 28 U.S.C. 2255.  On August 20, 2010, after a six-day evidentiary hearing, the district court denied the motion and a later motion to amend the judgment.  The district court granted a certificate of appealability on multiple claims.  This appeal followed.

### STATEMENT OF FACTS

A.  <u>The Offense Conduct</u>

On November 4, 2002, Fulks and Basham escaped from a Kentucky jail and embarked on a two-week, multi-state crime spree during which two women--Alice Donovan and Samantha Burns--were murdered.  Fulks's capital convictions and death sentences pertain to his and Basham's carjacking of Donovan outside a South

---

[1/]  In October 2004, at a separate trial, Brandon Basham, Fulks's accomplice, was convicted of carjacking, kidnapping and related offenses in connection with Donovan's murder and sentenced to death.  This Court affirmed Basham's sentence on direct appeal. <u>United States</u> v. <u>Basham</u>, 561 F.3d 302 (4th Cir. 2009), cert. denied, 130 S. Ct. 3353 (2010).

Carolina Wal-Mart store, after which they kidnapped, raped, and murdered Donovan. Fulks, 454 F.3d at 413-417.

Shortly after their November 4 jail escape, Fulks and Basham encountered James Hawkins and forced him at knifepoint to drive them north. Afterwards, they removed Hawkins from his vehicle, tied him to a tree, and drove to a trailer shared by Tina Severance--a former girlfriend of Fulks--and Andrea Roddy, in Portage, Indiana. Fulks and Severance schemed to steal firearms from Robert Talsma, a friend of Severance. On November 8, Fulks and Basham stole firearms and other items from Talsma's house. Fulks, 454 F.3d at 414-415.

The two men and two women drove in Severance's van to Sturgis, Michigan. Afterwards, Fulks and Severance left Basham and Roddy to visit Fulks's brother Ronnie in Goshen, Indiana. There, they smoked marijuana and methamphetamine. On November 10, the four reunited and drove to Piketon, Ohio, where Basham wrote bad checks and Fulks stole a purse and a cell phone. The next day, they drove to a motel in Kenova, West Virginia. Leaving the women at the motel, Fulks and Basham drove Severance's van to a mall near Huntington, West Virginia, to break into cars and steal purses. There, Fulks and Basham carjacked and kidnapped Samantha Burns, a 19-year-old college student, and drove her to a secluded spot near the Ohio River. Fulks and Basham killed Burns, concealed her body, and burned her

4

car to remove any fingerprints.  The two men returned to their

motel.  Fulks, 454 F.3d at 414-415.[2/]

On November 12, the two men and two women drove to a motel

in Little River, South Carolina.  The next day, Fulks and Basham

broke into cars and stole purses.  On November 14, the four drove

to Myrtle Beach, South Carolina.  That afternoon, after leaving

the women at a motel, Fulks and Basham broke into a residence

outside Conway, South Carolina.  During the burglary, Carl

Jordan, the resident's father, drove up.  Fulks and Basham each

fired shots at Jordan as they fled, forcing Jordan to retreat.

The two men abandoned Severance's van, stole a white truck, and

drove to a Wal-Mart in Conway to steal another vehicle.  Fulks,

454 F.3d at 416.

At 2:37 p.m., a Wal-Mart surveillance camera recorded the

arrival of a blue BMW driven by Alice Donovan followed by Fulks

and Basham in the truck.  Basham entered the BMW and forced

Donovan to the back of the parking lot where Fulks was waiting.

Fulks and Basham kidnapped Donovan and drove off in her BMW, with

Fulks at the wheel while Basham sat in the back seat with

Donovan.  Along the way, Fulks and Basham tried to draw money

from Donovan's account at various ATMS.  Fulks and Basham stopped

---

[2/]  In 2005, in the United States District Court for the Southern District of West Virginia, Fulks and Basham pleaded guilty to carjacking resulting in Burns's death and were sentenced to life imprisonment.  Fulks, 454 F.3d at 416 n.1.

5

at a cemetery in North Carolina where both men raped Donovan. Fulks and Basham then killed Donovan and concealed her body. Fulks, 454 F.3d at 417.

Fulks and Basham returned to their motel and told the women that they needed to flee because the police had seized Severance's van. On November 15, Fulks and Basham drove to the home of Beth McGuffin in Huntington, West Virginia. They spent the next two days smoking crack. On November 17, Fulks and Basham drove to a mall in Ashland, Kentucky, where they planned to break into cars. However, Basham was arrested after he tried to kidnap two women. Fulks returned to McGuffin's home where he learned of Basham's arrest. On November 18, Fulks drove to his brother's home in Goshen in Donovan's BMW, eluding along the way after a high speed chase, highway patrol officers. On November 20, 2002, police officers followed Fulks and his brother after observing them leave the brother's house. Later that day, they arrested Fulks after a brief foot chase. Fulks, 454 F.3d at 417.

On November 28, 2002, federal and state investigators organized a team to search for Donovan's body in North Carolina. Basham and his attorneys accompanied the agents, including Brunswick County Sheriff Ronald E. Hewett and FBI Agent Jeff Long. During the ride, Basham saw a deer and said, "I never could kill a deer and here I have," but he stopped before finishing his sentence. Later, Basham told investigators he

6

threw away a Liz Claiborne purse strap at the cemetery.  Basham, 561 F.3d at 313.

In January 2009, investigators discovered Donovan's remains in a wooded area in Horry County, South Carolina, based on information provided by Fulks.  J.A. 100279.

B.  The Trial Proceedings

On April 23, 2003, a grand jury charged Fulks and Basham with capital and non-capital crimes relating to their crime spree and the killing of Donovan.  On September 12, the government filed a notice of its intent to seek the death penalty under Section 3593(a), alleging the following statutory gateway intent factors with respect to the carjacking and kidnapping offenses: (1) intentional killing of Donovan (18 U.S.C. 3591(a)(2)(A)); intentional infliction of serious bodily injury resulting in the death of Donovan (Section 3591(a)(2)(B)); intentional participation in an act, contemplating that Donovan's life would be taken and intending that lethal force would be used against Donovan (Section 3591(a)(2)(c)); and intentionally engaging in an act of violence, knowing that the act created a grave risk of death to Donovan which constituted a reckless disregard for human life, and that Donovan died as a result (Section 3591(a)(2)(D)). The notice alleged as statutory aggravating factors, that Donovan's death occurred during her kidnapping, Section 3592(c)(1), and that the murder was committed for pecuniary gain.

Section 3592(c)(8).  The court dismissed the pecuniary gain aggravating factor before submission of the case to the jury.

The death notice alleged the following non-statutory aggravating factors under Section 3593(a) and (c): (1) Fulks's other murder, attempted murders, and other acts of violence, (2) his future dangerousness to other persons, including inmates and correctional officers, as evidenced by the two capital offenses and the other aggravating factors; and (3) the impact of Fulks' murder of Donovan on her family.[3/]

On May 4 and 7, 2004, Fulks pleaded guilty to all charges without a plea agreement.  The district court conducted jury selection for the sentencing phase from May 10 to May 21, 2004. The sentencing phase lasted from June 1 to June 30, 2004.  The government presented more than 100 witnesses in three weeks.  The government's case centered on Fulks's and Basham's crime spree that resulted in the killings of Burns and Donovan.  The government sought to prove that Fulks played an active, if not the leading role during the spree.  By contrast, Fulks tried to show that Basham was the leader and the killer, and that Fulks was merely Basham's follower.  The government presented victim

---

[3/]  The "other acts of violence" allegation included: (A) the escape from the Hopkins County Jail, (B) the carjacking and kidnapping of Burns that resulted in her death, (C) a burglary and the assault with intent to kill Carl Jordan; (D) the carjacking and kidnapping of Hawkins; and (E) the high-speed chase that endangered the lives of the state police officers.

impact evidence through the testimony of Donovan's family and friends.  See Fulks, 454 F.3d at 418-419, 434-435.

The government also introduced evidence of Fulks's extensive criminal record.  Fulks had a federal conviction for interstate transportation of a stolen vehicle in 1998, and state convictions for burglary, bad checks forgery, attempted assault, and trespass.  Other evidence showed that Fulks had a history of supporting himself and his family by breaking into cars and stealing; that he beat and sexually abused his wife; and he was also violent toward his girlfriends.  Fulks, 454 F.3d at 413; 06/18/2004 Tr. 252-255; 06/22/2004 Tr. 126-127.

Fulks's violent acts continued after his arrest.  On April 24, 2003, while incarcerated pending trial, Fulks fought law enforcement agents when they tried to seize unauthorized photographs from him.  In May 2004, Fulks tried to escape from a hospital for inmates and fought staff members when they apprehended him.  06/21/2004 Tr. 81-87, 111-212.

The defense case lasted from June 22 to June 25, 2004. Fulks presented 24 defense witnesses, including family members and other witnesses who described Fulks's "miserable childhood," and expert testimony that Fulks suffered from mental deficiencies that were caused by fetal alcohol spectrum disorder.  Fulks, 454 F.3d at 420.

C.  The Jury Verdict

On July 30, 2004, the jury returned a special verdict recommending the death sentence on both the carjacking and the kidnapping counts.  It found the threshold "grave risk of death" statutory intent factor under Section 3592(a)(2)(D).[4]  It also found the statutory kidnapping aggravator, and every alleged non-statutory aggravator.

The jurors found 32 of Fulks's 43 mitigating factors, including 22 unanimously.  The findings are as follows: (1) Fulks's mother abused alcohol while pregnant with Fulks [12 jurors]; (2) Fulks's brain was permanently damaged due to his mother's drinking [9 jurors]; (3) Fulks's IQ was between 77 and 79 [four jurors]; (4) Fulks's ability to process information was impaired by Fetal Alcohol Spectrum Disorder [no jurors]; (5) Fulks's ability to control his impulses was impaired by FASD [one juror]; (6) Fulks's ability to make good decisions was impaired by FASD [no jurors]; (7) Fulks's ability to understand cause-and-effect and predict consequences of his actions was impaired by

---

[4] Section 3591(a)(2)(D) was modeled, in part, on the Supreme Court's decisions in Tison v. Arizona, 481 U.S. 127 (1987), and Enmund v. Florida, 458 U.S. 782 (1982). Enmund held that the Eighth Amendment bars the death penalty for a person who participates in a felony resulting in murder but who does not intend to kill.  But in Tison, the Court held that the Eighth Amendment permitted the death penalty for two men who broke their father and another person out of jail, carjacked a vehicle with three occupants, and then watched as their father executed the occupants.  See United States v. Williams, 610 F.3d 271, 284-290 (5th Cir. 2010).

10

FASD [no jurors]; (8) Fulks's ability to learn from his mistakes was impaired by nuerological damage [no jurors] (9) Fulks suffered from learning disabilities as a child [12 jurors]; (10) Fulks tried hard in school but could never do well [no jurors]; (11) Fulks's parents did not help him with homework and left him at school with soiled pants [10 jurors]; (12) Fulks was neglected by both parents [12 jurors]; (13) Fulks lived in a house infested with rats and roaches [12 jurors]; (14) Fulks's parents did not supply him with adequate clothing or school supplies [12 jurors]; (15) Fulks frequently went hungry or was uncertain whether he would get food as a child [11 jurors]; (16) Fulks's parents sold food stamps for beer [12 jurors]; (17) Fulks's parents drank to excess daily [6 jurors]; (18) Fulks was often left unsupervised [12 jurors]; (19) Fulks was permitted to roam the streets as a young child [12 jurors]; (20) Various officials recommended unsuccessfully that Fulks be removed from his home at age 9 [12 jurors]; (21) Fulks's parents gave him little attention or affection [12 jurors]; (22) Fulks was subjected to emotional abuse as a child [12 jurors]; (23) Fulks was subjected to physical abuse as a child [12 jurors]; (24) Fulks grew up seeing his parents frequently fighting each other [12 jurors]; (25) Fulks grew up seeing heavy drinking and frequent fighting by other adults in his house [12 jurors]; (26) Fulks learned at home that violence and fighting were normal relationships between men

11

and women [4 jurors]; (27) Fulks grew up seeing graphic photographs of naked women papering the walls and ceiling of his basement [12 jurors]; (28) Fulks's father showed him pornographic movies as a young child [12 jurors]; (29) Fulks's mother was often half-dressed around the house [no jurors]; (30) Fulks was sexually abused as a child [no jurors]; (31) Fulks started drinking at age nine, used marijuana at age 11 or 12, and his parents made no effort to stop him [12 jurors]; (32) Fulks's brother taught him to inhale gasoline and paint as a young teenager [12 jurors]; (33) Fulks's father encouraged him to steal [no jurors]; (34) Fulks's mother ignored his stealing [12 jurors]; (35) Fulks's brother taught him to steal, fight, and break into cars [12 jurors]; (36) Fulks attempted suicide at age 13 [12 jurors]; (37) Fulks was diagnosed with depression, substance abuse, and possible sociopathic tendencies at age 14 [10 jurors]; (38) Fulks's capacity to conform his conduct to the law was impaired [no jurors]; (39) Fulks took part in the offenses under mental and/or emotional disturbance [no jurors]; (40) Fulks was under the influence of alcohol and drugs at the time of the offenses [no jurors]; (41) other factors in Fulks's childhood, background, or character weigh against a death sentence [1 juror]; (42) no one has escaped from a high-security federal prison since 1993 [8 jurors]; and (43) Fulks pleaded

12

guilty to carjacking and kidnapping resulting in death [12 jurors].  J.A. 201809-201819.

On July 27, 2006, this Court affirmed the judgment.  It rejected every claim raised by Fulks.  It independently ruled that the death sentence was not imposed arbitrarily, and that the evidence supported the jury's special finding that Donovan's death occurred during the commission of, or flight from, a kidnapping.  Fulks, 454 F.3d at 421 n.4.

D.   The Section 2255 Motion

In 2008, Fulks filed a motion to vacate his sentence under 28 U.S.C. § 2255.  Fulks raised, among other things, multiple claims of ineffective assistance of counsel, and a claim that the government violated due process by allegedly presenting conflicting theories of guilt at the separate trials of Fulks and Basham.

The district court held an evidentiary hearing from February 22, 2010 to March 1, 2010.  As is relevant here, defense attorneys John Blume, William Nettles, and Shari Johnson testified about their strategy and tactics in defending Fulks.  Andrea Lyon, a professor at DePaul law school and an experienced capital litigator, testified as an expert witness for Fulks.

The district court denied Fulks's motion, finding, among other things, that Fulks received "world-class representation

13

from a highly skilled, motivated team of four lawyers with death penalty experience." J.A. 100296.

SUMMARY OF ARGUMENT

1. Fulks received the effective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984). Blume's conduct was reasonable at all stages of the case. In any event, even if counsel performed deficiently in any respect, Fulks was not prejudiced.

a. Blume rendered effective assistance of counsel in advising Fulks to make incriminating pretrial statements and to plead guilty to the charges without a government benefit. Blume reasonably decided that the best defense strategy was to avoid the death penalty because the government had an overwhelming case against Fulks. Consistent with that strategy, Blume properly advised Fulks to make incriminating statements and then to plead guilty to show that Fulks did not deserve the death penalty because he had accepted responsibility and shown remorse. Blume reasonably declined to seek immunity for Fulks's pretrial statements because Blume wanted the jury to hear Fulks's relatively exculpatory version of the crimes without subjecting Fulks to a potentially devastating cross-examination.

In any event, Fulks was not prejudiced because he has not shown that, but for counsel's advice, he would have remained silent, pleaded not guilty, and gone to trial. The government's

14

case against Fulks on all charges was overwhelming.  Because Fulks's primary goal was to avoid the death penalty, pleading not guilty and contesting his guilt would have sharply increased the likelihood that the jury would sentence him to death.

b.  Blume's voir dire was reasonable.  Blume properly used the "Colorado method" of capital voir dire to determine whether potential jurors harbored pro-death penalty views that would subject them to challenges for cause.  Blume's use of "case specific" questioning during voir dire did not result in a disorganized and jury-alienating voir dire.

Second, Blume was not ineffective in failing to inquire during jury selection why juror Sylvia Allison left blank on her jury questionnaire a question about past victimization of a serious crime, which would have revealed that her husband had been murdered in 1971.  Blume cured his oversight by moving for a new trial after he learned of Allison's omission after trial, and raising the issue on direct appeal after the district court denied his new trial motion.  Moreover, Blume testified that it is uncertain whether he would have necessarily struck Allison with a peremptory challenge at trial even if he had known of her omission during jury selection.

Third, Blume acted reasonably in seating three jurors with allegedly strong pro-death views after the district court denied his challenges for cause instead of striking them with peremptory

15

challenges.  That strategy allowed Blume to preserve for appeal his claims that those jurors were biased in the event of a death sentence.  Blume was not required to remove those jurors with peremptory challenges.  In any event, Fulks was not prejudiced because no biased juror sat on his case.  This Court's rejection of Fulks's juror bias claims on direct appeal constituted a conclusive ruling that Fulks's jury was impartial.

c.  Blume reasonably decided not to raise on direct appeal claims regarding the prosecutor's summation on mitigating factors and the district court's jury instructions on mitigating factors. Although Blume did not recall his reason for omitting the jury instruction issue, mitigation issues did not fit within his appellate strategy of focusing on issues relating to Fulks's claimed inability to present his theory that he was not the actual killer of Donovan to a fair jury.

Neither mitigation issue had merit and both were therefore much weaker than the issues that Blume raised on appeal.  The Eighth Amendment is violated only if there is a reasonable likelihood that the jury was prevented from considering mitigating evidence.  Neither the prosecutor's argument not the jury instructions prevented the jury from considering Fulks's mitigating factors.  As to the prosecutor's argument, review would have been limited to plain error because Blume did not object to the prosecutor's argument at trial.  There was no

16

error, much less a plain error. The prosecutor properly argued that Fulks's mitigating factors did not absolve him of his responsibility for his crimes.  As to the jury instructions, the district court properly charged the jury that Fulks had the burden of proof to show that a mitigating factor existed by a preponderance of the evidence, and that the jury had to decide whether any submitted mitigating factor was actually mitigating.

In any event, Fulks was not prejudiced for two reasons. First, the special verdict showed that the jurors considered Fulks's mitigating factors because one or more jurors found the existence of numerous mitigating factors, some of them unanimously.  Second, the weight of the government's aggravating factors, including Fulks's commission of two murders, an attempted murder and his extensive criminal record, and the impact of the crime on Donovan's family, overwhelmed Fulks's mitigating factors.

2.  Fulks claims that the government presented inconsistent theories of guilt at his trial and at Basham's trial, but he must show "cause and prejudice" for not raising that claim on direct appeal.  Even assuming that Fulks had "cause" for his default, Fulks cannot show prejudice.

The government consistently argued at both trials that Fulks and Basham jointly killed Donovan and that they were equally culpable for her death.  Although the government presented

17

evidence of Basham's pretrial statements at Basham's trial alone, that resulted from the district court's evidentiary rulings that admitted Basham's statements as admissions against him under Fed. R. Evid. 801(d)(2), but excluded them from Fulks's trial on undue prejudice grounds under 18 U.S.C. 3593(c). The government did not present false evidence at either trial.

The prosecutor's argument at Basham's trial that Basham strangled Donovan was based on evidence reasonably elicited from a government witness by Basham, not the government. Further, the government repeatedly told the jury that it did not contend that Basham alone was responsible for Donovan's death.

In any event, Fulks was not prejudiced. The jury's finding that Fulks had only an intent to commit an act of violence that created a grave risk of death to Donovan under 18 U.S.C. § 3591(a)(2)(D) was consistent with the government's theory that Fulks and Basham aided and abetted each other in killing Donovan. Thus, the jury's death sentence was not premised on a finding that Fulks was Donovan's actual killer.

ARGUMENT

I

FULKS RECEIVED THE EFFECTIVE ASSISTANCE OF COUNSEL

Fulks contends (Br. 48-75) that he was denied the effective assistance of counsel at the pretrial and guilty plea stages of

18

his capital case, during jury selection before the penalty phase, and on direct appeal.  Those claims lack merit.

A.  Standard of Review

Whether a defendant was denied the effective assistance of counsel is a mixed question of law and fact that is reviewed de novo.  United States v. Nicholson, 611 F.3d 191, 205 (4th Cir. 2010).  The district court's factual findings are reviewed for clear error.  United States v. Smith, 640 F.3d 580, 590 (4th Cir.), cert. denied, No. 11-6133 (Oct. 11, 2011).

B.  General Legal Principles

To prevail on a claim of ineffective assistance of counsel, a defendant must show that (1) counsel's performance was constitutionally deficient and that (2) the error prejudiced the defense.  Strickland v. Washington, 466 U.S. 668, 687-694 (1984). In evaluating error, the test is whether the attorney's conduct satisfied an objective standard of reasonableness.  Courts do not have a "checklist for judicial evaluation of attorney performance," lest they "restrict the wide latitude counsel must have in making tactical decisions."  Strickland, 466 U.S. at 688-689.  Codes of professional behavior are helpful guides, but they do not set fixed rules for attorney performance because they cannot account for the variety of circumstances faced by a criminal defense attorney.  A detailed set of rules would unduly restrict counsel's independence in choosing strategies and

19

tactics for his client. Strickland, 466 U.S. at 688-689; Bobby v. Van Hook, 130 S. Ct. 13, 16 (2009). Counsel will rarely be limited to a particular technique or approach in making tactical decisions. He can balance limited resources in accord with effective trial tactics and strategies. Harrington v. Richter, 131 S. Ct. 770, 789-790 (2011).

There is a "'strong presumption" that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. The reasonableness of counsel's actions must be judged at the time of counsel's conduct, rather than by hindsight or on the basis of an adverse verdict. Strickland, 466 U.S. at 690; United States v. Higgs, __ F.3d __, 2011 WL 5867958 *10 (4th Cir. Nov. 23, 2011). A strategic choice made after thorough investigation of the law and facts relative to plausible options is "virtually unchallengeable." Strickland, 466 U.S. at 690. That is particularly true where, as here, those strategic choices have been made by experienced defense counsel. E.g., Williams v. Head, 185 F.3d 1223, 1228-1229 (11th Cir. 1999) (collecting cases) ("strong reluctance to second-guess" decisions by experienced counsel). Further, counsel's actions are presumed to have resulted from strategy rather than neglect. Cullen v. Pinholster, 131 S. Ct. 1388, 1404 (2011). Counsel is not required to confirm every aspect of his strategic basis for

20

decision, to prepare for remote possibilities, to present all relevant defense evidence, or to counter all government evidence with corresponding defense evidence.  Even a reasonable miscalculation will not make counsel ineffective.  Richter, 131 S. Ct. at 789-791.  When the record is unclear or incomplete, the presumption is that counsel acted reasonably.  Chandler v. United States, 218 F.3d 1305, 1314 n.15 (11th Cir. 2000).

Prejudice is defined as a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  Strickland, 466 U.S. at 694.  With respect to an error committed in a guilty plea case, the defendant must show a reasonable probability that he would not have pleaded guilty but proceeded to trial.  Premo v. Moore, 131 S. Ct. 733, 744 (2011).  That inquiry is dependent on the likely outcome of a trial if the defendant had pleaded not guilty.  See Hill v. Lockhart, 474 U.S. 52, 59-60 (1985).  At a capital sentencing stage, the defendant must show a reasonable probability that the balance of aggravating and mitigating factors did not warrant the death sentence.  Strickland, 466 U.S. at 695.

### 1.  Counsel Were Effective In Advising Fulks To Make Pretrial Statements And To Plead Guilty Without A Government Benefit

Fulks contends (Br. 67-75) that counsel were ineffective by advising him to make pretrial statements to the government and

21

then to plead guilty without a government benefit.  Counsel's advice was reasonable.  Moreover, Fulks was not prejudiced.

a.  Factual Background

1.  Counsel's Pretrial Strategy

At trial, Fulks was represented by John H. Blume, III, William F. Nettles, IV, Sherri L. Johnson, and Keir M. Weyble. Blume was appointed in January 2003.  Blume was lead counsel because of his capital litigation experience.  After graduating from Yale Law School in 1984 and clerking for a federal appeals court judge, Blume spent several years in private practice before forming the South Carolina Death Penalty Resource Center in 1988. In 1993, Blume joined the Cornell Law School faculty and formed the Cornell Death Penalty Project with Johnson and another attorney.  Blume has taught courses on criminal law (including capital case law), and supervised several class clinics at Cornell Law.  He has authored numerous scholarly articles on capital punishment, including voir dire in capital cases, and has been an active presenter at related educational seminars.  J.A. 100130-100132, 100235, 200715-200716, 200896-200897.

Blume was counsel of record in 15 potential capital trials. He successfully obtained a non-death verdict by jury or negotiated plea in every case except this case, which was Blume's only federal capital trial.  Blume presented argument in death penalty appeals in the federal courts of appeals and the United

22

States Supreme Court. He also participated in approximately 20 collateral attacks on state death penalty cases. He conducted three trial voir dires and approximately 15-20 mock voir dires. J.A. 200809-200814, 200907-200909.

Nettles had practiced law for 22 years and had been an Assistant Federal Public Defender in Florence, South Carolina, for 15 years. This case was Nettles's first capital trial. Nettles's primary responsibilities in this case were to do "field work," and to coordinate the potential expert witnesses. J.A. 200991-200994.

Johnson, a professor at Cornell Law since 1981, graduated from law school in 1979, worked in private practice, and has been the Assistant Director of the Cornell Death Penalty Project since 1996. Like Blume, she combines academic work with actual death penalty practice. Prior to this case, she participated in two death penalty trials, and was involved in eight capital cases that were resolved without a trial or a death sentence. She also worked on approximately 30 capital collateral attack cases. Johnson concentrated on the mitigation issues in the case. Blume and Johnson also enlisted Cornell law students to assist them in interviewing potential witnesses and researching legal issues. J.A. 100133, 200800-200802, 201319-201322.

Weyble was an associate in Blume's South Carolina office. Weyble was primarily a "law guy" who did not participate directly

23

at Fulks's trial.  He reviewed the trial transcript in preparation for Fulks's direct appeal.  J.A. 200718-200719, 201337.

At the Section 2255 hearing, Blume testified that he interviewed Fulks several times after being appointed counsel. Fulks repeatedly told Blume that he was not the actual killer of Donovan and Burns.  Blume believed Fulks.  Blume then decided that his best chance of avoiding a death sentence for Fulks would be to convince the government and the jury that Basham was the sole murderer of Donovan and Burns.  J.A. 200720, 200725, 200865-200866, 200933; Fulks, 454 F.3d at 426.

On March 10, 2003, the government provided Blume with 813 pages of discovery materials, including the surveillance videotapes of the carjacking and kidnapping of Donovan at the Wal-Mart and at the gas station in North Carolina.  After reviewing that information, Blume concluded that the government had an overwhelming case against Fulks, but its evidence did not refute Fulks's story that Basham was the sole murderer of Donovan.  Blume decided that Fulks needed to accept responsibility for his crimes and to cooperate with the government to avoid the death penalty.  Blume persuaded Fulks to submit an offer to plead guilty to the charges in exchange for a life sentence.  On April 9, at a meeting with prosecutors in the United States Attorney's Office, Blume presented Fulks's written

24

plea offer, and orally offered Fulks's help in locating Donovan's body.  Blume also said that Fulks had passed a private polygraph examination indicating that he did not kill Donovan or Burns. J.A. 200885-200890, 201947-201954.

The government rejected Fulks's plea offer because it: (1) believed that it had an overwhelming case against Fulks, (2) probably would not find any relevant or admissible evidence from the discovery of Donovan's body given the passage of time since her death, (3) concluded that Fulks and Basham would blame each other for Donovan's murder, (4) had independent evidence that Fulks was extensively involved in Donovan's murder, and (5) had declined to bargain with Basham.  On April 10, by letter, the government informed Blume that it would welcome Fulks's assistance, but it would use any statements made by Fulks against him at trial.  J.A. 200887-200888, 201950-201952, 201958-201960.

Despite the government's rejection of Fulks's plea offer, Blume and his co-counsel believed a pretrial statement by Fulks that admitted his role in the deaths of Burns and Donovan would benefit Fulks.  Blume was aware of the risks of having Fulks talk to the government, but he concluded that it was in Fulks's best interest to do so.  First, Blume thought that the government might accept a subsequent plea offer for a life sentence if Fulks admitted his role in the offenses, the government subsequently discovered Donovan's body before trial based in part on Fulks's

25

admissions, and Fulks continued to pass private polygraph examinations indicating that Basham was the actual killer. J.A. 200725-200726, 200996, 201323.

Second, even if the government continued to reject Fulks's plea offers despite obtaining a pretrial statement from him, Blume believed that the government would introduce Fulks's statement to the jury during the penalty phase of the trial. If so, Blume thought the statements could be used to Fulks's advantage by demonstrating to the jury that Fulks had accepted responsibility and expressed remorse for his crimes. Further, the statement would allow Fulks to present his version of the crimes to the jury without having to testify and face a potentially devastating cross-examination. Indeed, Blume did not want Fulks to testify at trial given Fulks's lengthy criminal record and mental problems. For those reasons, Blume did not consider asking the government to immunize Fulks's pretrial statements, because it would have been "self-defeating" to do so in light of his trial strategy. J.A. 200725-200729, 200888-200889, 200995-200997, 201053-201055, 201322-201325.

2. Fulks's Pretrial Statements

Blume persuaded Fulks to give pretrial statements about his role in the killings of Donovan and Burns to the FBI. On April 21, 2003, with Blume, Nettles, and a defense investigator present, Fulks orally described his role in the carjacking and

26

kidnapping of Donovan that was memorialized in an FBI Form 302. Fulks essentially blamed Basham for the crimes. Fulks said that when he and Basham entered the Wal-Mart parking lot, he thought that Basham was going to steal an unoccupied vehicle, but that Basham instead decided to carjack the BMW containing Donovan. Basham carried a pistol; Fulks was unarmed. Fulks drove the BMW north while Basham and Donovan remained in the back seat. During the trip, Basham told Fulks to buy some tape. Later, Basham raped Donovan and then "told" Fulks to have sex with Donovan. Fulks did not want to but felt "pressure" from Basham to do so. J.A. 201893-201896.

Afterwards, Basham taped Donovan's wrists, and told Fulks to look for a dirt road. Basham told Donovan that he did not intend to hurt her as he would just tie her up and leave her in the woods. After Fulks stopped the BMW, Basham took Donovan into the woods while Fulks remained by the BMW. Basham returned 20 minutes later and said that he had taken Donovan's clothing so that she would not run for help very quickly once she freed herself. Fulks and Basham drove to their motel in Myrtle Beach and then decided to flee the area. As they were driving north, Basham admitted that he killed Donovan and buried her in the woods to prevent her from identifying them to the police. Basham said that he had previously killed another woman and covered her

27

with tree bark to prevent detection and that her body had never been found.  J.A. 201896-201897.

On September 8, 2003, with Blume present, Fulks described his role in the carjacking and kidnapping of Burns that was memorialized in an FBI Form 302.  Again, Fulks placed most of the blame on Basham.  Fulks stated that Basham kidnapped Burns in her car while Fulks and Basham were stealing items from cars in a mall parking lot.  Basham drove off with Burns in her car followed by Fulks in another vehicle.  Basham wanted to rape Burns.  Later, while Fulks stood by his vehicle, Basham drove Burns to a remote location and returned alone a short time later. Afterwards, in Fulks's presence, Basham set fire to Burns's car. The two men then fled the area.  After Donovan's death, Basham told Fulks that he killed Burns.  J.A. 400001-400006.

3.  The Advice to Plead Guilty

Blume concluded that a guilty plea to all charges was the only realistic defense option after Fulks made his pretrial statements.  Blume believed that Fulks would be found guilty if he contested the charges, and that the defense "would get more mitigating value out of pleading" than by going to trial. Johnson agreed that the jury would turn on Fulks if he pleaded not guilty after having made his incriminating statements. Blume's strategy was confirmed by the results of a mock trial held in March 2004 in which several "jurors" voted for a life

28

sentence in part because they believed that Fulks was not the triggerman and because he had pleaded guilty. Blume discussed the options with Fulks, who agreed to plead guilty despite having initial reservations. J.A. 200729-200733, 200841-200844, 200889-200891, 201325, 201962-201969.

Blume decided that Fulks could not plead guilty to the carjacking charge on a principal theory because carjacking is a specific intent crime, and Fulks had denied that he intended to kill Donovan. After researching the issue, Blume concluded that Fulks could plead guilty to the carjacking offense under the vicarious liability theory of Pinkerton v. United States, 328 U.S. 640 (1946).[5/] Blume believed a guilty plea under Pinkerton would not only further the goals of acceptance of responsibility and remorse, but would also allow him to argue to the jury that Fulks's guilty plea to the carjacking charge did not admit any of the statutory gateway intent requirements under Section 3591(a)(2). J.A. 200889-200891.

On May 4, 2004, Fulks pleaded guilty to the carjacking charge on a Pinkerton theory based on his pretrial statements and to the remaining charges on a principal theory. The district

---

[5/] Under Pinkerton, a defendant is liable for a substantive crime committed by a co-conspirator if that crime was in further-ance of the conspiracy and reasonably foreseeable to the defendant. E.g., United States v. Hickman, 626 F.3d 756, 771-772 (4th Cir. 2010), cert. denied, No. 11-6404 (Oct. 17, 2011). A guilty plea may be based on Pinkerton liability. E.g., United States v. Bell, 137 F.3d 1274, 1274-1275 (11th Cir. 1998).

court deferred acceptance of Fulks's guilty plea to the carjacking charge because it was unsure whether a defendant can plead guilty under <u>Pinkerton</u> in a capital prosecution. Afterwards, both parties submitted legal memoranda arguing that a <u>Pinkerton</u>-based plea was permissible in a capital case.  On May 7, 2004, the district court accepted Fulks's guilty pleas.  J.A. 100208-100212.

### 4.  The Section 2255 Hearing

During the Section 2255 hearing, Lyon testified that she has been a capital and homicide criminal defense attorney since 1976. She has also published articles about capital defense work.  She held both moral and pragmatic objections to capital punishment. Lyon testified that it was an "industry standard" for counsel to advise a client not to speak to the authorities without a proffer agreement or equivalent protection against use of the client's statement at trial.  She explained that an unprotected statement provides evidence for the prosecution, and lowers the chances that the prosecution will give any benefit to the defendant later.  She further stated that juries do not view a defendant's pretrial statements to the police as mitigating evidence.  She concluded that Blume's advice to Fulks to make incriminating statements to the FBI without immunity was unreasonable.  J.A. 200942-200956.

Lyon further testified that it would never be "consistent with industry standards" for an attorney to advise his client to plead guilty to a capital charge without an agreement precluding the death penalty. She explained that capital litigators, through long experience, had abandoned the theory that a jury might give credit to a defendant for his guilty plea. J.A. 200961-200962.

### 5. The District Court's Rulings

The district court ruled that Blume's advice to Fulks to make incriminating pretrial statements to the government without a benefit was reasonable. The court emphasized that the government had a very strong case against Fulks and that Blume had four sound tactical reasons supporting his advice. First, Blume reasonably believed that the government might drop the death penalty if Fulks could persuade it that Basham was the actual killer of Donovan. Second, even if the government did not drop the death penalty, Fulks needed to tell the jury that he did not actually kill Donovan without testifying and exposing himself to cross-examination. Third, Fulks would make a stronger case for remorse and acceptance of responsibility before the jury if he did not exchange his statements for a government benefit. Fourth, Blume subsequently used Fulks's pretrial statements as a foundation for his trial motion to admit the allegedly

31

exculpatory private polygraph examinations into evidence.  J.A. 100202-100205.

The district court rejected Fulks's argument that his pretrial statements allowed the government to close gaps in the government's case, finding that Fulks's statements were cumulative to the government's case.  The court stated that the outcome of the trial would not have been different even if Fulks had remained silent because the government had a compelling case against Fulks.  J.A. 100202-100203.

The district court also ruled that Blume's advice to Fulks to plead guilty was a reasonable trial strategy given the overwhelming evidence against Fulks, and Blume's belief that Fulks could best avoid the death penalty by expressing remorse and accepting responsibility for his crimes.  J.A. 100222-100223.

Additionally, the district court expressly rejected Lyon's expert opinion that a guilty plea to a capital charge without a plea agreement is categorically deficient performance.  The court noted that in Nixon v. Florida, 543 U.S. 175 (2004), the Supreme Court stated that an attorney's concession of guilt in a capital case was not automatically deficient performance, and that the same principle applied here.  J.A. 100222-100223.

b.  Legal Principles

Review of counsel's performance at the pretrial and guilty plea stages of a case is very deferential.  During those stages,

counsel must make "careful strategic choices in balancing opportunities and risks." Premo, 131 S. Ct. at 741. A two-phase capital case presents unique challenges to a defense attorney. In many cases, the defendant's guilt is clear, and the government will have little, if any, incentive to plea bargain. In that situation, avoiding the death penalty may be the only realistic result for the defense. Counsel can therefore focus on the penalty phase while avoiding such counterproductive steps as aggressively challenging guilt at the guilt phase. Nixon, 543 U.S. at 189-191; Meyer v. Branker, 506 F.3d 358, 369 (4th Cir. 2007) (guilty plea may offer "best chance of not being sentenced to death"); Harvey v. Warden, 629 F.3d 1228, 1243 (11th Cir.), cert. denied, No. 11-295 (Nov. 14, 2011).

Thus, it is reasonable for counsel to advise a defendant to plead guilty to a capital charge without a plea agreement or other government benefit based on counsel's belief that the sentencer will view the guilty plea as a mitigating factor, thereby reducing the risk of a death sentence. See, e.g., Bell v. Evatt, 72 F.3d 421, 427-430 (4th Cir. 1995) (defendant entered a guilty but mentally ill plea to murder and kidnapping);[6] Stout v. Netherland, 1996 WL 496601 *8 (4th Cir. 1996) (unpublished) (defendant entered unconditional guilty plea

---

[6] Blume was an appellate counsel for Bell, which, like this case, involved a kidnapping and murder of a woman. Bell, 72 F.3d at 425.

33

to show remorsefulness); <u>Fairbank</u> v. <u>Ayers</u>, 650 F.3d 1243, 1255 (9th Cir. 2011) (mid-trial guilty plea strategy reasonable where, among other things, it permitted counsel to "cast [defendant] in a more sympathetic light"); <u>Post</u> v. <u>Bradshaw</u>, 621 F.3d 406, 415-419 (6th Cir. 2010) (no-contest plea without government benefit reasonable where counsel hoped that sentencer would regard plea as mitigating), cert. denied, 131 S. Ct. 2902 (2011).  Such advice does not become unreasonable as a result of a death sentence.  See <u>Strickland</u>, 466 U.S. at 689.

   c.  <u>Discussion</u>

Blume's advice to Fulks to make pretrial statements and then to plead guilty without a government benefit was reasonable. Blume believed that Fulks's best chance of avoiding the death penalty was by persuading the government and the jury that Basham was the sole murderer of Donovan and Burns.  A pretrial statement by Fulks was the best way to convey Fulks's version of the crimes to them, because only Fulks and Basham knew who actually killed Donovan and Burns.[7]  Morever, the jury might be more inclined to credit an early expression of remorse and acceptance of responsibility than a later statement, which might be viewed as a

---

[7] Blume reasonably prepared his defense strategy based on Fulks's repeated statements to Blume that Basham was the sole murderer of Donovan and Burns.  See <u>Strickland</u>, 466 U.S. at 691 ("[T]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions").

34

"deathbed conversion."  See <u>Premo</u>, 131 S. Ct. at 741
("[a]cknowledging guilt and accepting responsibility by an <u>early</u>
plea respond to certain basic premises in the law") (emphasis
supplied).  See also Guidelines §3E1.1, comment. (n.1(h))
("timeliness" of defendant's conduct is a relevant factor in
determining acceptance of responsibility credit); <u>United States</u>
v. <u>Guadagno</u>, 970 F.2d 214, 225 (7th Cir. 1992).

Blume gave compelling reasons for not seeking use immunity
in exchange for Fulks's pretrial statements.  As Blume explained,
immunity would have been "self-defeating" because it would have
prevented the jury from hearing Fulks's version of the crimes.
Fulks's sworn testimony at trial was not a viable substitute
because it would have exposed Fulks to a potentially damaging
cross-examination by the government.  Further, Blume had reason
to believe that the jury might question the sincerity of Fulks's
expression of remorse and acceptance of responsibility if it were
to learn that Fulks had exchanged his statements for a government
benefit.  Finally, it would have been pointless for Blume to have
requested immunity for Fulks's statements given the government's
earlier expressed intention to use any statement made by Fulks
against him at trial.

In addition, Blume made tactical use of Fulks's pretrial
statements by moving to admit the results of the exculpatory
defense polygraphs at trial, and by raising the issue on direct

35

appeal after the district court excluded the polygraph evidence. See Fulks, 454 F.3d at 434-435.

Blume's advice to Fulks to plead guilty to the capital charges was also reasonable. A guilty plea was Fulks's only realistic chance of avoiding the death penalty given the government's overwhelming case against Fulks on all charges. In addition, entering a not guilty plea after making two incriminating statements probably would have increased the risk of a death sentence. Also, further plea negotiations with the government were out of the question given the government's rejection of Fulks's earlier plea offer and the lack of any reason to believe the government would reconsider that decision.

Finally, Blume carefully limited Fulks's plea of guilty to the carjacking charge on a Pinkerton theory because, in part, Blume wanted to prevent Fulks from admitting that he intentionally killed Donovan, thereby making it more difficult for the government to prove any of the gateway intent factors in Section 3591(a)(2).

The district court properly rejected Lyon's opinion that it is categorically deficient for counsel to advise a defendant in a capital case to make an unprotected statement to the FBI or to plead guilty without a plea agreement.[8] The Supreme Court has

---

[8] Fulks's observation (Br. 67) that Lyon's expert testimony was "unrebutted" by the government is irrelevant. A factfinder may reject "unrebutted" or "unimpeached" testimony for any number of

36

rejected categorical rules in the ineffective-assistance context in favor of a case-specific reasonableness inquiry. E.g., Strickland, 466 U.S. at 689. It has also recognized that in capital cases, counsel can reasonably decide to focus his strategy on the penalty phase instead of the guilt phase. Nixon, 543 U.S. at 191. Thus, not only is it common for defendants to plead guilty or to admit guilt to capital charges without a plea agreement, e.g., United States v. Sampson, 486 F.3d 13, 19 (1st Cir. 2007), Meyer, supra, but reviewing courts have found that counsel acted reasonably under Strickland in advising their clients to do so. See pp. 33-34, supra. Moreover, Lyon's categorical rule is inconsistent with the 2003 ABA Guidelines, which merely discourage an attorney from advising a client to plead guilty to a capital case without a plea agreement. See 2003 ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, § 10.9.2, Commentary, 31 Hofstra L. Rev. 913, 1045 (2003 ABA Guidelines) ("counsel should be extremely reluctant to participate in a waiver of the client's trial rights").

---

reasons, including general implausibility, or because it is inconsistent with other evidence. See Maggio v. Fulford, 462 U.S. 111, 118 (1983). Furthermore, at least one other court has rejected capital ineffective-assistance claims despite Lyon's expert testimony for the defense. Harvey, supra, 629 F.3d at 1261-1263.

37

Fulks's suggestion (Br. 68-69, 73) that the Supreme Court endorsed Lyon's opinions in Nixon is mistaken.  In Nixon, the Court held only that counsel's decision to concede his client's guilt at the guilt phase of a capital trial without his client's express consent was not automatically prejudicial ineffective-assistance.  During its analysis, the Court cited a law review article written by Lyon for the unrelated proposition that counsel should not present inconsistent positions during a capital trial, such as by arguing that the defendant did not commit the crime at the guilt phase, but he is sorry for having done it at the penalty phase.  See Nixon, 543 U.S. at 191 (citing Lyon, Defending the Death Penalty Case: What Makes Death Different, 42 Mercer L. Rev. 695, 708 (1991)).

To be sure, Nixon also noted that the defense counsel in that case had decided not to enter a guilty plea without a plea agreement because he had determined that such a plea had little benefit for him, in accordance with the 2003 ABA Guidelines.  543 U.S. at 191 n.6.  But Nixon only described counsel's conduct in that case; it did not endorse the strategy of refusing to plead guilty in a capital case without a plea agreement.  Indeed, the validity of that practice was not an issue in Nixon.

Finally, Lyon's opinion that capital juries do not give mitigating weight to a defendant's pretrial statement or a guilty plea is wrong.  The jury unanimously found that Fulks's guilty

38

plea was a mitigating factor (J.A. 201816).  At least one other

capital jury has done so.  See Green v. French, 143 F.3d 865, 892

(4th Cir. 1998) ("at capital sentencing proceedings, Green

received the benefit of several mitigating circumstances based on

the fact that he pled guilty").[9/]  In addition, in a celebrated

case, a federal jury rejected the death penalty for a defendant

who pleaded guilty to charges arising from the Al Qaeda terrorist

organization's plot to use commercial aircraft to attack this

country.  See United States v. Moussaoui, 591 F.3d 263, 266 (4th

Cir. 2010).

Fulks's further argument (Br. 71) that it was unreasonable

for Blume to advise him to make his first statement relatively

early in the case because that gave the government time to

evaluate the statement for its own strategic purposes is

meritless.  Blume had reason to believe that the benefits from an

early statement of remorse and acceptance of responsibility

outweighed any disadvantages of alerting the government to

Fulks's version of the crimes.  See Premo, 131 S. Ct. at 741;

Strickland, 466 U.S. at 699 (counsel acted reasonably in

---

[9/]   Fulks's reliance (Br. 75) on Jones v. Page, 76 F.3d 831,
845 (7th Cir. 1996), is misplaced as that case says nothing about
a capital jury's willingness to credit a defendant for pleading
guilty.   The Seventh Circuit held only that counsel acted
reasonably in advising his client to plead guilty to a capital
charge before a court instead of a jury, even though the client
elected to be tried by a jury instead and was sentenced to death.

39

emphasizing that his client had accepted responsibility for his crimes). Moreover, Fulks's statements gave no evidentiary benefit to the government because it had a compelling independent case against Fulks, and--as the government predicted in refusing to plea bargain with Fulks or Basham--Fulks's pretrial statements essentially blamed Basham for both murders.

Although Fulks observes (Br. 72) that the government argued to the jury that Fulks was lying in his statements, the jury's verdict does not indicate that it found that Fulks's statements were lies. Indeed, the jury unanimously found that Fulks's guilty plea was a mitigating factor.

Fulks's further argument (Br. 72) that his guilty plea permitted the government to present a lengthy aggravation case that allegedly gave the jury less opportunity to evaluate his mitigation case ignores that the jury's special verdict demonstrates that it carefully considered Fulks's mitigating factors following his extensive mitigation case.

In any event, Fulks was not prejudiced under Strickland by Blume's advice because Fulks has not shown that he would have remained silent before trial, pleaded not guilty, and gone to trial. The government had an overwhelming case against Fulks on all charges, including the murders of Donovan and Burns, the attempted murder of Jordan, and the kidnapping of Hawkins. On the Donovan murder alone, the government had, among other things,

40

DNA evidence of Fulks's semen in Donovan's BMW, and videotapes of the carjacking and kidnapping at the Wal-Mart and at the gas station where they stopped shortly before they killed Donovan. Because Fulks's primary goal was to avoid the death penalty, a not guilty plea in a case involving two murders and other violent crimes would have dramatically increased the risk of a death sentence. See Meyer, 506 F.3d at 369-370.[10/]

### 2. Counsel Was Effective During Voir Dire

Fulks contends (Br. 48-58) that Blume was ineffective during jury selection because he (1) allegedly alienated and antagonized the jury during voir dire, (2) did not ask juror Sylvia Allison about the omission of the murder of her husband on her jury questionnaire, and (3) did not exercise peremptory strikes against three allegedly pro-death jurors. Blume was effective during jury selection. In any event, Fulks was not prejudiced because no biased juror sat on his case.

### a. Factual Background

### 1. Pretrial Strategy

Blume's primary goal during jury selection was to remove prospective jurors who had strong pro-death views and to keep

---

[10/] In arguing to the contrary, Fulks (Br. 72-73) contends only that he was reluctant to plead guilty and did so only after Blume spent significant time with him urging him to do so. But any defendant facing a capital trial will be initially reluctant to plead guilty. Fulks's initial reluctance to plead guilty is insufficient to show prejudice.

jurors who would be willing to vote for a life sentence if they found that Fulks did not actually kill Donovan and were convinced by Fulks's mitigation case.  J.A. 200719-200720, 200724.

In March 2004, Blume held a "mock" trial with 22 jurors. The pro-life jurors were influenced by, among others, the lack of evidence identifying Donovan's actual killer, and by Fulks's guilty plea.  The pro-death "jurors" emphasized that Fulks made no effort to end his crime spree with Basham.  J.A. 201962-201969.

Blume employed the so-called "Colorado method" to conduct voir dire that was created by David Wymore, a defense lawyer in Colorado.  The "Colorado method" directs defense counsel to rate potential jurors from 1 to 7 based on their views of the death penalty.  A juror scoring 1 will never impose the death penalty, whereas a juror scoring 7 (automatic death penalty) will always impose it.  Defense counsel using the "Colorado method" are guided by the following general principles: jurors are selected based on their life and death views only; pro-death jurors are questioned about their ability to respect the views of pro-life jurors; strong pro-death jurors are removed for cause; and peremptory challenges are prioritized based on the juror's views on punishment.  See Matthew Rubenstein, Overview of the Colorado Method of Capital Voir Dire, p.18, www.nacdl.org (November 2010)(last visited December 9, 2011); J.A. 200788-200789.

42

While questioning a potential juror, defense counsel should use leading questions to "strip" away extraneous defenses or irrelevant facts to gather information about the juror's view of the death penalty. Counsel should also use "case-specific and case-category" questions to build a record on appeal in the event a challenge for cause is denied. Counsel may use open-ended questions to gather information about the juror, but then should switch to leading questions to build a record for a challenge for cause. A leading question might be long, but its objective is to obtain a "yes or no" answer. Counsel should be candid and respectful toward potential jurors, but in some cases, "aggressive questioning of a pro-death juror is useful and necessary to provoke the juror to disclose her honest feelings." Rubenstein, supra, pp. 20-22, 25-26 (listing examples).

On defense motion, the district court summoned a state-wide venire of 800 persons. Each juror was mailed a standard jury questionnaire containing 58 questions to be returned to the court before jury selection. Upon arriving at the courthouse, each juror was given a supplemental questionnaire regarding their death penalty views. Fulks's defense counsel received most of those questionnaires between March 31 and May 6, 2004. After receiving the jury list, defense counsel prepared a voir dire outline, and a juror rating system after receiving a power point presentation about the "Colorado method" from Wymore. Counsel

43

then rated each potential juror under the "Colorado method."
After jury selection, a member of Fulks's defense team prepared a
brief biography of each selected juror.  J.A. 100236, 200900-
200908, 202404-202432, 202452-202460.

   2.  Voir Dire

   The district court began the voir dire, followed by defense
counsel and the government.  Blume, Johnson, and Nettles
conducted the voir dire.  Blume was present throughout the voir
dire; Johnson and Nettles rotated half-days.  Thus, while one
defense attorney questioned a juror, another attorney reviewed
the juror's questionnaire.  J.A. 200788, 201335.

   The jury, the counsel conducting the voir dire, the date of
the voir dire, the "Colorado method" rating, and whether the
defense challenged the juror for cause is set forth below:

| Juror | Counsel | Date | Rating | Challenge |
|---|---|---|---|---|
| Sylvia Allison | Blume | May 19, 2004 | 6.1 | Y |
| Agnes Bryan | Blume | May 14, 2004 | 4.33 | N |
| Richard Goehring | Blume | May 11, 2004 | 6.48 | Y |
| Lisa Harvey | Blume | May 14, 2004 | 6.9 | Y |
| Mary Huggins | Blume | May 19, 2004 | 4.2 | N |
| Timothy Kurzwell | Blume | May 19, 2004 | 5.25 | Y |
| Ann Lee | Blume | May 13, 2004 | 4 | N |
| Karl Nations | Blume | May 10, 2004 | 5.25 | Y |
| Pearl Gordon | Johnson | May 10, 2004 | 4.88 | N |
| Elizabeth Plyler | Johnson | May 11, 2004 | 4.3 | Y |
| Cynthia Steele | Johnson | May 17, 2004 | 4.3 | N |

44

| Joni Novinger | Nettles | May 14, 2004 | 3.94 | Y |
|---|---|---|---|---|

J.A. 100237, 202427-202439.

### i. Goehring

During the court's questioning, Goehring testified that he could be a fair juror. Blume then questioned Goehring about his views of the death penalty in cases in which a defendant acted intentionally but was not the actual killer, and when two killings were involved. Blume also asked whether a defendant's mitigation evidence would influence his views on the death penalty. As with his questioning of the other potential jurors, some of Blume's questions that incorporated case-specific facts were long. After Goehring expressed support for the death penalty, Blume challenged him for cause on the ground that he was a biased pro-death juror. The district court denied the challenge. Goehring was the jury foreman. J.A. 300534-300532; Fulks, 454 F.3d at 428.

### ii. Allison

Question 42 on the jury questionnaire asked whether any prospective juror or a close relative had ever been a victim of a serious crime. Allison left that question blank even though her husband had been murdered in 1971, shortly after they were married. No party asked Allison about that omission during voir dire. Fulks, 454 F.3d at 431.

During questioning by the court, Allison agreed to be fair even in a case involving two murders.  She also said she would consider mitigating evidence.  J.A. 302335-302345.

Blume questioned Allison about her views on the death penalty if she concluded that the defendant had intentionally killed the victim, or was responsible for two murders.  Blume also asked Allison whether she would stick to her opinion on an appropriate sentence even if the jury vote was 11-1 against her.  When Allison replied that she was not sure, the district court interrupted Blume and asked Allison whether she could hold firm to her views, but still be willing to reconsider them.  Allison said she could do both.  Blume challenged Allison for cause on the ground that she was a biased pro-death juror.  After further questioning of Allison, the district court qualified her. J.A. 302346-302358, 302366-302370; Fulks, 454 F.3d at 430.

   iii.   Harvey

Blume asked Harvey about her views on the death penalty if the defendant killed his victim intentionally and if two murders were involved.  At one point, Harvey seemed to say that she would automatically impose the death penalty for two murders.  The district court interrupted Blume and asked her whether she understood Blume's question, which was similar to a question asked by the court earlier.  Harvey replied that she would listen to all the facts.  After further questioning by Blume, the court

46

interrupted Harvey and said she was "telling [Blume] one thing and you are telling me something else." Harvey told the court that she would consider both sides. J.A. 301474-301483; Fulks, 454 F.3d at 429.

Blume challenged Harvey for cause based on her allegedly biased pro-death penalty views. The court denied the challenge, telling Blume that they had been "going around and around" because Blume was asking jurors impermissible "stake-out" questions. J.A. 301493-301499.

Afterwards, Blume exercised all of his 23 peremptory challenges, including six against 11 jurors rated at least a 6 under the "Colorado method" (McCants (6), Rowland (6.38), Morgan (6.44), White (6.48), Parramore (6.7), and Miles (6.8)), and 13 of the 20 jurors rated at least a 5 (Mitchum (5.9), Richards (5.8), Cunningham (5.75), Hayes (5.75), Mills (5.25), Dean (5.17), Edwards (5.63), Burkett (5.3), Adams (5.13), Howell (5.23), Martin (5.90), Reeves (5.30), Graham (5)). J.A. 200970, 202430-202433. Blume did not peremptory challenge Goehring, Allison, or Harvey.

3. Post-Trial Developments

i. The New Trial Motion

In July 2004, after the jury's verdict, Blume learned of the murder of Allison's husband. On July 9, Fulks filed a motion for a new trial on the ground that Allison was a biased juror based

47

on the omission of her husband's murder on the jury questionnaire. On July 16, the district court held a hearing on the motion. Allison testified that the omission of her husband's death from the jury questionnaire was inadvertent because she believed that she had fully answered Question 42. She also testified that she was surprised that she had been selected as a juror because she believed that her husband's murder would have caused her to be dismissed from the jury. Allison emphasized that her husband's death had no influence on her deliberations. Fulks, 454 F.3d at 430-431.

The district court denied Fulks's motion for a new trial on the ground that it would have denied a challenge for cause against Allison even if she had fully answered Question 42. It credited Allison's testimony that she honestly believed she had disclosed her husband's murder. The court expressly found that Allison was not a biased juror. Fulks, 454 F.3d at 431.

ii.    The District Court's Remarks at Basham's Trial

On August 4, 2004, at a pretrial hearing before voir dire in Basham's case, the district court stated that during Fulks's trial, Blume asked several jurors whether they would impose the death penalty in certain circumstances, and received positive answers. The district court noted that it had then advised those jurors that their answers to Blume appeared to contradict their earlier answers to the court. In each case, the court explained,

48

the juror said that he did not mean to tell Blume that he would impose the death penalty on the facts that Blume presented. J.A. 400446-400447.

The district court said that Basham's counsel should avoid Blume's voir dire method because Blume "paid a price with the jurors because it looked like he was trying to trick them." But the court then added, "maybe I started down the wrong path by asking the juror to follow up and explain" his answers to Blume because in each case, the juror said that he did not mean to tell Blume that he would impose the death penalty in every case. Although "no juror really accused [Blume] of trying to trick them outright," the court sensed that "some jurors resented that a little bit." J.A. 400447-400449.

4. Direct Appeal

On direct appeal, Blume raised six claims of juror bias, including claims that Goehring, Allison, and Harvey held biased pro-death penalty views, and that Allison was biased by omitting her husband's death on the jury questionnaire. This Court affirmed the district court's rulings. It stated that in a capital case, a juror should be excused for cause if he cannot give meaningful consideration to a defendant's mitigating evidence. It applied an abuse of discretion standard of review because an assessment of a juror's bias often turns on issues of credibility and demeanor that a district court is better

49

positioned to decide than an appellate court. The Court concluded that the district court did not abuse its discretion in concluding that the three jurors challenged for cause would fairly apply the death penalty, and in holding that Allison's omission of her husband's death on the jury questionnaire was inadvertent and did not establish bias. Fulks, 454 F.3d at 427-433.

5. The Section 2255 Hearing

Blume testified that he did not challenge Harvey, Goehring, or Allison by peremptory challenge because he believed that the district court's denial of his challenges for cause against them was "sufficiently egregious" to warrant preserving the issue for appeal. Blume explained capital counsel in other cases had followed a similar strategy. J.A. 200789-200790, 200898-200899. For that reason, Blume decided against requesting additional peremptory challenges, even though he had contemplated such a request during pretrial strategy sessions. J.A. 200898.

Blume further testified that he simply "missed" Allison's omission of her husband's death on the jury questionnaire. Blume did not know whether he would have kept Allison on the jury if he had known about that information before jury selection. Blume said he might have removed her, but might also have seated her to preserve the juror bias issue on appeal. J.A. 200790-200794.

Lyon testified that she had conducted voir dire in more than 100 cases, including voir dire in more than 12 capital cases. She believed that voir dire is very crucial in a capital case, and that the most important thing a defense counsel should do during voir dire is to listen to the jurors. J.A. 200942-200947, 200964-200967.

Lyon was aware of the "Colorado method" of voir dire, but testified that it is "not enough by itself," and she questioned the usefulness of its rating system. She testified that counsel conducting voir dire should ask "open-ended questions" about other issues, including whether jurors are likely to believe expert medical opinions. J.A. 200967-200968, 200983.

Lyon testified she had read most, but not all, of the voir dire in this case. She concluded that Blume's voir dire was professionally unreasonable, ineffective, and "some of the worst voir dire I have ever read in my life." She criticized Blume for making long speeches to the jurors and then asking them for a "yes" or "no" response. J.A. 200968-200969, 200978-200980, 200987.

Lyon further testified that if counsel has unsuccessfully challenged a juror for cause based on the juror's pro-death penalty views, he should challenge that juror by peremptory challenge, instead of seating the juror to preserve the issue for appeal. She believed that strong pro-death jurors tend to

51

"belittle" and "push around" jurors who do not favor the death penalty to obtain a death sentence.  J.A. 200969-200971, 200987-200988.

### 6.  The District Court's Rulings

The district court ruled that Blume's jury selection strategy and voir dire did not violate the Sixth Amendment. First, it expressly rejected Fulks's claim that Blume conducted a rambling, ineffective, and confusing voir dire.  The court explained that it had presided over the voir dire and it had reviewed the jury selection transcript before making its ruling. The court concluded that Fulks's "bald allegations that the questions posed by Blume were improper, ineffective, or offensive to jurors is unavailing."  J.A. 100234-100239.

Second, the court ruled that Fulks was not prejudiced under Strickland by Blume's failure to ask Allison about the omission of her husband's death on the jury questionnaire.  The district court stated that the result of the trial would not have been different because it found that Allison was an impartial juror in denying Fulks's motion for a new trial and this Court affirmed its ruling on direct appeal.  J.A. 100239-100240.

Third, the court held that Blume's decision to appeal the court's denial of his challenges for cause instead of seeking additional peremptory challenges to remove the jurors was a reasonable trial strategy.  J.A. 100241-100243.

52

b.  Legal Principles

Courts defer to counsel's decisions and choices during voir dire.  See Gardner v. Ozmint, 511 F.3d 420, 426 (4th Cir. 2007).  Counsel's voir dire is constitutionally reasonable unless it is "so ill-chosen that it permeates the entire trial with obvious unfairness."  Holder v. Palmer, 588 F.3d 328, 338 (6th Cir. 2009); DeLozier v. Sirmons, 531 F.3d 1306, 1323 (10th Cir. 2008); Teague v. Scott, 60 F.3d 1167, 1172 (5th Cir. 1995).  Thus, counsel has wide latitude in making challenges for cause and exercising peremptory challenges against potential jurors.  Gardner, 511 F.3d at 426 (counsel forewent peremptory challenge against one juror to reserve his challenges for potentially more problematic jurors); DeLozier, 531 F.3d at 1323.  Indeed, a reviewing court has no objective method of evaluating counsel's exercise of his peremptory challenges.  Thompson v. Altheimer & Gray, 248 F.3d 621, 628 (7th Cir. 2001) (Wood, J., concurring).

Reviewing courts defer to a district court's judgment about the impartiality of a potential juror during voir dire because the district court is in a better position to assess the demeanor of the venire and the individuals who compose it.  See Skilling v. United States, 130 S. Ct. 2896, 2918 (2010); Uttecht v. Brown, 551 U.S. 1, 9-10 (2007); United States v. Cabrera-Beltran, 660 F.3d 742, 749 (4th Cir. 2011).  For those same reasons, a trial

53

court is also in a unique position to evaluate counsel's voir dire, and to judge the venire's reactions to counsel's voir dire.

When counsel challenges a juror for cause and that challenge is denied, counsel has two choices. He can choose to either remove the challenged juror peremptorily and forgo a later Sixth Amendment challenge, or allow the juror to sit, preserving the Sixth Amendment claim for appeal. United States v. Martinez-Salazar, 528 U.S. 304, 315 (2000); United States v. Johnson, 495 F.3d 951, 963 (8th Cir. 2007).

To establish prejudice under Strickland, the defendant must show that counsel's deficient voir dire resulted in the "seating of a juror biased or otherwise prejudiced" against him. Gardner, 511 F.3d at 426; Treesh v. Bagley, 612 F.3d 424, 436-439 (6th Cir. 2010), cert. denied, 131 S. Ct. 1678 (2011); Fields v. Brown, 503 F.3d 755, 776 (9th Cir. 2007). A juror is impartial if he can render a verdict based on the evidence presented in court. Cabrera-Beltran, 660 F.3d at 749-750. If no juror is removable for cause, a defendant's right to an impartial jury under the Sixth Amendment is satisfied. Rivera v. Illinois, 129 S. Ct. 1446, 1454 (2009). A single biased juror requires reversal of a death sentence. Morgan v. Illinois, 504 U.S. 719, 729 (1992).

54

c.  <u>Discussion</u>

1.  <u>Blume's Voir Dire Methods</u>

Blume's voir dire methods were reasonable.  Blume permissibly selected the "Colorado method" of capital voir dire to select the jury for Fulks's penalty hearing because his primary strategic objective was to avoid a death sentence. Consistent with that objective, Blume properly questioned the potential jurors about their views on the death penalty in cases involving intentional killings and multiple killings.  It was also reasonable for Blume to ask potential jurors whether they would consider a defendant's mitigation case.  <u>E.g.</u>, J.A. 300536-300540 (Goehring); 301476-301482 (Harvey); 302349-302353 (Allison).  See 2003 ABA Guideline § 10.10.2B(1) p. 1049 (counsel should be familiar with techniques for "exposing those prospective jurors who would automatically impose the death penalty following a murder conviction").

Blume's method of incorporating case-specific facts in his questioning was reasonably designed to uncover any hidden biases that the jurors may have had.  Some of Blume's leading questions were long, but they were necessary to held him build a record to support a later challenge for cause against jurors with inflexible pro-death penalty views.  See <u>Rubenstein</u>, <u>supra</u>, at 21.  Indeed, two district courts have held that case-specific voir dire is appropriate in capital cases.  <u>United States</u> v.

55

Fell, 372 F.Supp.2d 766, 769-771 (D. Vt. 2005), affirmed on other grounds, 531 F.3d 197 (2d Cir. 2008); United States v. Johnson, 366 F.Supp.2d 822, 840-850 (N.D. Iowa 2005). The ABA has also endorsed case-specific voir dire in capital cases. 2003 ABA Guideline § 10.10.2, Commentary, p. 1051. This Court's conclusion on direct appeal that it was a "close" question (454 F.3d at 428) whether Goehring was biased and the district court's similar "close" remark about Harvey (id. at 429) confirms the effectiveness of Blume's voir dire. In any event, asking long questions of potential jurors does not meet the "so ill chosen" standard that defines constitutionally inadequate voir dire.

The district court properly rejected Lyon's opinion that Blume conducted an incompetent and jury-alienating voir dire. First, the district court was better positioned to evaluate Blume's voir dire than Lyon because it observed the jury's reaction to Blume's voir dire whereas Lyon only read the cold transcripts. Cf. Uttecht, 551 U.S. at 10. Second, Lyon's strong anti-death penalty views colored her judgment. Her shrill attack on Blume's voir dire (e.g., "some of the worst voir dire I have ever read in my life" (J.A. 200969)) did not include specific examples of Blume's alleged incompetent voir dire.[11] Lyon's

---

[11] Fulks identifies (Br. 42) four examples of Blume's allegedly unduly lengthy questions, but he does not justify Lyon's failure to identify them for the district court, which was responsible for evaluating Blume's performance in the first instance. Furthermore, of the four examples, two actually involved

56

conclusory opinions therefore did not overcome the presumption that Blume acted reasonably during voir dire. Cf. Fairbank v. Ayers, 650 F.3d at 1255 ("bare allegation that defense counsel's closing should have more strongly emphasized certain arguments" did not overcome presumption of competence). Third, Lyon's opinion that an attorney conducting voir dire should not rely exclusively on the "Colorado method," but must buttress it with other methods was unsupported by any authority. In any event, Blume was not required to follow Lyon's preferred voir dire methods. Cf. Richter, 131 S. Ct. at 789 (counsel will rarely "be limited to any one technique or approach"). Fourth, Lyon's opinion may have been further colored by an incorrect view of the law regarding challenges for cause and peremptory challenges. Lyon indicated (J.A. 200970-200971) that defense counsel can preserve a claim on appeal that a district court improperly denied his challenge for cause against an allegedly biased juror even though counsel removed the juror with a peremptory challenge. The Supreme Court has ruled to the contrary. See Martinez-Salazar, 528 U.S. at 315.[12/]

_____

Johnson's voir dire of juror Steele (J.A. 301921-301923), whereas the other two involved Blume's voir dire of Allison (J.A. 302346-302350).

[12/] Fulks notes (Br. 45 n.11) that the district court rejected an affidavit from lawyer Henderson Hill supporting Lyon's opinion that Fulks submitted as part of his motion to amend the judgment under Fed. R. Civ. P. 59(e). But Rule 59(e) does not authorize a party to relitigate old matters or to raise arguments or present

57

Fulks incorrectly contends (Br. 42, 57) that the district court's ruling that Blume conducted a constitutionally reasonable voir dire was contradicted by its criticism of Blume's voir dire at Basham's trial. First, at Basham's trial, the court opined only that Blume's voir dire prompted a jury reaction against Blume personally; it did not evaluate Blume's voir dire under the Strickland standard and therefore it did not conclude that Blume's voir dire was either constitutionally deficient or prejudicial.

Second, the district court overstated the instances in which it interrupted Blume's voir dire to resolve apparently inconsistent answers given by a juror during voir dire. During Kurzwell's voir dire, the district court interrupted Blume once to ask Kurzwell to justify allegedly inconsistent answers to Blume and the court. J.A. 302472. During Harvey's voir dire, the court questioned Harvey about her apparent inconsistent answers regarding her willingness to give the death penalty for two murders. J.A. 301482-301483. During Allison's voir dire, the district court interrupted Blume twice to obtain clarifying answers, but the court did not suggest that Allison's answers were inconsistent, and Allison never indicated that she believed

---

evidence that could have been presented prior to the entry of judgment. E.g., Exxon Shipping Co. v. Baker, 554 U.S. 471, 486 n.5 (2008). The district court properly rejected Hill's affidavit because Fulks could have presented it at the Section 2255 hearing but failed to do so.

that Blume was trying to trick her.  J.A. 302350 (whether Allison would consider mitigating evidence); J.A. 302357 (whether she would hold fast to her opinion).  Of the remaining five jurors examined by Blume, the district court either did not interrupt Blume's voir dire, or it simply ruled on objections by the prosecutors without extended discussion.  J.A. 300317-300329 (Nations); 300534-300542 (Goehring); 301176-301189 (Lee); 301619-301628 (Bryan); 302412-302424 (Huggins).  In sum, there was no extended disagreement between the court and Blume over Blume's questions to the jurors.

More importantly, the district court admitted that its interruption of Blume's voir dire to ask follow-up questions probably contributed to the jury's allegedly adverse reaction against Blume.  See Fulks, 454 F.3d at 429 (court: "Harvey was confused by the questions from both the court and defense counsel") (emphasis supplied).  As Blume had no control over the district court's participation in the voir dire process and could not predict that the court would interrupt his voir dire, it was reasonable for him to use the "Colorado method" during voir dire. Finally, because the voir dire occurred several weeks before the penalty phase deliberations, the "comments of the court and counsel during voir dire were surely a distant and convoluted memory by the time the jurors began their deliberations."  Penry v. Johnson, 532 U.S. 782, 801-802 (2001).  And the jury

59

presumably followed its instructions to base its sentence on the evidence alone (J.A. 303919-303920), rather than on its opinion of counsel's voir dire methods.  See Jones v. United States, 527 U.S. 373, 394 (1999).

2.   Allison's Omitted Information On the Jury Questionnaire

Fulks's contention (Br. 45-46, 50) that Blume was ineffective because he did not learn during jury selection that Allison had omitted the murder of her husband on the jury questionnaire is unpersuasive.  Blume cured that oversight because he discovered Allison's omission after trial, promptly filed a motion for a new trial based on her omission, and raised a juror bias issue on appeal after the district court denied the motion.  An earlier discovery of Allison's omission would not necessarily have changed Blume's jury selection strategy because Blume testified that he might have seated her anyway in order to raise a claim on appeal that Allison was biased for two independent reasons.

3.   The Appeal of the Denial of the Challenges for Cause

Blume reasonably elected to preserve for appeal his challenges for cause against jurors Goehring, Allison and Harvey by seating them instead of striking by peremptory challenge. Under Martinez-Salazar, Blume would have lost the juror-bias issue for appeal if he had removed the jurors by peremptory challenge.  Fulks's argument (Br. 50-52) that Blume gained

60

nothing by seating those jurors instead of striking them with a peremptory challenge is incorrect. Because the FDPA requires a unanimous vote by the jury for a death sentence, a capital defendant can receive a life sentence even if several pro-death jurors vote for death. Accordingly, Blume reasonably employed a two-track strategy that sought first to obtain a life sentence at trial, but failing that, to seek reversal of a death sentence on appeal on the ground of juror bias. In a civil context, the Seventh Circuit has indicated that this can be a winning strategy. Thompson, 248 F.3d at 623 (strategy "put[s] the litigant in a heads-I-win-tails-you-lose position: if he wins a jury verdict, he can pocket his victory, and if he loses, he can get a new trial") (Posner, J.).[13] Notably, defense counsel in capital cases often raise on appeal a claim that the district court improperly seated a pro-death juror at trial. E.g., United States v. Barnette, 390 F.3d 775, 792-794 (4th Cir. 2005), reversed on other grounds, 546 U.S. 803 (2005); Johnson, 495 F.3d at 963-964; United States v. Nelson, 347 F.3d 701, 710-711 (8th Cir. 2003).

---

[13] Fulks observes (Br. 52) that Blume personally believed that Fulks had no chance of success on appeal because Blume subsequently described this Court as a "black hole" with respect to death penalty cases. Blume's remark was inaccurate because this Court does not affirm all death sentences. Indeed, in 2000, four years before Fulks's trial, this Court reversed a federal death sentence on the ground that the district court improperly excluded the defendant's surrebuttal evidence. See United States v. Barnette, 211 F.3d 803, 821-826 (4th Cir. 2000).

61

Relying exclusively on scholarly articles, Fulks contends
(Br. 44-45, 53-54) that keeping strong pro-death jurors on a jury
is unreasonable because they tend to push more moderate jurors
into voting for a death sentence.  But Blume was not required to
base his juror selection strategy on the basis of generalizations
of group dynamics during capital jury deliberations.  Every jury
deliberates differently, and it was not a foregone conclusion
that Fulks's jury would inevitably return a death sentence.
Blume could reasonably believe that the jury would return a life
sentence if he presented a compelling mitigation case.  Moreover,
nothing in this record even hints that Fulks's death sentence
resulted from the alleged (and speculative) dominating influence
of Allison, Harvey, and Goehring on the remaining nine jurors.
Presumably, the jury followed the district court's instructions
that each juror had to decide whether the death penalty was
warranted, and that during deliberations, each juror should
discuss the case with a "due regard for the opinions of one
another," to be willing to change his mind, but also to maintain
his "honest beliefs" about the case.  J.A. 303950-303951, 303955-
303956.

Fulks's further argument (Br. 52) that Blume had no
realistic chance of obtaining a reversal on appeal because of the
deferential abuse of discretion standard of review is also
meritless.  "[D]eference does not imply abandonment or abdication

of judicial review." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). Indeed, reviewing courts have reversed findings of juror impartiality by district courts in appropriate cases. E.g., Hughes v. United States, 258 F.3d 453 (6th Cir. 2001); Thompson, 248 F.3d at 627. It was therefore reasonable for Blume to seek relief on appeal from the district court's denial of his challenges for cause instead of striking the jurors by peremptory challenge.[14]/

Fulks contends (Br. 51-52) that success on appeal would have simply resulted in a jury without the three allegedly biased jurors on remand, the same result that Blume would have obtained by striking them peremptorily at trial. That argument overlooks the real-world significance of a reversal of a death sentence on appeal. Faced with the prospect of retrying a defendant at a lengthy penalty phase many years after the offense, the government might opt instead to accept a plea offer for a life sentence instead. Moreover, even if retried as a capital case, the odds are at least as large that one juror would vote against

---

[14]/ Because Fed. R. Crim. P. 24(b) only permits additional peremptory challenges in multi-defendant cases, it would have been futile for Blume to have requested additional peremptory challenges to challenge those jurors whom he had unsuccessfully challenged for cause.

63

the death penalty--assuring a defendant a life sentence--as that a second jury panel would impose the death sentence.[15/]

In any event, Fulks was not prejudiced under Strickland because no biased juror served on the jury.[16/]  Fulks's contention (Br. 54-58) that Goehring, Harvey, and Allison were biased incorrectly conflates their "Colorado method" ratings with the test for impartiality under the Sixth Amendment.  The district court's rulings that each was an impartial juror, and this Court's affirmance of those rulings on direct appeal, Fulks, 454 F.3d at 427-433, demonstrate that no biased juror sat on Fulks's case.

Fulks's argument (Br. 58) that this Court's decision on direct appeal was not a definitive ruling on his juror bias

---

[15/]  Fulks's argument (Br. 43) that it was unreasonable for Blume to seat the three jurors when he used most of his peremptory challenges against jurors with lower "Colorado method" ratings is insubstantial.  Counsel's use of peremptory challenges is based on many factors, including observations of potential jurors that are not always captured on a cold record.  For that reason, reviewing courts lack an "objective way to second-guess the lawyer's decisions about the way her peremptory challenges were used." Thompson, 248 F.3d at 628 (Wood, J., concurring).  Thus, Blume's decisions to remove some "Colorado method" level 5 and level 6 jurors while seating others to preserve his juror bias claims on appeal were well within the limits of reasonable attorney performance.

[16/]  Fulks's observation (Br. 54) that a different jury might have returned a life sentence because he allegedly presented a compelling case in mitigation is beside the point because the quality of Fulks's mitigation case is irrelevant to the question whether a biased juror sat on his case.  In any event, as we show below, pp. 80-81, infra, the government's strong case in aggravation overwhelmed Fulks's mitigation case.

claims because it evaluated the district court's rulings under a deferential abuse of discretion standard of review is also meritless.  Reviewing courts defer to district court rulings on juror bias to the extent that the district courts are best positioned to evaluate a juror's demeanor and credibility.  See Skilling, Uttecht, both supra.  The abuse of discretion standard does not insulate district courts from errors of law.  See Koon v. United States, 518 U.S. 81, 100 (1996).  Thus, a district court must exclude a biased juror as a matter of law.  See Cabrera-Beltran, 660 F.3d at 749.

Here, on direct appeal, this Court affirmed the district court's ruling that no juror was biased under the proper constitutional principles for evaluating juror bias.  Fulks, 454 F.3d at 427-428, 430-434.  The Court's affirmance was therefore a conclusive ruling that the three challenged jurors were impartial under the Sixth Amendment.[17]

---

[17]  Fulks's further argument (Br. 55) that this Court's analysis of the juror bias issue was deficient because it did not know the "Colorado method" ratings of the challenged jurors is unpersuasive.  Because the "Colorado method" does not inform the test for juror impartiality under the Sixth Amendment, this Court did not have to know the challenged jurors's ratings to decide the juror bias issues.

Nor is there any merit to Fulks's related contention (Br. 55-56) that the three jurors had a cumulatively biased impact on the trial.  Because every juror was impartial, the cumulative effect was an impartial jury.

### 3.  Counsel Were Effective On Appeal

Fulks contends (Br. 58-67) that counsel were ineffective by not challenging on appeal the prosecutor's summation and the district court's instructions on mitigation.  Counsel reasonably omitted both issues on appeal.  In any event, Fulks was not prejudiced.

### a.  Factual Background

### 1.  The Trial Evidence

Fulks's mitigation case included expert testimony from, among others, Doctors Ruben Gur, David Bachman, Howard Becker, and Arlene Andrews.  On cross-examination, the government sought to show that there was no causal connection between Fulks's problems and his crimes because many people with similar problems do not commit rape and murder.  Dr. Gur agreed that most people with brain damage do not commit rape and murder.  J.A. 303273-303274.  Dr. Becker did not know whether any studies had linked fetal alcohol spectrum syndrome to criminal behavior. J.A. 303436.  Dr. Bachman believed that the causation issue was "difficult."  J.A. 303513.  Dr. Andrews acknowledged that Fulks's killings of Burns and Donovan were not "retaliatory," because the two women had not harmed Fulks.  Andrews also admitted that individuals with "tough times" do not necessarily commit crimes. J.A. 303645, 303652-303653.

2.  The Prosecutor's Closing Argument

During his closing argument, the prosecutor referred to the mitigation evidence, stated that mitigation makes a person less culpable for a crime, emphasized that the law "gives great weight to mitigating factors," and weighs in favor of "enumerating all sorts of potential mitigating factors."  He also argued that the defense had to prove the existence of a mitigating factor by a preponderance of the evidence and that the jury had to decide whether a particular fact was actually mitigating.  J.A. 303769-303770.

The prosecutor further argued that Fulks's experts had admitted that there was no "cause and effect" between a person's poor upbringing or mental problems and his commission of a crime. He emphasized that many people with similar problems do not commit crimes.  J.A. 303798-303799.

In rebuttal argument, the prosecutor contended that Fulks's poor upbringing would have been highly relevant if he had retaliated against his parents or if he had been younger, but Fulks was 25-years-old when he killed Donovan, and he had not been mistreated by his parents for a very long time.  J.A. 303899-303900.  Fulks did not object to the prosecutor's argument.

67

### 3.  The Jury Instructions

The district court instructed the jury that arguments of counsel were not evidence.  J.A. 303919-303920.  It then instructed the jury on mitigation.  It told the jury to "consider whether [Fulks] has established the existence of any mitigating factors."  It defined mitigation as any information about a defendant's background, record, or character that the jury deemed relevant that would suggest that a death sentence was not appropriate.  It also stated that the number of factors that the jury could consider as mitigating was limitless.  J.A. 303942-303943.

The court stated that Fulks had submitted a list of mitigating factors for the jury's consideration, and that the jury "must" undertake a "two-step" process to determine whether one or more of them had been proven.  First, the jury had to find that the mitigating factor existed by a preponderance of the evidence.  Second, if the jury "determine[d] that the factor [was] proven, you must determine whether the fact is mitigating, as I have defined the term for you."  If a juror was persuaded that a mitigating factor existed, the juror "must consider it."  The court directed the jury to report the mitigating factors that it found by a preponderance of the evidence on the special verdict form.  The court then read Fulks's 43 proposed mitigating factors to the jury.  It reminded the jury that it could

68

"consider" a fact as a mitigating factor even if it had not been identified as such by Fulks.  J.A. 303943-303949.  Fulks objected to the district court's jury instructions on the ground that they would permit the jury to disregard his mitigation evidence.  6/29/2004 Tr. 220; J.A. 303559-303960.

   4.  <u>Fulks's Direct Appeal</u>

Before this case, Blume had handled 50-100 criminal appeals, many of them capital cases.  Blume, Johnson and Weyble were responsible for Fulks's appeal; Nettles played only a supporting role.  Each attorney read the record to determine potential appellate issues.  The attorneys also directed some Cornell law students to read the transcript to identify potential appellate issues that may have escaped the attention of Fulks's trial team.  J.A. 200794-200795, 200868, 201337.

Blume concluded that Fulks could obtain reversal of his death sentence on appeal only if he could show that he did not actually kill Donovan.  He decided to raise issues that related to Fulks's inability to present that defense to a fair jury, including the biased juror issues, and the exclusion of the exculpatory defense polygraphs.  Nettles also believed that the biased juror issues were among the stronger appellate issues.  Although Blume had a general policy of raising all potentially meritorious issues, he could not recall his actual reason for

69

omitting the jury instruction issue on appeal.  J.A. 200797–200798, 201052-201053.

On March 13, 2006, Fulks filed his direct appeal brief that raised the following issues: (1) the district court erroneously permitted two government witnesses to testify despite their failure to be included on the government's pretrial witness list, (2) five jurors were biased, (3) the district court improperly excluded Fulks's exculpatory polygraph examinations, (4) a letter that Donovan had written detailing her previous abuse was improperly admitted, and (5) the relaxed evidentiary standards at capital sentencing proceedings are unconstitutional.  See 2006 WL 850572; Fulks, 454 F.3d at 413.

5.  The District Court's Rulings

The district court ruled that counsel did not err by omitting the jury instruction issue on direct appeal because the court's jury instructions complied with the Eighth Amendment. Further, Fulks presented an extensive case in mitigation, the district court submitted Fulks's suggested mitigating factors to the jury, and the jurors found most of Fulks's mitigating factors.  J.A. 100189-100195.

The district court also ruled that the prosecutor properly argued that Fulks's deprived childhood and mental problems did not mitigate his crimes, rejecting Fulks's claim that the prosecutor's argument required Fulks to show a causal nexus

70

between his mitigating factors and his crimes. Even if the prosecutor's argument indirectly suggested such a nexus, Fulks was not prejudiced under <u>Strickland</u> because the court's instructions on mitigating factors correctly explained the role of mitigating factors to the jury, and jurors found the existence of many of Fulks's mitigating factors. J.A. 100195-100198.

b. <u>Legal Principles</u>

To show that counsel was ineffective on direct appeal, a defendant must show that counsel omitted issues that were clearly stronger than those presented. It is insufficient to show that counsel merely failed to raise a nonfrivolous issue. Counsel is more likely to be effective on appeal when he focuses on quality instead of quantity. As to prejudice, the defendant must show that there is a reasonable probability that, but for counsel's error, he would have prevailed on appeal. See <u>Smith</u> v. <u>Robbins</u>, 528 U.S. 259, 285, 288 (2000); <u>Jones</u> v. <u>Barnes</u>, 463 U.S. 745, 753 (1983); <u>Lawrence</u> v. <u>Branker</u>, 517 F.3d 700, 709 (4th Cir. 2008).[18/]

---

[18/] Fulks argues that (Br. 64-65) counsel's performance should be evaluated under the 2003 ABA Guidelines, which instruct appellate counsel to raise all "arguably meritorious" issues and rejects the tactic of "winnowing" out less meritorious claims. See Guideline 10.15.1C, Commentary, p. 1083. But the Supreme Court has ruled not only that the ABA Guidelines are not the test for evaluating counsel's performance in capital cases under the Sixth Amendment, <u>e.g.</u>, <u>Van Hook</u>, 130 S. Ct. at 17, but it has also approved of the strategy of "winnowing" out less meritorious claims on appeal in a capital case. <u>Smith</u> v. <u>Murray</u>, 477 U.S. 527, 536 (1986). See also <u>Jones</u>, 463 U.S. at 753 n.6 (noting that the ABA Guidelines regarding appeals are not required by the Constitution even if they are desirable).

71

The Eighth Amendment requires that a defendant be allowed to present, and a jury be allowed to consider, all relevant mitigating evidence, including evidence of the defendant's character and background that does not relate to the crime. E.g., Adbul-Kabir v. Quarterman, 550 U.S. 233, 246-248 (2007); Tennard v. Dretke, 542 U.S. 274, 284-286 (2004). The FDPA mirrors that standard. 18 U.S.C. 3592(a). An Eighth Amendment violation occurs only if there is a reasonable likelihood that the jury was prevented from considering mitigating evidence. See Ayers v. Belmontes, 549 U.S. 7, 14 (2006); Boyde v. California, 494 U.S. 370, 386 (1990). The critical factors are the evidence presented at the sentencing hearing, the parties' arguments, and the jury instructions. Ayers, 549 U.S. at 16; Boyde, 494 U.S. at 376- 386. An erroneous argument by the prosecutor is less likely to be prejudicial than an erroneous jury instruction because the latter has the force of law. Boyde, 494 U.S. at 384-385.

A capital jury is not required to "give effect to mitigating evidence in every conceivable manner in which the evidence might be relevant." Johnson v. Texas, 509 U.S. 350, 372 (1993). Cf. Buchanan v. Angelone, 522 U.S. 269, 276 (1998) ("[w]e have never * * * held that the state must affirmatively structure in a particular way the manner in which juries consider mitigating evidence"). Thus, a jury does not have to give mitigating effect or weight to any particular evidence. United States v. Basham,

72

561 F.3d 302, 337 (4th Cir. 2009); United States v. Higgs, 353 F.3d 281, 327 (4th Cir. 2003); Moody v. Polk, 408 F.3d 141, 153 (4th Cir. 2005) ("jury thus was free to conclude that the factor was present but reject the contention that it had mitigating value"); United States v. Lawrence, 555 F.3d 254, 267 (6th Cir. 2009), cert. denied, 130 S. Ct. 1879 (2010). Indeed, evidence can sometimes function as a "two-edged" sword. The defense may view it as mitigating but the jury might find that it is aggravating instead. For example, a jury might view evidence of a defendant's deprived childhood and violent tendencies as indicating that he was not under the influence of an accomplice during a murder. E.g., Cullen, 131 S. Ct. at 1410; Burger v. Kemp, 483 U.S. 776, 793-794 (1987). Further, the government can require the defendant to establish the existence of a mitigating factor by a preponderance of the evidence. Walton v. Arizona, 497 U.S. 639, 650 (1990). Thus, it is proper to instruct jurors that each must decide whether a particular fact was proven and whether it constituted a mitigating factor. See Castro v. Ward, 138 F.3d 810, 830-831 (10th Cir. 1998).

In determining whether jury instructions improperly limited consideration of mitigating evidence, the test is whether there was a reasonable likelihood that the jurors understood the challenged instructions to preclude consideration of the relevant mitigating evidence. Buchanan, 522 U.S. at 279; United States v.

73

Davis, 609 F.3d 663, 692 (5th Cir. 2010), cert. denied, 131 S. Ct. 1676 (2011). A challenged instruction must be viewed in the context of the whole charge, not in isolation. Jones, 527 U.S. at 391.

As to a prosecutor's summation, a party may argue inferences from the evidence and point out weaknesses in his adversary's case to sharpen the issues for the jury. See Herring v. United States, 422 U.S. 853, 862 (1975). A reviewing court should not lightly assume that a prosecutor intends for an ambiguous remark to have its most damaging meaning, or that the jury will draw that meaning when there are less damaging interpretations. A prosecutor's argument must often be improvised on the spot, which leads to imperfect syntax and ambiguous meanings. See Donnelly v. DeChristoforo, 416 U.S. 637, 646-647 (1974). A reviewing court will accept a trial court's reasonable interpretation of a prosecutor's argument. United States v. Robinson, 485 U.S. 25, 31 (1998).

A prosecutor may permissibly argue that a defendant's mitigating evidence is minimal in relation to the aggravating factors or that the defendant must take responsibility for his crimes despite a disadvantaged background. On the other hand, he may not argue that the jury is forbidden from considering evidence of the defendant's background and character. Compare Boyde, 494 U.S. at 385-386 (prosecutor permissibly argued that

74

defendant's mitigating evidence did not mean that the defendant's crime was "less serious or that the gravity of the crime [was] any less"); United States v. Rodriquez, 581 F.3d 775, 799 (8th Cir. 2009) (prosecutor permissibly argued that defendant had "free will" despite terrible upbringing), cert. denied, 131 S. Ct. 413 (2010); United States v. Fell, 531 F.3d 197, 221-223 & n.14 (2d Cir. 2008) (prosecutor permissibly asked for "connection" between the defendant's mitigating evidence and his crimes), cert. denied, 130 S. Ct. 1880 (2010); Sims v. Brown, 425 F.3d 560, 580 (9th Cir. 2005) (prosecutor permissibly argued that there was no "bridge" between the defendant's disadvantaged childhood and his later crimes), cert. denied, 549 U.S. 833 (2006), with Brown v. Payton, 544 U.S. 133, 144 (2005) (prosecutor impermissibly argued that jury could not consider defendant's post-offense religious conversion as a mitigating factor).

In evaluating prejudice on a claim that the jury was prevented from considering relevant mitigating evidence at the penalty phase, a reviewing court must reweigh the evidence in aggravation against the totality of the available mitigating evidence. See Wong v. Belmontes, 130 S. Ct. 383, 386 (2009); Wiggins v. Smith, 539 U.S. 510, 534, 536 (2003). A weakly supported death sentence is more likely to have been affected by an error than one with overwhelming record support. Strickland,

75

466 U.S. at 696.  Evidence that the capital crime involved torture, rape, or kidnapping, e.g., Boyd v. Allen, 592 F.3d 1274, 1297 (11th Cir. 2010), or that the defendant was responsible for multiple killings, e.g., Strickland, 466 U.S. at 671-672 (three killings); Rhoades v. Henry, 638 F.3d 1027, 1052 (9th Cir.), cert. denied, No. 11-5211 (Oct. 11 2011), is very powerful aggravating evidence.  Cf. Belmontes, 130 S. Ct. at 389-390 (defendant not prejudiced by mitigation case where counsel successfully excluded evidence of defendant's second murder).

   c.  Discussion

   Counsel did not err by failing to raise the mitigation instruction and argument issues on direct appeal.  Although Blume did not remember his actual reasons for omitting the issue of the jury instructions on mitigation on direct appeal, such a claim did not fit in his strategy of raising only those issues that related to Fulks's alleged inability to present his theory that he was not the actual killer of Donovan to the jury.  Thus, Blume's inability to remember his reason for omitting the jury instruction issue on direct appeal did not overcome the presumption that he did so for strategic reasons.  Cullen, 131 S. Ct. at 1404; Yarborough v. Gentry, 540 U.S. 1, 8 (2003) ("[W]hen counsel focuses on some issues to the exclusion of others, there

76

is a strong presumption that he did so for tactical reasons rather than through sheer neglect").[19]

Furthermore, the mitigation instruction and argument issues had no merit and they were therefore much weaker than the issues that Blume did raise on direct appeal.[20]  The jury instructions, viewed as a whole, satisfied the mitigation consideration standard of the Eighth Amendment.  The district court listed all of Fulks's mitigating factors and repeatedly told the jury to consider all mitigation evidence.  The instruction that the jury

------

[19] During the evidentiary hearing, Blume testified that he also could not recall his reasons for omitting an unrelated issue on appeal.  Blume explained that his normal practice is to raise a potentially meritorious argument on appeal and he implied that he does not "winnow" out less meritorious issues.  J.A. 200910.

Fulks argues (Br. 64) that the presumption of competence is overcome because Blume's testimony that he does not "winnow" out issues shows that he lacked a strategic reason for omitting the mitigation issue on direct appeal. That argument is flawed for several reasons. Blume's general policy of raising all potentially meritorious issues on appeal did not mean that he would raise every issue on appeal.  Blume could have concluded that the mitigation issue was not potentially meritorious.  Further, because Blume's appeal strategy was to raise issues relating to Fulks's inability to inform the jury that he was not the actual killer of Donovan, it was reasonable for him to omit the jury mitigation issue. Finally, even if Blume ultimately decided to "winnow" out the mitigation issue despite his general policy against "winnowing" out issues, that decision was consistent with the constitutional standard for effective assistance of counsel on direct appeal. See Jones, 463 U.S. at 752-753.

[20] Because a single biased juror requires reversal of a death sentence, Blume reasonably emphasized  juror bias claims on appeal, especially since the district court and this Court described the issue as "close" with respect to Harvey and Goehring, respectively. Fulks, 454 F.3d at 428 (Goehring), 429 (Harvey).

77

had to determine whether any fact was actually mitigating correctly stated the law.  See Johnson, Basham, Moody, and Higgs.[21/]  Further, the instructions properly required Fulks to prove the existence of a mitigating factor by a preponderance of the evidence.  See Walton, 497 U.S. at 650.  No rational jury would have believed that the court's jury instructions precluded it from considering Fulks's mitigating evidence.

The prosecutor's argument issue was extremely weak because Fulks's failure to object to the prosecutor's argument would have limited review on appeal to plain error.  E.g., United States v. Young, 470 U.S. 1, 7 (1985).  Under that doctrine, Fulks would have had to show not only that there was an error that was plain, but also that he was prejudiced, and that the failure to correct the error would have seriously affected the public reputation, fairness or integrity of judicial proceedings.  E.g., Puckett v. United States, 556 U.S. 129 (2009).

---

[21/]  Fulks's heavy reliance (Br. 61-63) on Abdul-Kabir is misplaced.  In that case, the Court held that a state sentencing scheme did not permit the jury to consider the defendant's mitigators where it authorized the jury to impose a death sentence if it found that the defendant's crime was deliberate and the defendant presented a continuing threat to society, and where the trial court gave no mitigating evidence instruction.  550 U.S. at 247-264. In marked contrast, the court's instructions and the special verdict form demonstrate that the jury fully considered Fulks's mitigators.

Fulks's related argument (Br. 65-66) that Higgs is inapposite because it did not involve a challenge to a court's jury instructions overlooks that Johnson and Basham both did.

78

Fulks could not have met the demanding plain error standard on appeal because, contrary to his claim (Br. 62-63), the prosecutor's argument was consistent with the Eighth Amendment. The prosecutor expressly told the jury to consider Fulks's mitigating evidence within the limits of the court's instructions. His further argument that there was no "cause and effect" between some of Fulks's mitigating evidence properly referred to the evidence elicited during his cross-examination of Fulks's experts. In sum, the prosecutor merely told the jury that it should not find that Fulks's background mitigated his crimes, not that it could not consider it. E.g., Sims, 425 F.3d at 580 (prosecutor validly argued that many people with disadvantaged backgrounds do not commit crimes, that the defendant's crimes were not retaliatory for abuse, and pointed out flaws in defense expert's testimony). Further, any prejudice from the prosecutor's argument was minimized because the jury undoubtedly followed the district court's instruction that counsel's arguments were not evidence. E.g., Jones, 527 U.S. at 394.

In any event, Fulks was not prejudiced under Strickland for two reasons. First, the record reflects that the jury did consider Fulks's mitigation evidence. Fulks devoted a significant amount of trial time to presenting mitigating evidence, his counsel argued that the jury should consider it

79

(J.A. 303831-303839, 303850-303876, 303882-303883) and the district court's instructions directed the jury to consider them. See Ayers, 549 U.S. at 16-17; United States v. Whitten, 610 F.3d 168, 184 n.6 (2d Cir. 2010); Fell, 531 F.3d at 233. The special verdict form confirms that the jury considered Fulks's mitigation evidence because individual jurors (sometimes unanimously) expressly found many of the submitted factors. E.g., Whitten, 610 F.3d at 184 n.6 ("the verdict form evidences the jury's active consideration of the mitigating evidence"); Rodriguez, 581 F.3d at 801 ("the jury's verdict, which found six family-impact mitigation factors, indicates the jury did not erroneously disregard the factors as irrelevant").[22]

Second, the cumulative effect of the government's aggravating factors overwhelmed Fulks's mitigating factors.

---

[22] Fulks's argument (Br. 63) that it is impossible to tell from the special verdict form whether the jury considered his mitigating factors instead of simply rejecting them overlooks that the special verdict form listed each mitigating factor and then required the jury to state the number of jurors that found it. Thus, where the special verdict form contains a "0" beside a mitigating factor, the only logical conclusion is that the jury considered but rejected it.

Fulks's related argument (Br. 62) that it is uncertain whether the jury actually considered his mitigating factors because some of them functioned as a "two-edged sword" is also meritless. The special verdict form shows that the jury carefully evaluated Fulks's submitted mitigation factors and determined which ones were mitigating and which were not. Beyond that, the jury was not required to state whether it found that some of Fulks's submitted mitigating factors were actually aggravating in nature or to ascribe the weight an individual juror may have given to a mitigating factor.

Fulks's killing of Donovan involved carjacking, kidnapping and

rape.  His crime spree included the killing of Burns, the

attempted killing of Jordan, and the kidnapping of Hawkins.

Fulks also had a lengthy criminal record, and a history of

violence toward his wife and girlfriends.  And Donovan's murder

inflicted a heavy toll on her family.  The jury would have

sentenced Fulks to death regardless of any error in the

prosecutor's argument or the jury instructions on mitigation.[23/]

II

THE GOVERNMENT PRESENTED CONSISTENT THEORIES
AT THE TRIALS OF FULKS AND BASHAM

Fulks contends (Br. 75-84) that the government presented

inconsistent legal theories at his and Basham's separate trials

by arguing that the defendant on trial was the actual killer of

Donovan.  Fulks is incorrect.

A.  The Standard of Review

Fulks did not raise his inconsistent theories claim on

direct appeal, even though he filed his appellate brief two years

after Basham's 2004 trial.[24/]  Because collateral attack is not a

---

[23/] Fulks's observation (Br. 22-23) that the government
acknowledged that he presented a compelling mitigating case in its
response to his Section 2255 motion (e.g., J.A. 200403) overlooks
that the government did so only to rebut Fulks's claim that
counsel's mitigation case was constitutionally deficient.  The
government has always maintained that its aggravating factors
substantially outweighed Fulks's mitigating factors.

[24/] Basham raised a similar inconsistent theories claim on
direct appeal, but this Court concluded that Basham waived the

81

substitute for a direct appeal, Fulks's failure to raise his inconsistent theories claim on direct appeal requires him to show "cause and prejudice" for his default. E.g., Murray v. Carrier, 477 U.S. 478, 489-490 (1986). The prejudice prong requires a showing of "actual prejudice," a standard that varies from claim to claim, but which is, at a minimum, higher than the standard for prejudice on plain error review. See United States v. Frady, 456 U.S. 152, 165-169 (1982). Even assuming that Fulks can demonstrate "cause"--ineffective assistance of appellate counsel--for his procedural default, Fulks cannot establish "actual prejudice" here.[25/]

B.  Factual Background

1.  Pretrial Rulings

Before the district court severed the cases of Fulks and Basham before trial, the government moved to admit Basham's oral and demonstrative statements made to FBI Agent Long and Sheriff Hewett while attempting to locate Donovan's body on November 28, 2002. At a February 25, 2004 evidentiary hearing, FBI Agent Jeff Long testified that Basham--relaying his admissions through his

---

issue by not obtaining a definitive ruling from the district court. Basham, 561 F.3d at 335.

[25/]  Blume did not attend Basham's trial nor did he instruct his co-counsel to do so. In addition, Blume did not review Basham's trial transcript before filing Fulks's direct appeal brief. J.A. 200794-200795.

attorneys--said that Fulks strangled Donovan with a purse strap, after which Basham threw the purse strap out of the BMW as they were leaving the crime scene.  J.A. 400169.[26/]

Sheriff Hewett memorialized Basham's statements in a report to a superior, Lieutenant Crocker, dated December 3, 2002. Hewett referred to the report to refresh his recollection during the evidentiary hearing.  As refreshed, Hewett testified that during the ride, Basham saw a deer, and then spontaneously said "I could never kill a deer, and here I have--" but he did not finish his sentence on the advice of his counsel.  J.A. 400205-400206.  Hewett further testified that Basham later referred to the purse strap that was used to kill Donovan and then demonstrated the length of the strap by pulling his shackled hands apart.  Basham told Hewett that he threw the strap in the woods and also demonstrated how he did so.  J.A. 400208, 400210-400211.

On cross-examination, Hewett testified that his prior statement reflected that Basham described the strap "and indicated by this motion that it was used to strangle Alice Donovan."  Hewett admitted that nothing was "verbalized."  Hewett also testified that, according to Basham, Fulks slit Donovan's

---

[26/] In his grand jury testimony, Agent Long testified that Basham said that Fulks killed Donovan by strangling her with a purse strap and then possibly by slitting her throat.  J.A. 400028.

83

throat with a knife and then gave the knife to Basham.  J.A. 400221-400220, 400230, 400935-400939.

   2.  Fulks's Trial

At his trial, Fulks moved to admit Basham's "deer statement" to show that Basham was the actual killer of Donovan.  The government objected on the grounds that (1) Basham's statement was silent as to who actually killed Donovan, so it could have meant, among other things, that Basham actively assisted Fulks during the murder of Donovan, and (2) the rule of completeness under Fed. R. Evid. 106 would require admission of Basham's related statements that implicated Fulks.  The government noted that Basham had demonstrated to Sheriff Hewett how Fulks had strangled Donovan with the purse strap.  The district court excluded Basham's "deer statement" on the ground that its tendency to confuse the issues outweighed its probative value under 18 U.S.C. 3593(c).  J.A. 400506-400518.  The government did not present evidence regarding Basham's "deer statement" or his purse strap demonstrations at Fulks's trial.

During closing argument, the government argued that Fulks and Basham were "equally culpable" for Donovan's death, and repeatedly emphasized that Fulks and Basham worked as a team during their crime spree.  J.A. 303693, 303714, 303715, 303716, 303732, 303741, 303775.  The government then argued that the jury did not have to find that Fulks "actually killed Alice Donovan"

84

to impose the death sentence.  It stated that in some cases, it is impossible to determine the real killer when there are no eyewitnesses to a crime or a lack of forensic evidence.  J.A. 303695-303696.  The government agreed with Fulks's submission that only two men knew who killed Donovan, but it argued that "those men were Chad Fulks and Brandon Basham."  In describing the sequence of events leading to Donovan's death, the government argued only: "after the rape, she is killed."  J.A. 303734. Later, the government acknowledged that there was "no direct evidence that anyone [in particular] killed Alice Donovan," but argued that the circumstantial evidence showed that "both of them" killed Donovan.  J.A. 303771, 303775-303776.  The government also argued that Fulks falsely minimized his role in the murders of Donovan and Burns.  J.A. 303717-303720.

### 3.  Basham's Trial

At Basham's trial, the government introduced Basham's "deer statement" into evidence through Sheriff Hewett.  Hewett further testified on direct-examination that Basham took them to the area where the "strap was thrown."  J.A. 400546, 400557.

The following exchange occurred:

Q: Tell this jury what Brandon Basham described to you
as to what happened to Alice Donovan:
A: May I.
Q: You can demonstrate, if he demonstrated.
A: Brandon Basham had his hands like this once again.
I have explained to you how he was shackled.  He took
his hands together and did this (indicating), "Then I

85

threw it over there.  Check in those trees right over
there."

J.A. 400558.  Hewett further testified that the agents did not
find a purse strap.  Ibid.  Later, Hewett looked at Basham and
asked, "Is there where it happened?"  Basham replied, "This is
it.  It is."  J.A. 400559.  See Basham, 561 F.3d at 313.

Basham cross-examined Hewett as follows:

Q: There is nothing in your notes, nor is there
anything in Lieutenant Crocker's notes that indicate
that Brandon Basham told you that he used the strap, is
there?
A:  No Sir. He did not tell me he used the strap.  He
demonstrated, though.
Q:  He demonstrated?
A:  Yes, Sir.
Q:  Your notes, nor Lieutenant Crocker's notes say that
he did that; isn't that true?
A:  That is true because he didn't say.  He showed.

J.A. 400572-400573.

During closing argument, the government stated that it did
not have to prove, and the jury did not have to find, who
actually killed Donovan.  The government argued it was not saying
that Basham was more culpable than Fulks, or vice versa, although
the evidence showed that they were a "death squad" that "acted
together and killed Alice Donovan."  J.A. 400581-400583, 400589.

The government also argued that Fulks and Basham were, at
times, more aggressive than the other during their crime spree,
but "that is not the point."  J.A. 400590-400591.  In describing
the carjacking, kidnapping, and murder of Donovan, the government
emphasized that the pair acted together and aided and abetted

each other.  J.A. 400617-400621 ("both of them together acting as a team"), 400636 ("aider and abetter"), 400637 ("they held her to kill her").  The government specifically argued that the jury could find Basham guilty of carjacking even "if you actually believe that Chad Fulks actually killed Alice Donovan" and Basham had "nothing to do with it."  J.A. 400640.

The government then turned to Basham's statements.  The government referred to the unfinished portion of Basham's "deer statement" and asked rhetorically: "what do you think he is thinking about?  Here I have smoked a joint?  Here I have stolen a car?"  J.A. 400648.  It then referred to the purse strap evidence:

> What does he tell the Sheriff?  He tells the Sheriff that it was right there by that gate.  He tells--he not only tells, he demonstrates.  He demonstrates for that Sheriff a Liz Claiborne purse strap that was used to kill Alice Donovan.  Then what does he say?  I threw it in the woodline. [Basham's counsel] asks Sheriff Hewitt says [sic] he didn't say I killed Alice Donovan. Sheriff Hewitt said to you in this Courtroom in front of you, the jury, no, he demonstrated it.

J.A. 400648-600649.  The government later argued that the jury had seen "Sheriff Hewitt demonstrate how Brandon Basham demonstrated how Alice Donovan was strangled," and that Basham later admitted to a friend, "we killed them."  The government further argued that Fulks could not have killed Donovan without Basham, and that Basham could not have killed Donovan without Fulks.  J.A. 400650-400651.

87

In its rebuttal argument, the government stated that Basham had minimized his role in the crimes.  J.A. 400657-400658, 400671-400672.  It also stated that Basham's conduct of holding a gun on Donovan had resulted in the death of Donovan "even if you don't believe that Brandon Basham, himself, killed Alice Donovan, even if you disregard Sheriff Hewitt."  J.A. 400660.

At Basham's penalty phase stage, the government referred to the statutory intent factors and began by arguing that the intentional killing factor had been established.  It further argued:

> [Basham] describes a purse strap, and he demonstrates, he demonstrates to Sheriff Hewitt how Alice Donovan was strangled.  And then he tells Sheriff Hewitt, "I threw the purse strap into the woods."  He has demonstrated. He even has his arms down.  You saw Sheriff Hewitt stand up there and show.
>
> Does that mean Brandon Basham's strangling of Alice Donovan is the only hand that caused Alice Donovan's death?  The government does not submit that.  The government submits, and submitted all along, that Chad Fulks is just as responsible.  Chad Fulks had every right, as well, to make sure Alice Donovan died.

J.A. 400695.  The government argued that all of the statutory intent factors applied because Basham killed Donovan, but the jury could give him the benefit of the doubt by finding the third or fourth intent factor.  J.A. 400700.  In its reply argument, the government stated that Donovan died "at the hands of these two men."  J.A. 400743.

88

C.   The District Court's Ruling

The district court ruled that the government did not present inconsistent theories of guilt at Fulks's and Basham's trials, holding that the government consistently maintained that both men were "equally culpable" for Donovan's murder.  At most, in the court's view, the government presented inconsistent arguments regarding the vagueness of Basham's statements, but that did not violate due process.  J.A. 100243-100252.

D.   Legal Principles

The Supreme Court has never held that due process prevents the government from prosecuting defendants based on inconsistent theories.  See Bradshaw v. Stumpf, 545 U.S. 175, 190 (2005) (Thomas, J., concurring).  This Court and the First Circuit have held that, at a minimum, the government can emphasize the role of each defendant at separate murder trials.  See Higgs, 353 F.3d at 326; United States v. Hansen, 434 F.3d 92, 106 (1st Cir.), cert. denied, 127 S. Ct. 203 (2006).  In Higgs, this Court held that the government properly argued at one trial that the defendant had masterminded the murders because he ordered a co-defendant to kill the victims, but argued at the co-defendant's trial that the co-defendant had acted of his own free will despite the orders from the defendant.  353 F.3d at 326-327.

On the other hand, two courts of appeals have held that the government may present inconsistent arguments or theories at the

89

separate trials of co-defendants as long as it does not present false evidence at any trial. See, e.g., United States v. Frye, 489 F.3d 201, 214 (5th Cir. 2007) (government properly argued at co-defendant's separate trials that each defendant shot the victim); cert. denied, 552 U.S. 1126 (2008); United States v. Paul, 217 F.3d 989, 998-999 (8th Cir. 2000) (government argued that each defendant was the triggerman at separate trials). See also Nguyen v. Lindsey, 232 F.3d 1236, 1240-1241 (9th Cir. 2000) (collateral attack).[27]

E. Discussion

The government presented consistent arguments in Fulks's case and in Basham's case. In both cases, the government argued that Basham and Fulks jointly killed Donovan, and that both men were equally culpable. At Fulks's trial, the government expressly refrained from arguing that Fulks was the actual killer of Donovan. To the contrary, it acknowledged that the evidence did not show who actually killed Donovan. The government also argued that the law did not require the jury to find that Fulks was Donovan's actual killer in order to sentence Fulks to death.

---

[27] Fulks's reliance (Br. 80-81) on the Sixth Circuit's decision in Stumpf v. Houk, 653 F.3d 426 (6th Cir. 2011), is no longer valid. Stumpf held that a state violated due process by making inconsistent arguments at the separate trials of co-defendants. However, on October 26, 2011, after Fulks filed his brief, the Sixth Circuit granted rehearing en banc in that case and vacated the panel's decision. Ibid. See Sixth Circuit Rule 35(a).

The evidence and arguments at the two trials were not identical, but that was not the result of false testimony or inconsistent theories of guilt by the government. First, it was the district court's evidentiary rulings that resulted in the admission of Basham's pretrial oral and demonstrative statements at his trial only. Furthermore, the district court's rulings that admitted Basham's statements against him as admissions under Fed. R. Evid. 801(d), but excluded from Fulks's trial as unduly prejudicial under Section 3593(c) were properly based on the law and the facts before the court at each trial. Moreover, the government did not present false evidence or argue inconsistent legal theories in objecting to the admission of Basham's statements at Fulks's trial. Its contention that Basham blamed Fulks for killing Donovan was consistent with the testimony of FBI Agent Long and Sheriff Hewett. Finally, the jury did not hear the government's objections to Fulks's motion to admit Basham's statements into evidence.

Second, the government's argument at Basham's trial that Basham strangled Donovan was based on the evidence elicited from Hewett on cross-examination by Basham's counsel, not by the government. J.A. 400695, see also 400649, 400660.[28] During the

_____

[28] Fulks errs (Br. 78) in contending that the prosecutor's argument that Basham's unfinished "deer statement" did not refer to a stolen car or to drugs implied that Basham alone killed Donovan. Fulks's strained interpretation of the government's argument is inconsistent with the Supreme Court's standard for evaluating a

91

government's case, Hewett did not testify that Basham admitted

that he strangled Donovan.  Hewett testified only that a purse

strap was used to strangle Donovan without mentioning who

actually strangled her, and that Basham threw the strap away

later.  J.A. 400558-400559.  By contrast, Basham's counsel

elicited evidence from Hewett that implied that Basham had

demonstrated to Hewett how Basham "used the strap."  J.A. 400572-

400573.  In short, the government's argument at Basham's second-

in-time trial was based on testimony that occurred after Fulks's

trial and was therefore not part of a scheme to present

inconsistent legal theories of guilt at either trial.  In any

event, in its argument during Basham's penalty phase, the

government downplayed any argument that Basham strangled Donovan

---

prosecutor's argument in <u>Donnelly</u>.  The most reasonable
interpretation of the government's argument is that Basham did not
finish his "deer statement" because he was suddenly reminded of his
own role in Donovan's death, not that he acted alone in killing
her.

Contrary to Fulks, the government's isolated reference at
Fulks's trial to Basham as Fulks's "puppet * * * throughout a lot
of this crime spree" (J.A. 303735) was consistent with its central
arguments in both cases.  The government's argument that Fulks was
in charge some or even most of time did not imply that Fulks was
the actual killer of Donovan, especially given its express argument
that its evidence did not show who actually killed Donovan.
Further, at Basham's trial, the government also argued that Fulks
was the general leader of the crime spree.  See J.A. 400651,
400665-400666.  In any event, because Fulks and Basham blamed each
other for Donovan's death, the government properly emphasized the
role of each defendant at his own trial.  See <u>Higgs</u>, 353 F.3d at
326-327.

92

by also arguing that Basham was not "the only hand that caused" Donovan's death, as Fulks was just as responsible for her death. That was consistent with the government's repeated and overall theory throughout the case that Basham and Fulks were equally culpable for Donovan's murder.

Moreover, because Fulks and Basham were liable for Donovan's death either as principals or because they acted together, any difference in the government's characterization of their roles in the crimes was insignificant and did not constitute a due process violation. See Frye, 489 F.3d at 214.

Finally, Fulks was not actually prejudiced. The jury's finding that Fulks had only the intent to commit an act of violence that created a grave risk of death to Donovan under Section 3591(a)(2)(D) was consistent with the government's theory that Fulks and Basham were jointly responsible for Donovan's death, regardless of who actually killed her.[29] The jury's death sentence therefore reflected the evidence presented against Fulks and the government's legal theory of guilt.

---

[29] The jury in Basham also found only the "grave risk of death" intent factor under Section 3591(a)(2)(D), Basham, 561 F.3d at 316. That both juries found only the statutory intent factor applicable to aiders and abettors is further proof that the government's theories of guilt were consistent at both trials.

93

CONCLUSION

The judgment should be affirmed.

Respectfully submitted.

WILLIAM N. NETTLES          LANNY A. BREUER
United States Attorney       Assistant Attorney General

ROBERT F. DALEY, JR.        GREG D. ANDRES
Assistant U.S. Attorney      Acting Deputy Assistant
District of South Carolina    Attorney General

                             SCOTT N. SCHOOLS
                              Associate Deputy
                              Attorney General


                             /s/
                             THOMAS E. BOOTH
                             Attorney
                             Criminal Division
                             Department of Justice
                             Washington, D.C.  20530
                             (202) 514-5201
                             Fax: 202.305.2121
                             Thomas.Booth@usdoj.gov

94

CERTIFICATE OF COMPLIANCE

I certify that this brief complies with Federal Rule of Appellate Procedure 32(a) because it contains 21,777 words according to the word count function of Word Perfect 12, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(ii).  I further certify that this brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirement of Rule 32(a)(6) because this brief was prepared using a monospaced typeface Courier New 12.


/s/ Thomas E. Booth
Thomas E. Booth

95

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that copies of this Brief for the United States were served this day on counsel for the defendant via the Fourth Circuit's ECF system:

Billy Nolas


Date: December 23, 2011   /s/_____
                          THOMAS E. BOOTH
                          Attorney
                          Appellate Section
                          Criminal Division
                          Department of Justice
                          950 Pennsylvania Avenue, NW
                          Room 1511
                          Washington, D.C.  20530
                          (202) 514-5201
                          Fax: 202.305-2121
                          Thomas.Booth@usdoj.gov

96