No. 11-3

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

CHADRICK EVAN FULKS,

*Petitioner-Appellant,*

v.

UNITED STATES OF AMERICA,

*Respondent-Appellee.*

_____

On Appeal from the United States District Court
for the District of South Carolina
Criminal No. 4:02-992, Joseph F. Anderson, Jr., U.S.D.J.

_____

**REPLY BRIEF OF APPELLANT**

Billy H. Nolas
Amy Gershenfeld Donnella
Assistant Federal Defenders
Federal Community Defender Office
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520

Attorneys for Petitioner-Appellant

Dated:      February 24, 2012

## PRELIMINARY STATEMENT REGARDING CITATIONS

All emphasis herein is supplied, unless otherwise indicated.

Parallel citations usually are omitted.

Internal quotation marks and citations may be omitted when to do so does not alter the meaning or significance of the quoted passage.

When quoting from the District Court's Order, citations to the record contained in the Order usually are omitted.

References to the possessive form of Appellant's last name (Fulks' or Fulks's) have been conformed to the former (Fulks').

The Joint Appendix is cited as "A" followed by the page number.

Appellant's Initial Brief is referred to as "Appellant's Brief" or "Fulks Br."

The Government's Brief is referred to as "Government's Brief" or "Gov. Br."

ii

## CONTENTS

PRELIMINARY STATEMENT REGARDING CITATIONS. . . . . . . . . . . . . . . ii

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

ARGUMENT IN REPLY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.     TRIAL COUNSEL WERE INEFFECTIVE IN SELECTING THE JURY. . . . . . . . . . . . 1
       A.     Deficient Performance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
       B.     Prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

II.    APPELLATE COUNSEL WERE INEFFECTIVE FOR FAILING TO APPEAL THE
       UNCONSTITUTIONAL "TWO-STEP" MITIGATION JURY INSTRUCTION. . . . . . . 12
       A.     The Instruction Was Unconstitutional. . . . . . . . . . . . . . . . . . . . . 12
       B.     Appellate Counsel Were Ineffective.. . . . . . . . . . . . . . . . . . . . . 13
              1.     Deficient performance. . . . . . . . . . . . . . . . . . . . . . . . . . 13
              2.     Prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

III.   TRIAL COUNSEL WERE INEFFECTIVE FOR ADVISING APPELLANT TO GIVE
       UNPROTECTED STATEMENTS TO THE GOVERNMENT AND PLEAD GUILTY
       WITHOUT OBTAINING ANY BENEFIT IN RETURN. . . . . . . . . . . . . . . . . . . . 18
       A.     Deficient Performance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
       B.     Prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

IV.    APPELLANT'S DUE PROCESS AND EIGHTH AMENDMENT RIGHTS WERE
       VIOLATED BY THE GOVERNMENT'S USE OF INCONSISTENT THEORIES IN FULKS
       AND BASHAM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
       A.     This Issue Is Not Defaulted. . . . . . . . . . . . . . . . . . . . . . . . . . . 30
       B.     The Government Used Inconsistent Theories. . . . . . . . . . . . . . . . 31
       C.     Appellant's Constitutional Rights Were Violated. . . . . . . . . . . . . 42

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

## TABLE OF AUTHORITIES

### Federal Cases

Banks v. Dretke, 540 U.S. 668 (2004) ................................................................. 30

Bell v. Evatt, 72 F.3d 421 (4th Cir. 1995) . ...................................................... 18, 21

Bobby v. Van Hook, 130 S. Ct. 13 (2009) ...................................................... 15, 16

Bradshaw v. Stumpf, 545 U.S. 175 (2005), on remand, Stumpf v. Houk, 2011 WL 3506101, 653 F.3d 426 (6th Cir. 2011) . ............................................................... 43

Caldwell v. Mississippi, 472 U.S. 320 (1985) . ...................................................... 8

Castro v. Ward, 138 F.3d 810 (10th Cir. 1998) . ................................................... 12

Fairbank v. Ayers, 650 F.3d 1243 (9th Cir. 2011) ........................................... 19, 23

Fields v. Brown, 503 F.3d 755 (9th Cir. 2007) ................................................... 9, 10

Florida v. Nixon, 543 U.S. 175 (2004) . ....................................... 6, 18, 19, 25

Gardner v. Ozmint, 511 F.3d 420 (4th Cir. 2007) . .................................................... 9

Giglio v. United States, 405 U.S. 150 (1972) . ...................................................... 42

Green v. French, 143 F.3d 865 (4th Cir. 1998) ................................................... 19, 23

Griffin v. Warden, 970 F.2d 1355 (4th Cir. 1992) ................................................... 14

Harvey v. Warden, 629 F.3d 1228 (11th Cir. 2011) . ........................................ 18, 20

Hill v. Lockhart, 474 U.S. 52 (1985) . ............................................................... 28, 29

Hughes v. United States, 258 F.3d 453 (6th Cir. 2001).......................................... 4

Jones v. Barnes, 463 U.S. 745 (1983) ............................................................... 15, 16

Jones v. Page, 76 F.3d 831 (7th Cir. 1996) ............................................................. 19

Lockett v. Ohio, 438 U.S. 586 (1984) ...................................................................... 36

Lockhart v. McCree, 476 U.S. 162 (1986) . ............................................................... 8

Meyer v. Branker, 506 F.3d 358 (4th Cir. 2007) . ............................................... 18, 19

Moody v. Polk, 408 F.3d 141 (4th Cir. 2005) ......................................................... 12

Murray v. Carrier, 477 U.S. 478 (1986) . ................................................................ 31

Napue v. Illinois, 360 U.S. 264 (1959) . .................................................................. 42

Post v. Bradshaw, 621 F.3d 406 (6th Cir. 2010) ................................... 19, 23, 24, 25

Premo v. Moore, 131 S. Ct. 733 (2011) ......................................................... 18, 19, 20

Smith v. Groose, 205 F.3d 1045 (8th Cir. 2000) . .................................................... 42

Smith v. Murray, 477 U.S. 527 (1986) . ............................................................ 15, 17

Smith v. Robbins, 528 U.S. 259 (2000) ................................................................. 17

Strickland v. Washington, 466 U.S. 668 (1984) . ................................................... 1, 3

Stout v. Netherland, 1996 WL 496601 (4th Cir. 1996) . ...................................... 18, 22

Thompson v. Altheimer & Gray, 248 F.3d 621 (7th Cir. 2001) . ................................. 4

Tice v. Johnson, 647 F.3d 87 (4th Cir. 2011) . ........................................................ 14

Treesh v. Bagley, 612 F.3d 424 (6th Cir. 2010) . ...................................................... 9

United States v. Barnette, 211 F.3d 803 (4th Cir. 2000) ....................................... 2, 3

United States v. Barnette, 390 F.3d 775 (4th Cir. 2004) ....................................... 3, 4

United States v. Basham, 561 F.3d 302 (4th Cir. 2009) . ....................................... 12

United States v. Guadagno, 970 F.2d 214 (7th Cir. 1992) .............................. 19, 21

United States v. Higgs, 353 F.3d 281 (4th Cir. 2003) . ................................... 12, 42

United States v. Johnson, 495 F.3d 951 (8th Cir. 2007) ..................................... 3, 4

United States v. Lawrence, 555 F.3d 254 (6th Cir. 2009) . .................................. 12

United States v. Luck, 611 F.3d 183 (4th Cir. 2010) ............................................ 14

United States v. Moussaoui, 591 F.3d 263 (4th Cir. 2010) . ....................... 19, 21, 22

United States v. Nelson, 347 F.3d 701 (8th Cir. 2003) ....................................... 3, 4

United States v. Paul, 217 F.3d 989 (8th Cir. 2000) ............................................ 42

United States v. Sampson, 486 F.3d 13 (1st Cir. 2007) ....................................... 19

Williams v. Taylor, 529 U.S. 362 (2000) .............................................................. 23

Young v. Cato, 205 F.3d 750 (4th Cir. 2000) . ....................................................... 7

**Federal Statutes**

18 U.S.C. § 3591 ................................................................................................. 38

18 U.S.C. § 3595 ................................................................................................. 18

28 U.S.C. § 2254(d) ......................................................................................... 9, 23

**Miscellaneous**

American Bar Association, Guidelines for the Appointment and Performance of
Defense Counsel in Death Penalty Cases, 31 HOFSTRA L. REV. 913 (2003)5, passim

American Bar Association, GUIDELINES FOR THE APPOINTMENT AND
PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES (1989). 16, passim

## ARGUMENT IN REPLY

Many of the arguments in the Government's Brief mirror the District Court's opinion, and are erroneous for the reasons already stated in Appellant's Brief. Here, we address additional arguments by the government.

### I.    TRIAL COUNSEL WERE INEFFECTIVE IN SELECTING THE JURY

Counsel were ineffective during jury selection where they questioned jurors in a manner that likely antagonized the jurors; failed to question a juror about important information, revealed post-trial, concerning the murder of the juror's husband; and seated three jurors who counsel knew to be "sure votes for death."

The government suggests that a defendant challenging counsel's jury selection faces a uniquely difficult burden for establishing ineffective assistance of counsel. Gov. Br. at 53, 64 n.15. Indeed, the government says a "court has no objective method of evaluating counsel's exercise of his peremptory challenges," id. at 53, a claim which, if true, would make such ineffectiveness claims unreviewable.

The government is wrong. Ineffective assistance of counsel claims relating to jury selection are evaluated under the same standard as any other ineffective assistance of counsel claims – the deficient performance and prejudice test of Strickland v. Washington, 466 U.S. 668 (1984), and its progeny. See Fulks Br. at 48-49. Appellant meets that standard.

### A.   Deficient Performance

**1.**   The government says Blume's decision to seat three "sure votes for death" on the jury in order to preserve an issue for appeal was motivated in part by Blume's purported knowledge that "capital counsel in other cases had followed a similar strategy." Gov. Br. at 50.  The government's claim is contrary to the record. Blume did *not* testify that he knew of other lawyers who had taken his approach. Instead, Blume's testimony was that "what [other] people were doing in jury selection in federal capital cases" was *filing motions for additional peremptory strikes*, so they could *eliminate* such pro-death jurors.  A200898-99.

**2.**   The government disagrees with Blume's assessment of "this Court as a 'black hole' with respect to death penalty cases," observing that, "four years before Fulks' trial, this Court reversed a federal death sentence on the ground that the district court improperly excluded the defendant's surrebuttal testimony.  See United States v. Barnette, 211 F.3d 803, 821-26 (4th Cir. 2000)." Gov. Br. at 61 n.13 (quoting law review article by Blume); see Fulks Br. at 52 (quoting Blume's published statements about his view of this Circuit's capital jurisprudence).

The government's response misses the point.  Appellant described Blume's view of this Circuit's capital jurisprudence because Strickland's "assessment of attorney performance requires" that the court "evaluate [counsel's] conduct from

2

counsel's perspective at the time." 466 U.S. at 689. Here, Blume's "perspective at the time" was that the issue he was preserving for appeal had no chance of success, which highlights the unreasonableness of his decision.

Moreover, the case cited by the government to show that this Circuit sometimes grants relief, <u>Barnette</u>, actually highlights the unreasonableness of counsel's actions here. In <u>Barnette</u>, this Circuit *rejected* the defendant's challenge to the District Court's life-and-death qualification of jurors – <u>i.e.</u>, a claim like that raised by appellate counsel here – based upon the deference due the trial judge under the "abuse of discretion" standard for reviewing such claims. 211 F.3d at 811-12. Thus, <u>Barnette</u> confirms that it was unreasonable for counsel to seat three "sure votes for death" on the jury in order to preserve the issue for appeal. <u>See also</u> Fulks Br. at 36, 52 (describing deferential appellate review of these issues).

**3.** The government thinks it "notabl[e]" that "defense counsel in capital cases often raise on appeal a claim that the district court improperly seated a pro-death juror." Gov. Br. at 61, citing <u>United States v. Barnette</u>, 390 F.3d 775, 792-94 (4th Cir. 2004); <u>United States v. Johnson</u>, 495 F.3d 951, 963-64 (8th Cir. 2007); <u>United States v. Nelson</u>, 347 F.3d 701, 710-11 (8th Cir. 2003). But what truly is "notable" about these cases is that, in each case, the appellate court *applied highly deferential abuse-of-discretion review* to the district court's ruling and *rejected the*

*defendant's arguments*. See Barnette, 390 F.3d at 794 ("district court did not abuse its discretion"); Johnson, 495 F.3d at 964 (district court is "accorded deference"; "We therefore cannot say that the district court abused its discretion"); Nelson, 347 F.3d at 710-11 ("substantial deference to the district court"; "abuse of discretion"; "virtually unassailable on appeal"). Thus, again, the government's cases highlight the unreasonableness of counsel's approach in Appellant's case.

**4.**    The government says Appellant's "argument ... that Blume had no realistic chance of obtaining a reversal on appeal" is erroneous because other Courts of Appeals "have reversed findings of juror impartiality by district courts in appropriate cases." Gov. Br. at 62-63, citing Hughes v. United States, 258 F.3d 453 (6th Cir. 2001), Thompson v. Altheimer & Gray, 248 F.3d 621, 627 (7th Cir. 2001). But the government fails to observe that the cases it cites (both from other Circuits) involved truncated voir dire in which a juror made a "*clear declaration that she did not think she could be a fair juror,*" Hughes, 258 F.3d at 458; see also Thompson, 248 F.3d at 624 (similar), and neither the court nor counsel made any attempt to rehabilitate the juror, see Hughes at 458-59 ("district court and counsel failed to conduct the most rudimentary inquiry of the potential juror to inquire further into her statement that she could not be fair"); Thompson at 624. The government has not identified any case in which a Court of Appeals has reversed a district court's no-bias

4

ruling where, as here, that ruling was made after extensive back-and-forth questioning by the parties and the court.

5.     The government suggests that counsel did not think the "sure votes for death" jurors were as bad as their "Colorado method" ratings indicated, because "use of peremptory challenges is based on many factors, including observations of potential jurors that are not always captured on a cold record." Gov. Br. at 64 n.15. But the Colorado method ratings *incorporate* these "many factors" that may not otherwise appear in the voir dire record – the ratings were created by "four or five members of the [defense] team" who reviewed the juror questionnaires and observed the jurors in court. Order at 114 (A100236). In particular, the high scores of these three "sure votes for death" represented counsel's judgment, based upon all of the information available at the time, that these three jurors were "people who I would refer to, if we weren't here in court, as the stone cold killer" for capital sentencing purposes. A200902 (Blume). See Fulks Br. at 43.

6.     As stated in Appellant's Brief, the District Court, during proceedings in Basham, criticized Blume's jury selection and concluded that "Blume really paid a price with the jurors because it looked like he was trying to trick them." Id. at 42, 57 (quoting District Court). The government struggles in vain to escape the District Court's contemporaneous observations. See Gov. Br. at 57-60.

First, the government asserts that Blume's actions could not have affected the outcome of sentencing because the District Court "opined only that Blume's voir dire prompted a jury reaction against Blume personally." Gov. Br. at 58. But jurors were unlikely to make such a distinction between the credibility of defense counsel and the credibility of the defense case. Instead, jurors' doubts about Blume's candor likely jaundiced their view of the entire defense presentation. See Florida v. Nixon, 543 U.S. 175, 181 (2004) (counsel's ability to convince jurors to vote for life depends upon counsel's "credibility"); id. at 191-92 (jurors likely to be "cynical" about defense case when they have doubts about counsel's "candor").

Second, the government says Blume's apparent lack of candor during voir dire could not have affected sentencing because jury selection "occurred several weeks before the penalty phase deliberations," and the jury was instructed before it deliberated "to base its sentence on the evidence alone." Gov. Br. at 59-60. But, as stated above, jurors' doubts about Blume's candor likely affected their view of the entire case, including the parties' evidentiary presentations which began immediately after jury selection. By the time deliberations began, the jurors already had seen the entire case through eyes that were likely to be cynical of the defense.

Finally, the government suggests that the impression Blume made on jurors was not as bad as the District Court found it to be. See Gov. Br. at 58-59. The

6

government's attempt to reconstruct the record is no substitute for the District Court's contemporaneous observation of the effect of Blume's questioning.

### B.    Prejudice

**1.**    The government asserts that Appellant cannot show prejudice from the seating of three "sure votes for death" on the jury because the District Court's original "rulings that each was an impartial juror, and this Court's affirmance of those rulings on direct appeal, ... demonstrate that no biased juror sat on Fulks' case." Gov. Br. at 64. See also id. at 54, 64 n.16, 65 (same argument). As set forth in Appellant's Brief and below, the government errs.

Appellant had *both* the right to an "impartial jury" *and* the right to effective assistance of counsel. The question of whether Appellant can establish a specific violation of the constitutional right to an "impartial jury" is not the appropriate question here. Instead, in the context of this ineffective assistance of counsel claim, the appropriate question arising from the seating of three "sure votes for death" is whether counsel's error "undermines confidence" in the death sentence. See Young v. Cato, 205 F.3d 750, 759 (4th Cir. 2000) (Strickland's "undermines confidence" standard requires only a "reasonable probability" of a different result, which is "less than a preponderance"). In the circumstances of this case, the Strickland prejudice standard is met.

The influence of three strongly pro-death jurors on this decision "undermines confidence" in the death sentence and, thus, establishes prejudice under Strickland. Given the significant mitigating evidence present by Appellant, there is a "reasonable probability," i.e., a probability sufficient to "undermine confidence" in the outcome of capital sentencing, that a jury untainted by three "sure votes for death" would have returned a life sentence. See Fulks Br. at 54-56, 58.

To be sure, with respect to a jury's *guilt-innocence* decision, it may be that a defendant cannot establish "prejudice" from counsel's inept jury selection without showing that "partial" jurors were seated. That is so because the guilt-innocence decision turns on objective determinations, about which all "impartial jurors" are likely to agree. But the role of the capital sentencing jury is dramatically different from the role of the jury at a guilt-innocence trial, because the capital sentencing jury must make a broadly discretionary, "highly subjective," and "largely moral judgment" about the defendant's worth as a human being. Caldwell v. Mississippi, 472 U.S. 320, 340 n.7 (1985). See also Lockhart v. McCree, 476 U.S. 162, 182- 83 (1986) (contrasting capital sentencing jury's "broad discretion to decide whether or not death is the proper penalty," with guilt-innocence "jury's more traditional role of finding the facts and determining the guilt or innocence of a criminal defendant, where jury discretion is more channeled").

8

The cases cited by the government are not to the contrary. See Gov. Br. at 54, citing Gardner v. Ozmint, 511 F.3d 420 (4th Cir. 2007); Treesh v. Bagley, 612 F.3d 424 (6th Cir. 2010); Fields v. Brown, 503 F.3d 755 (9th Cir. 2007).

In Gardner, this Circuit rejected a claim that counsel was ineffective for failing to use a peremptory strike against a juror who Gardner believed was biased. 511 F.3d at 425-26. However, Gardner is inapposite for several reasons. First, Gardner was a state prisoner, whose claims were reviewed by this Circuit under the highly deferential standards of 28 U.S.C. § 2254(d), see 511 F.3d at 423, 426; here, this Court's review of Appellant's claims is *de novo*. Second, Gardner did not assert that the juror had any bias *toward a death sentence*, see id. at 425-26; thus, the special concerns that arise in Appellant's case because of the broadly discretionary nature of the capital sentencing decision played no role in Gardner. Third, Gardner's asserted bias of only *one* juror, while Appellant's counsel seated *three* "sure votes for death." Finally, Gardner had "no evidence" at all that the juror actually was "biased or otherwise prejudiced," id. at 426; in Appellant's case, the evidence of pro-death bias is very strong, as this Court recognized on direct appeal.

The other circuit opinions cited by the Government are inapposite for similar reasons. See Treesh, 612 F.3d at 428, 435-39 (deferential § 2254(d) review; only one juror challenged for alleged pro-death bias; not a close case as to bias; trial counsel

9

did not even move to strike juror for cause); Fields, 503 F.3d at 776 (only one juror challenged; no allegation of pro-death bias).

**2.** The government says "nothing in this record even hints that Fulks's death sentence resulted from the alleged (and speculative) dominating influence of Allison, Harvey, and Goehring on the remaining nine jurors." Gov. Br. at 62. But one would not *expect* to find any such record evidence, since jury deliberations are held in secret. Under these circumstances, as discussed above and in Appellant's Brief, the prejudice inquiry necessarily looks to matters such as the highly subjective nature of the capital sentencing decision, the existence in this case of significant mitigation from which a jury reasonably could have returned a death sentence, and the likely effect of three such pro-death jurors on the deliberative process.

The government's own citation confirms that, under all the circumstances, the Court should not have confidence in the death sentence imposed in this case. See Matthew Rubenstein, Overview of the Colorado Method of Capital Voir Dire, THE CHAMPION p.18 (Nov. 2010), cited in Gov. Br. at 42, 43, 55 ("Interviews with jurors ... have established that many pro-death jurors employ coercive and bullying tactics to intimidate potential life-giving jurors to give up principled and lawful positions supporting the imposition of a sentence less than death." (citing Sundby, War and Peace in the Jury Room: How Capital Juries Reach Unanimity, 62 HASTINGS L.J. 103

10

(2010), as "providing numerous examples of potential life-giving jurors being pressured by" pro-death jurors)).

And, remarkably, in this case there *is* record evidence that the pro-death jurors dominated jurors who were inclined toward a life sentence. When interviewed by a reporter immediately after returning the death sentence,"*Juror Sylvia Allison* said *jurors were split early in the day 10-2 ...* [and] '*we had to convince*'" the life-voting jurors to vote for death. A201821. See also A201823 (reporting from juror interviews: "Jurors deliberated for about four hours ... Then, they voted but were hung 10-2. The jury began more intense discussions ... [during which] *some jurors pleaded their case for the death penalty*" and "the *two holdouts ... 'just listened*[.]' ... After roughly two more hours of deliberations, ... the group grew tired and wanted to vote again," and returned a death sentence.).

**3.**     The government says Appellant cannot show prejudice because "the government's strong case in aggravation overwhelmed Fulks' mitigation case." Gov. Br. at 64 n.16, 80-81. In light of the strength of the mitigation that was presented, the Government's argument fails. See Fulks Br. at 54. A jury very reasonably could have returned a life sentence in this case. Indeed, as stated above, two jurors originally did vote for life.

11

II.    **APPELLATE COUNSEL WERE INEFFECTIVE FOR FAILING TO APPEAL THE UNCONSTITUTIONAL "TWO-STEP" MITIGATION JURY INSTRUCTION**

Direct appeal counsel were ineffective for failing to raise a meritorious Eighth Amendment challenge to the jury instructions, which counsel preserved at trial because the instructions prevented the jurors from giving effect to relevant mitigating evidence.

A.    **The Instruction Was Unconstitutional**

The two-step instruction violated the Eighth Amendment. See Fulks Br. at 60-63, 65-67.

1.    In defending the instruction, the government relies upon United States v. Higgs, 353 F.3d 281 (4th Cir. 2003); Moody v. Polk, 408 F.3d 141 (4th Cir. 2005); United States v. Basham, 561 F.3d 302 (4th Cir. 2009); United States v. Lawrence, 555 F.3d 254 (6th Cir. 2009); Castro v. Ward, 138 F.3d 810 (10th Cir. 1998). See Gov. Br. at 72-73, 78. Three of these – Higgs, Moody and Lawrence – are inapposite because they did not involve challenges to jury instructions. See Fulks Br. at 65-66 (discussing Higgs). Neither Basham nor Castro addressed the specific instructions, and arguments about those instructions, that are raised in the instant case.

2.    The government states that some of Appellant's mitigation was "a 'two-edged' sword," in that it could be seen as mitigating and aggravating. Gov. Br. at 73.

12

As stated in Appellant's Brief at 62, the "two-edged" nature of the evidence *supports* Appellant's argument that the instructions were unconstitutional; given the instructions, there is a reasonable likelihood that jurors would consider the aggravating value of such evidence, but not consider its mitigating value.

3.      Finally, many cases cited by the government are inapposite because they relate to the government's erroneous assertion that Appellant claims appellate counsel were ineffective for failing to challenge the prosecutor's argument. See Gov. Br. at 74-75, 78-79, 81. Appellant does not raise a challenge to the prosecutor's argument. Appellant discussed the prosecutor's argument because it is relevant to whether the jury instruction was unconstitutional, as the government itself recognizes. See id. at 72 (Eighth Amendment question is if there is a "reasonable likelihood" that the jury understood the instructions in manner that impaired consideration of mitigation; answer to that question requires consideration of the instructions, the evidence, and "the parties' arguments"). Since Appellant does not challenge the constitutionality of the prosecutor's argument, the government's cases addressing what is "permissible" or "impermissible" for a prosecutor to say are inapposite.

### B.      Appellate Counsel Were Ineffective

Appellate counsel were ineffective for failing to raise this preserved issue. See Fulks Br. at 64-65.

### 1.    Deficient performance

The government says appellate counsel made a strategic decision to "winnow" this claim in favor of claims counsel believed were stronger or in line with a different appellate theme. See Gov. Br. at 69-71, 76-77. But counsel's testimony was that it was *not* his practice to "winnow" appellate claims in capital cases, and that he had no tactical or strategic reason for not raising this issue in this case. See Fulks Br. at 64-65. This Court should reject the government's argument, since "courts should not conjure up tactical decisions an attorney could have made, but plainly did not." Griffin v. Warden, 970 F.2d 1355, 1358 (4th Cir. 1992); Tice v. Johnson, 647 F.3d 87, 105 (4th Cir. 2011) (quoting Griffin); United States v. Luck, 611 F.3d 183, 188 (4th Cir. 2010) (same).

The government's "strategy" argument is also inconsistent with what the record shows about the issues appellate counsel did raise. According to the government, appellate counsel had a "strategy of raising only those issues that related to Fulks' alleged inability to present his theory that he was not the actual killer of Donovan to the jury." Gov. Br. at 76; see also id. at 77 n.19 (asserting "appeal strategy was to raise issues relating to Fulks' inability to inform the jury that he was not the actual killer of Donovan"). But, of the seven issues on appeal, only *one* raised the not-the-actual killer issue. See United States v. Fulks, 454 F.3d 410, 420-21 (4th Cir. 2006)

14

(seven issues, fifth of which was that "court abused its discretion in excluding evidence regarding the results of three polygraph examinations ... which indicated that Fulks had truthfully disclaimed knowledge of and participation in the murders"). Moreover, a challenge to the two-step instruction's effect on the jury's ability to consider mitigation would have fit nicely with other issues counsel did raise, such as the argument that the "court erroneously qualified jurors ... [who] would not properly consider the mitigation evidence." Id. at 427. Again, this Court should reject the government's invocation of a "strategy" counsel did not have.

The government, citing Bobby v. Van Hook, 130 S.Ct. 13 (2009), Smith v. Murray, 477 U.S. 527 (1986), and Jones v. Barnes, 463 U.S. 745 (1983), criticizes Appellant for citing the 2003 ABA Guidelines (American Bar Association, Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, 31 HOFSTRA L. REV. 913 (2003)) in support of the argument that no reasonable capital appellate lawyer would have "winnowed" this claim. Gov. Br. at 71 n.18. The government's reliance on these cases is misplaced.

In Van Hook, the Supreme Court criticized the lower court for using the 2003 ABA Guidelines to judge counsel's actions in *1985*. "Judging counsel's conduct [at a 1985 trial] on the basis of these 2003 Guidelines – without even pausing to consider whether they reflected the prevailing professional practice at the time of the trial –

15

was error." 130 S.Ct. at 17. In Appellant's case, however, the 2003 ABA Guidelines were in effect at the time of appellate counsel's actions and, thus, serve as appropriate "'guides' to what reasonableness entail[ed]" at the time. 130 S.Ct. at 16 (quoting Strickland).

Moreover, the anti-"winnowing" approach to capital appeals was not an innovation of the 2003 ABA Guidelines. The 1989 ABA Guidelines (American Bar Association, GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES (1989)) took the same approach, stating:

> Traditional theories of appellate practice notwithstanding, appellate counsel in a capital case should not raise only the best of several potential issues. Issues abandoned by counsel in one case, pursued by different counsel in another case and ultimately successful, cannot necessarily be reclaimed later. When a client will be killed if the case is lost, counsel (and the courts) should not let any possible ground for relief go unexplored or unexploited. ...
> Chief Justice Burger argues that "[t]here can hardly be any question about the importance of having the appellate advocate examine the record... to select [only] the most promising issues for review..." Jones v Barnes, 103 S.Ct. 3308, 3314 (1983). This is truly bad advice in capital cases – at any level. If the past few years teach us anything, it is to raise 'em all.

1989 ABA GUIDELINES, Guideline 11.9.2, Commentary (some citations and internal quotation marks omitted; footnote moved to text).

In sum, the ABA Guidelines in effect for many years prior to this appeal, the ABA Guidelines in effect at the time of this appeal, and the testimony of counsel at

16

the § 2255 hearing, see Fulks Br. at 64, all confirm that it was not professionally reasonable in a capital case at the time of this appeal to take the "winnowing" approach advanced by the government.

The other cases cited by government, Jones v. Barnes and Smith v. Murray, do not undermine this conclusion. Jones v. Barnes was a non-capital case, for which appellate "winnowing" may be a reasonable approach. Smith v. Murray assessed the performance of appellate counsel for *an appeal taken in 1978*, see 477 U.S. at 531, long before even the 1989 ABA Guidelines were promulgated, when modern capital litigation was in its infancy. By the time of Appellant's direct appeal, professional norms in capital cases had long-since shifted to the anti-winnowing approach of the 1989 and 2003 ABA Guidelines.

### 2.    Prejudice

Appellant was prejudiced by counsel's failure to raise this preserved issue on direct appeal because, had counsel raised it, there is a "reasonable probability" that this Court would have reversed the death sentence. Smith v. Robbins, 528 U.S. 259, 285 (2000). Given the significant mitigation presented to the jury, Appellant was prejudiced, and the government's no-prejudice arguments, Gov. Br. at 75-76, 79-91, are erroneous. See Fulks Br. at 63-65.

Only one government argument requires reply. The government suggests that,

17

had appellate counsel raised this issue, this Court would have addressed the harmless error question by "reweigh[ing] the evidence." Gov. Br. at 75. Actually, because the error "was properly preserved for appeal," this Court would have reversed the death sentence unless "the Government establishe[d] beyond a reasonable doubt that the error was harmless." 18 U.S.C. § 3595(c)(2)(C). Prejudice is established here because there is a reasonable probability that this Court would not have deemed the error harmless beyond a reasonable doubt.

### III. TRIAL COUNSEL WERE INEFFECTIVE FOR ADVISING APPELLANT TO GIVE UNPROTECTED STATEMENTS TO THE GOVERNMENT AND PLEAD GUILTY WITHOUT OBTAINING ANY BENEFIT IN RETURN

Counsel were ineffective when they advised Appellant to give unprotected statements to the government and to plead guilty, without obtaining any benefit in return.

#### A. Deficient Performance

1. The government cites several cases for its argument that it was reasonable for counsel to advise Appellant to give unprotected statements and plead guilty without any benefit. See Gov. Br. at 32-41, citing Premo v. Moore, 131 S.Ct. 733 (2011); Florida v. Nixon, 543 U.S. 175 (2004); Meyer v. Branker, 506 F.3d 358 (4th Cir. 2007); Harvey v. Warden, 629 F.3d 1228 (11th Cir. 2011); Bell v. Evatt, 72 F.3d 421 (4th Cir. 1995); Stout v. Netherland, 1996 WL 496601 (4th Cir. 1996)

18

(unpublished, text on Westlaw); Fairbank v. Ayers, 650 F.3d 1243 (9th Cir. 2011); Post v. Bradshaw, 621 F.3d 406 (6th Cir. 2010); United States v. Guadagno, 970 F.2d 214 (7th Cir. 1992); United States v. Sampson, 486 F.3d 13 (1st Cir. 2007); Green v. French, 143 F.3d 865 (4th Cir. 1998); United States v. Moussaoui, 591 F.3d 263 (4th Cir. 2010); Jones v. Page, 76 F.3d 831 (7th Cir. 1996).

Several of the government's cases were cited by the District Court and are discussed in Appellant's Brief. See id. at 68-71, 73-75 (discussing Florida v. Nixon, Meyer v. Branker, United States v. Sampson, Jones v. Page). Those opinions do not aid the government, and actually support Appellant, for the reasons already stated. The rest of the government's cases are similarly unhelpful to the government.

Nothing in Premo v. Moore suggests that counsel's actions were reasonable here. The lawyer found effective in Premo did *not* advise his client to give an unprotected statement and did *not* advise his client to plead guilty without benefit. Instead, the client already had given confessions (to police and others) when counsel entered the case, and counsel negotiated a plea bargain in which the prosecution dropped the most serious charges of "aggravated murder, which carried a potential death sentence," in exchange for a guilty plea to "felony murder" and "a sentence of 300 months, the minimum sentenced allowed by law for the offense." 131 S.Ct. at 738. It was in this context of a *negotiated plea for a non-death sentence* that Premo

19

deemed reasonable the approach of "[a]cknowledging guilt and accepting responsibility by an early plea," id. at 741, the language quoted in the Government's Brief at 35.

Nor do the eight lower court cases cited by the government advance its argument. In *none* of the cases did counsel advise the defendant to give unprotected statements to the prosecution, as counsel did here. Neither the District Court nor the government has cited any case where it was deemed reasonable for counsel to urge his client to give such unprotected statements. Moreover, additional features of the government's cases make them unhelpful to the government.

In four of the eight cases – Harvey v. Warden, Bell v. Evatt, United States v. Guadagno, United States v. Moussaoui – trial counsel *did not advise the defendant to plead guilty*.

In Harvey, 629 F.3d at 1232-33, after counsel unsuccessfully moved to suppress the defendant's confession, Harvey *pled not guilty* and counsel tried the guilt phase by "conced[ing] the facts of the murder" and arguing that, "[i]nstead of first-degree murder, the evidence would show that [Harvey] was guilty of second-degree murder." Thus, counsel in Harvey took a professionally reasonable approach, as described by Appellant's capital defense expert, Andrea Lyon, by the Supreme Court in Florida v. Nixon, and in Appellant's Brief at 68-71.

20

In Bell, 72 F.3d at 427, counsel took the same professionally reasonable approach as in Harvey – Bell *pled not guilty* and counsel tried the guilt phase by "conced[ing] his guilt to the kidnapping charge and pursu[ing] a verdict of guilty but mentally ill ('GBMI') for both the murder and the kidnapping charge." Counsel thus "urged the jury to reject the State's evidence and find his client GBMI" at the guilt-phase, and "a GBMI verdict would have increased Bell's chances of receiving a life sentence" at the penalty-phase. Id. at 429.

Similarly, in Guadagno, 970 F.2d at 218, Guadagno *pled not-guilty* and was tried by jury. In any event, Guadango is inapposite because it was a *non-capital case* with *judge sentencing* under the Federal Sentencing Guidelines. See Fulks Br. at 38-39 (describing significant differences between jury sentencing in capital case and judge sentencing).

In Moussaoui, 591 F.3d at 274, Moussaoui did plead guilty, but he did so "*against the advice of his counsel*." See also id. at 275 (defendant "intentionally disregarded the advice of counsel"); id. at 290 ("Moussaoui made it clear ... that he had met with his attorneys, who had advised that he *not* plead guilty, but that he was freely and voluntarily choosing to reject that advice." (emphasis in original)). Moreover, there is no indication that any juror found the guilty plea to be a mitigating factor. Instead, in this *sui generis* case, the jury declined to recommend death after

21

Moussaoui told the jurors that "jail [was] a greater punishment than being sentenced to death, and [that] martyrdom, execution, [would] be a reward," and that the jury "could save [an] American life by keeping [him] alive because they could use [him] as a bargaining chip, so if one day some American serviceman [is] taken hostage ... they could exchange Moussaoui [for] the American soldier." Id. at 277.

The government, then, is left with four cases in which counsel actually advised the defendant to plead guilty, Stout v. Netherland (1987 guilty plea), Green v. French (1984 guilty plea), Fairbank v. Ayers (1986 guilty plea), or "no contest," Post v. Bradshaw (1984 "no contest" plea), at the guilt-innocence phase of a capital case. In each case, the *defendant was sentenced to death*. Thus, these cases confirm what Appellant has stated – some capital defense lawyers *used to believe* an open guilty plea was a good strategy but, by the time of this trial, experience had taught otherwise and reasonable capital defense counsel knew better. See Fulks Br. at 40-41, 67-71, 74. Moreover, Stout, Green, Fairbank and Post are not helpful to the government for several additional reasons.

In Stout, capital sentencing was by a *judge*, not a jury. 1996 WL 496601 at *2. As capital defense expert Lyon testified at the § 2255 hearing, the strategic calculus may be different for judge sentencing because judges are more likely to treat the defendant's "cooperation" as mitigating. See Fulks Br. at 38-39.

22

In Green and Fairbank, the courts evaluated the ineffective assistance claims under the highly deferential standards of 28 U.S.C. § 2254(d), because they were brought by state prisoners. See Green, 143 F.3d at 868-76 (discussing § 2254); id. at 891 ("we cannot conclude that the state court unreasonably applied" Strickland);[1] Fairbank, 650 F.3d at 1251 (discussing "deference and latitude" required by § 2254(d)); id. at 1254-55. Thus, Green and Fairbank are not convincing authority here, where this Court's review is *de novo*, rather than through the deferential lens applied to state prisoner habeas cases. Moreover, the defendant in Fairbank did receive some benefit for the guilty plea – the prosecution dropped one death-eligibility "special circumstance," and some of the prosecution's most damning evidence was excluded. See 650 F.3d at 1248, 1255.

Finally, Post v. Bradshaw is particularly unhelpful to the government. In Post, the defendant was *sentenced to death* after pleading "no-contest," in 1984. 621 F.3d at 412. Indeed, the three-judge panel that sentenced Post to death "found the no-contest plea *non-mitigating*." Id. at 417. Again, Post is one of the cases from which reasonable capital defense counsel learned, by the time of Appellant's trial, that an open guilty plea at the guilt phase of a capital case is a bad idea.

---

[1]Indeed, Green's interpretation of § 2254(d) was later rejected as *too* deferential to the state courts. See Williams v. Taylor, 529 U.S. 362, 374 (2000).

23

Moreover, Post's counsel had strategic reasons for suggesting a no-contest plea that are absent from Appellant's case. By pleading no-contest, Post obtained a sentencing before a three-judge panel, rather than a jury, with a unanimous vote of the judges required for a death sentence. 621 F.3d at 417-18. Post's counsel had made the "determination that Post stood a better chance with three less emotional judges than he did with 12 jurors," especially because counsel "kn[e]w that [one judge] had religious reservations about the death penalty" and co-counsel "did not think that judge would vote for death." Id. at 418. It was under these conditions, where the no-contest plea led to sentencing in a forum that counsel had reason to believe would not return a death sentence, that the Post majority deemed the no-contest plea "a reasonable tactic." Id.

Even under such circumstances, one of the Sixth Circuit Judges on the Post panel dissented and would have found counsel ineffective, stating:

> [T]he majority ... concludes that ... counsel's advice to plead no contest was objectively reasonable because there was "hope that the plea would be considered a mitigating factor." I disagree. While ... Post's attorneys were in an unenviable position – there was strong evidence of their client's guilt, but he had refused to plead guilty [in exchange for a life sentence] – ... the Constitution requires attorneys to make strategic judgments based on something more concrete than unsubstantiated hope, especially when their client's life hangs in the balance.

621 F.3d at 428 (Cole, J., dissenting).

24

Judge Cole explained that his conclusion that counsel were ineffective was

supported by the 1989 and 2003 ABA Guidelines and Supreme Court precedent:

> The 1989 ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (the "ABA Guidelines") advise that attorneys representing defendants facing the death penalty "should insist that no plea to an offense for which the death penalty can be imposed will be considered without a written guarantee, binding on the court or other final sentencer, that death will not be imposed." ABA Guidelines 11.62 cmt. Further, they recommend that "[i]f no written guarantee can be obtained that death will not be imposed following a plea of guilty, counsel should be extremely reluctant to participate in a waiver of the client's trial rights," and that "counsel must strive to prevent a client from pleading guilty where there is a likelihood that such a plea will result in a death sentence." Id. 11.6.3 cmt. The 2003 version of the these guidelines offer similar guidance. See ABA Guidelines 10.9.2 cmt. (rev. ed. 2003). Indeed, citing the 2003 ABA Guidelines, the Supreme Court has stated:
>
>> [P]leading guilty [to a capital offense] without a guarantee that the prosecution will recommend a life sentence holds little if any benefit for the defendant. Pleading guilty not only relinquishes trial rights, it increase the likelihood that the State will introduce aggressive evidence of guilt during the sentencing phase, so that the gruesome details of the crime are fresh in the jurors' minds as they deliberate on the sentence.
>
> Florida v. Nixon, 543 U.S. 175, 191 n.6 (2004).
>
> \* \* \*
>
> In this situation, the ABA Guidelines' recommendation is clear. In following their guidance we do not ... need to adopt them as per se rules. Rather, as ... the Supreme Court has stated repeatedly, we look to them for guidance in determining whether counsel's representation was constitutionally inadequate.

621 F.3d at 429-30 (Cole, J., dissenting).

**2.** The government says capital defense expert Lyon's testimony that

capital counsel should never advise a client to plead guilty without death being taken off the table "is inconsistent with the 2003 ABA Guidelines," which supposedly "merely discourage an attorney from advising a client to plead guilty to a capital case without a plea agreement." Gov. Br. at 37. The government is wrong. Lyon's testimony is consistent with the ABA Guidelines, as demonstrated in Appellant's Brief, and immediately above in Judge Cole's opinion in Post.

Neither the 1989 ABA Guidelines nor the 2003 ABA Guidelines contemplate that effective counsel would *ever* advise the client to enter a guilty plea without a guarantee of a non-death sentence.

The 1989 ABA Guidelines state: "Counsel should insist that no plea to an offense for which the death penalty can he imposed will be considered without a written guarantee, binding on the court or other final sentencer, that death will not be imposed." Id., Guideline 11.6.2, cmt. See also id. n.2 (observing that, by 1989, capital counsel had learned from experience that an open guilty plea is likely to lead to a death sentence; concluding that a guilty plea is "an effective strategy *only* when the attorney *knows without any doubt* that no death sentence will result. Any other 'strategy' for entering a guilty plea is ill-advised and should be abandoned." (emphasis in original)). The 1989 Guidelines also recognize, however, that a client may wish to plead guilty against counsel's advice; when that happens, "counsel

26

should be extremely reluctant to participate." Id., Guideline 11.6.3, cmt.

The 2003 ABA Guidelines take the same approach. Counsel has the duty "seek an agreed-upon disposition" that takes death of the table. 2003 ABA GUIDELINES at 1035. "If ... a negotiated disposition is rejected by either the prosecution or the client when a settlement appears to counsel to be in the client's best interest," counsel should *not* advise the client to plead guilty anyway; instead "counsel should continue efforts at persuasion while also continuing to litigate the case vigorously." Id. at 1043. Like the 1989 Guidelines, the 2003 Guidelines recognize that, in the end, the "decision whether to enter a plea of guilty lies with the client," id. at 1044, and, thus, *a client may insist* on pleading guilty, against counsel's advice, without a guarantee of a non-death sentence. If the client does insist on a guilty plea when "no written guarantee can be obtained that death will not be imposed following a plea of guilty, counsel should be extremely reluctant to participate in a waiver of the client's trial rights." Id. at 1045.

In short, the 2003 Guidelines, like the 1989 Guidelines, recognize that *a client may insist* on pleading guilty without a guarantee of a non-death sentence and, if the client does so insist, counsel should be "extremely reluctant to participate" in the guilty plea proceedings. In short, an open guilty plea is such a bad idea that counsel should vigorously resist it even when the client insists upon it.

27

At the time of Appellant's trial, *reasonable* capital defense lawyers would not advise the client to plead guilty without assurance of a non-death sentence.

## B. Prejudice

As the government recognizes, the prejudice inquiry is whether, had counsel performed effectively, there is "a reasonable probability that [Appellant] would not have pleaded guilty but proceeded to trial." Gov. Br. at 21. See also Fulks Br. at 72 (same). Prejudice is shown here. Appellant was very reluctant to plead guilty, and agreed to do so only after much urging from counsel. Id. at 39-40, 72. Effective counsel would have urged Appellant to plead *not guilty* and there is at least a "reasonable probability" that Appellant would have accepted that advice. Id. at 73.

The government argues that Appellant was not prejudiced because the prejudice inquiry supposedly "is dependent on the likely outcome of a trial if the defendant had pleaded not guilty," and the "government had an overwhelming case" for guilt. Gov. Br. at 21, 40-41, citing Hill v. Lockhart, 474 U.S. 52, 59-60 (1985). The government errs. While the prejudice inquiry *sometimes* is linked to "the likely outcome of a trial if the defendant had pleaded not guilty," that is not so under the circumstances of Appellant's case.

In Hill, a non-capital case, the Supreme Court described the "prejudice" standard for guilty plea cases as follows:

28

In ... order to satisfy the "prejudice" requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.

In many guilty plea cases, the "prejudice" inquiry will closely resemble the inquiry ... [for] reviewing ineffective-assistance challenges to convictions obtained through a trial. For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial.

474 U.S. at 59.

Thus, Hill recognized that, in a non-capital case, there may be a link between the likely outcome of trial and the likelihood that the defendant would have pled not guilty because. That is so in a non-capital cases because, in such cases, effective counsel's *"recommendation as to the plea"* will *depend upon the likely outcome of a trial* – effective counsel in non-capital case is unlikely to recommend going to trial if the outcome is sure to be a conviction. In a capital case, however, the situation is different. As stated in Appellant's Brief and above, effective capital counsel's "recommendation as to the plea" is to *plead not guilty*, even if faced with a sure conviction, because of the adverse repercussions of a guilty plea on the capital sentencing phase.

29

**IV.  APPELLANT'S DUE PROCESS AND EIGHTH AMENDMENT RIGHTS WERE VIOLATED BY THE GOVERNMENT'S USE OF INCONSISTENT THEORIES IN <u>FULKS</u> AND <u>BASHAM</u>**

Appellant's due process and Eighth Amendment rights were violated when the government presented inconsistent theories in <u>Fulks</u> and <u>Basham</u>.

### A.   This Issue Is Not Defaulted

The government erroneously asserts this issue is defaulted because it was not raised on direct appeal. Gov. Br. at 81-82. Counsel's duty on direct appeal is to raise issues arising from the trial record. Counsel had no duty to raise this issue on direct appeal; thus, failure to raise it cannot be a default.

As the government observes, appellate counsel "did not attend Basham's trial" and "did not review Basham's trial transcript before filing Fulks' direct appeal brief." Gov. Br. at 82 n.25. To deem this issue waived because counsel did not *post-trial* seek out evidence from another case would impose on counsel the type of "prosecutor may hide, defendant must seek" rule that "is not tenable in a system constitutionally bound to accord defendants due process." <u>Banks v. Dretke</u>, 540 U.S. 668, 696 (2004).

In the alternative, if the Court believes direct appeal counsel *do* have a duty to seek evidence that the government *later* pursued an inconsistent approach against a codefendant, then appellate counsel here plainly breached that duty, thus establishing

30

"cause" to overcome any default arising from counsel's failure to raise this issue; and the merits of this issue establish "prejudice" arising from that "cause." See Murray v. Carrier, 477 U.S. 478, 488-89 (1986). Thus, again, the issue is before this Court on its merits.

**B.     The Government Used Inconsistent Theories**

The government's main argument is that its theories in Fulks and Basham were consistent. We first review the evidence and prosecutorial arguments in each case, then address the government's specific assertions.

**1.**     In **Basham**, the government introduced two separate admissions by Basham that *Basham killed Alice Donovan* – the "purse strap statement" and the "deer statement."

*Basham's "purse strap statement"*: At Basham's trial, Sheriff Hewett testified that Basham demonstrated with his hands how *Basham had strangled Donovan* with a purse strap; after so demonstrating, Basham said, "Then I threw [the purse strap] over there." When Basham's counsel asked Sheriff Hewett why his contemporaneous notes did not include a *statement* from Basham that Basham had killed Donovan, the Sheriff responded that Basham "did not *tell* me he used the strap. *He demonstrated*, though. ... [H]e didn't say. *He showed*." The prosecutor, in closing arguments, emphasized that "Sheriff Hewett says [Basham] didn't *say* I killed Alice Donovan.

31

Sheriff Hewett said to you in this courtroom in front of you, the jury, no, he *demonstrated* it." "*He [Basham] killed Alice Donovan*." See Fulks Br. at 76, 79, 83-84; Gov. Br. at 85-88, 91-92 (describing government's use of "purse strap statement" against Basham).

*Basham's "deer statement"*: Basham said to Sheriff Hewett, while they were looking for Donovan's body, "You know, I could never even kill a deer and here I have ...," at which point Basham's counsel stopped him. Basham's counsel moved to exclude the "deer statement" because its meaning was "speculative," but the District Court disagreed, saying it was *"very powerful evidence"* against Basham. At Basham's trial, the government argued that the "deer statement," like the "purse strap statement," was an admission by Basham that Basham killed Donovan. See Fulks Br. at 76, 78-79, 84; Gov. Br. at 85, 87 (describing government's use of "deer statement" against Basham).

In **Fulks**, Fulks consistently maintained that Basham killed Donovan. Basham's "purse strap" and "deer" statements, as used by the government at Basham's subsequent trial, would have supported Fulks' defense, but the government prevented Fulks from using either of them.

*Basham's "purse strap statement"*: At a pre-trial hearing "FBI Agent Jeff Long testified that Basham – relaying his admissions through his attorneys – said that *Fulks*

32

strangled Donovan with a purse strap, after which Basham threw the purse strap" away.  Gov. Br. at 82-83.  Sheriff Hewett, the next witness, testified that he was present when Basham's counsel "relay[ed]" Basham's statement "that Fulks strangled Donovan with a purse strap," and he had "memorialized Basham's statements in a report ... dated December 3, 2002."  Id. at 83.  Sheriff Hewett further testified that Basham personally "demonstrated the length of the strap by pulling his shackled hands apart ... 'and indicated by this motion that it was used to strangle Alice Donovan.'"  Id. at 83.  See also A400208-13, A400221-22 (Hewett's pre-trial testimony about Basham's "purse strap statement" and actions).

For obvious reasons, Fulks did not seek admission of Basham's "purse strap statement."  After all, the government's pre-trial representation was that Basham said and demonstrated that *Fulks* strangled Donovan with the purse strap.  It was not until Basham's later trial that the government took the opposite position, and represented that Basham had said and demonstrated that *Basham* strangled Donovan with the purse strap.

*Basham's "deer statement"*: Fulks moved to admit Basham's "deer statement" as evidence that Basham killed Donovan.  The government opposed its admission, arguing that Fulks was taking the statement "out of context," that it was not an admission to killing Donovan, that it had "no meaning," and that Basham "could have

33

been talking about anything." The government argued that, if the "deer statement" were admitted, the "rule of completeness" would also require admission of the "purse strap statement," through which "Sheriff Hewett demonstrat[ed] how Brandon Basham said that *Chad Fulks took the purse strap and strangled*." The District Court accepted the government's arguments, and excluded the "deer statement." See Fulks Br. at 77-78; Gov. Br. at 84 (describing exclusion of "deer statement" at Fulks' sentencing).

*The government's presentation to Fulks' jury*: The prosecutor told the jury, "The plain fact of the matter is, [*Chad Fulks*] *is the leader*. ... [M]ake no mistake about it, *Brandon Basham was a puppet*, and *Chad Fulks was pulling his strings throughout*." A303735. See also A303701-04, A303708-09, A303721-24, A303735, A303742 (prosecutor's argument that, throughout the crime spree, Fulks took "the leadership role," was "driving this train" and was "calling the shots"). The prosecutor told the jury it should not believe Fulks' statements about Basham's responsibility, including Fulks' claim that Basham killed Donovan, because Fulks was just trying to avoid responsibility for his own actions by falsely shifting blame to Basham. See Fulks Br. at 15-19, 78. The prosecutor told the jury it should disbelieve Fulks' claim that Basham killed Donovan, and should believe that Fulks killed Donovan, because of circumstantial evidence that included Fulks' leadership role, his actions at other

34

times during the crime spree, and his lack of credibility. See A303690-91 ("Fulks chose Alice Donovan. ... He chose to kill." "Fulks had Alice Donovan's life in his hands. He chose death."); A303692 (jurors should reject "credibility of Chad Fulks" and should not "believe him" when he says "[h]e didn't kill Alice Donovan"); A303700 (Fulks "kills two women"); A303726 ("Less than an hour before Alice Donovan is carjacked and kidnaped, ... Fulks is trying to kill Carl Jordan .... [A] reasonable inference is that, if he is trying to kill a man that barely had an opportunity to see his face, ... what do you think he will do to a woman that he spent several hours with that he robbed? That he raped?"); A303736 (Fulks "has beaten and physically abused just about every woman in his life. ... What do you think he was going to do with Alice Donovan after he raped her? ... What do you think he did to the woman that meant nothing to him?"); A303739 ("Do you honestly believe that Chad Fulks would have allowed Alice Donovan to live and to testify against him? Do you honestly believe that?"); A303739 (jury should disbelieve Fulks' claim that Basham "killed Alice Donovan"); A303760 (jury should reject the arguments of Fulks' "lawyers [who] want you to believe that he ... didn't kill Alice"); A303771, A303774-75 (jury should find the first "threshold intent factor," that "Chad Fulks, himself, intentionally killed Alice Donovan" based upon "circumstantial evidence" about Fulks' actions during the crime spree, which showed that Fulks "will do anything");

35

A303788-89 ("Fulks says he didn't kill Alice Donovan. ... [D]o you believe Chad Fulks? Do you believe Chad Fulks? This man who has spun a web of deceit his entire life."); A303794 ("Fulks wants you to believe that, for the first time in his entire life, for the first time, that he is telling you the truth. ... I didn't kill Alice Donovan."); A303799 (Fulks "killed Alice Donovan").

In summary, in Basham, the government's position was that Basham's "purse strap" and "deer" statements showed that *Basham* strangled Donovan, and represented that Basham *expressly admitted to being the strangler* in his "purse strap statement." In Fulks, the government argued that Basham's "deer statement" was meaningless, and convinced the court to exclude it, and the government expressly represented that Basham's "purse strap statement" was that *Fulks* strangled Donovan, the opposite of what it represented about that statement at Basham's trial.

The government's inconsistent positions about who actually killed Donovan were not peripheral to the capital sentencing decision; they were significant. The Supreme Court has recognized that evidence that the defendant did not actually kill the victim can be important mitigation, e.g., Lockett v. Ohio, 438 U.S. 586, 608 (1984), and nationwide statistics show that the death penalty rarely is imposed when the defendant does not actually kill the victim, with just 0.78% of the defendants executed since reinstatement of the death penalty in 1976 being persons who did not

36

directly kill the victim, see http://www.deathpenaltyinfo.org/those-executed-who-did-not-directly-kill-victim (last visited Feb. 20, 2012) (since reinstatement of death penalty, 10 executions of defendants who did not kill victim); http://www.deathpenaltyinfo.org/documents/FactSheet.pdf (last visited Feb. 20, 2012) (total of 1,281 executions).

2.    The government erroneously asserts that, at "Fulks' trial, the government expressly refrained from arguing that Fulks was the actual killer of Donovan." Gov. Br. at 90. As set forth in part 1, supra, the prosecutor at Fulks' trial repeatedly argued that the jury should find that Fulks killed Donovan and should reject Fulks' statements that Basham killed Donovan.

3.    The government erroneously asserts that its presentations were not inconsistent because the prosecutor at Fulks' trial argued "that the jury did not have to find that Fulks 'actually killed Alice Donovan' to impose the death sentence." Gov. Br. at 84-85. See also id. at 90 (same). While the prosecutor did argue that the government did not "*have to*" prove Fulks killed Donovan, he also repeatedly told the jury that the government *had* proved it, as set forth in part 1, supra.

Moreover, the prosecutor's explanation to the jury of *why* the government did not "*have to*" prove Fulks was the killer was itself inconsistent with the government's presentation in Basham. The Fulks prosecutor told the jury the government did not

37

"have to" prove the killer's identity because, "*with no confession*, it is, virtually, impossible to, with direct evidence, to prove who the killer is." A303695-96. In Basham, however, the government represented that there *was a confession* – Basham's "purse strap statement" and "deer statement" – which expressly identified *Basham* as the killer.

4.    The government erroneously asserts that "proof that the government's theories of guilt were consistent at both trials" can be found in the fact that the only "threshold intent factor" found by the jury in each case was "grave risk of death," 18 U.S.C. § 3591(a)(2)(D) (defendant "intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to [Donovan], such that participation in the act constituted a reckless disregard for human life, and [Donovan] died as a direct result of the act"). Gov. Br. at 93 & n.29.

Actually, the jury's finding of the "grave risk" threshold intent factor has *no relevance* to this issue. The government's argument is negated by the jury instructions and trial prosecutor's arguments regarding the threshold intent factors, which demonstrate that the finding of the "grave risk" intent factor is irrelevant.

The jury was instructed on the four possible threshold intent factors codified in § 3591(a)(2): (A) Fulks "intentionally killed" Donovan; (B) Fulks "intentionally inflicted serious bodily injury that resulted in the death" of Donovan; (C) Fulks

38

"intentionally participated in an act, contemplating that the [Donovan's] life ... would be taken or intending that lethal force would be used ... and Donovan died as a direct result of the act"; and (D) "grave risk." A303927-28.

The jury was instructed to find *one and only one* of the four possible threshold intent factors, and to then proceed to the next stage of deliberations. A303930 (oral instructions: "If you find, unanimously, the existence of one threshold intent factor, additional findings with respect to intent would not be relevant to your deliberations; therefore, you should proceed to the next step and consider the statutory aggravating factor."); A201810 (verdict form: "Select ... the Threshold Intent Factor ... you unanimously find .... You may not select more than one.").

In accord with the instructions, the trial prosecutor repeatedly told the jury to find just *one* intent factor, then "move on":

> Four threshold intent factors. You jurors can only find one. Only allowed to find one. The law says you can only find one, and you can only find one. ... You might find all four in your mind, you may think there are all four there, but the law says that you can only find one. ... Once you find one, there is no need to go to any of the other three. You are only allowed to check one. ... These are the four threshold intent factors .... Again, you are only allowed to find one. Once you found one, move on. Just move on.

A303766-70.

The prosecutor told the jury that the evidence supported all four of the

39

threshold intent factors, including the first, "that Chad Fulks, himself, intentionally killed Alice Donovan." A303771, A303774-75. See also part 1, supra (describing prosecutor's arguments that Fulks killed Donovan).

The prosecutor then suggested to the jury that it should find the "grave risk" threshold intent factor simply because it was the *easiest to find* – "grave risk" was a "no-brainer" because it could be found even if the evidence was taken "in the light most favorable to the defendant," "his [own] version of events." A303772.

Thus, the fact that the jury found only "grave risk" says *absolutely nothing* about the significance to the jury of evidence about who actually killed Donovan. Instead, it merely reflects the fact that the jury was allowed to find just one factor, and the prosecutor suggested "grave risk" as the easiest to find.

Finally, the finding of "grave risk," rather than a different threshold factor, had *no effect on the sentencing decision* because the jury was instructed that "[t]he threshold intent factor *cannot be considered in the weighing process*." A303949.[2]

---

[2]The instructions and prosecutor's arguments in Basham were to the same effect. See id., Tr. 11/1/2004 at 47 (A400685) (Basham prosecutor's argument: "The judge will charge you that you jurors are only allowed to find one [threshold intent factor]. ... [T]here is actually evidence [from] which you ... could find ... all four of them. But, as a matter of law, ... [y]ou can only select one, despite the fact that there is evidence you believe there are two, or three, or all four present."); id. at 206, 228 (Basham instructions: "You must find one of these threshold intent factors ... before you may continue your deliberations. ... You may not select more than one. If you have found unanimously the existence of one threshold intent factor, additional

40

5.      The government tries to blame its presentation of inconsistent theories on the "district court's evidentiary rulings" or the idea that "the government's argument at Basham's trial that Basham strangled Donovan was based on the evidence elicited from Hewett on cross-examination by Basham's counsel, not by the government." Gov. Br. at 91-92. The government cannot avoid responsibility for its own actions.

The "district court's evidentiary rulings" were based, at least in part, on the government's assertion in Fulks that Basham's "deer statement" "had no meaning" and Basham's "purse strap statement" identified *Fulks* as the person who strangled Donovan, positions that were contrary to those the government took in Basham. Indeed, the government's representation in Fulks that the "purse strap statement" identified Fulks as the strangler prevented the defense in Fulks from even moving for admission of that statement, which the prosecution later used in Basham to show that *Basham* was the strangler. Nor can the government shift responsibility to Basham's counsel because he asked questions that elicited testimony from Sheriff Hewett that Basham was the strangler. Sheriff Hewett was part of the prosecution team. His testimony, elicited by the prosecution or the defense, was part of the government's

findings with respect to intent would not be relevant to your deliberations; therefore, you should proceed to the next step and consider the statutory aggravating factor." "The threshold intent factor cannot be considered in the weighing process.").

41

case, and it was directly contrary to the government's representations in Fulks.  See

Napue v. Illinois, 360 U.S. 264, 269 (1959) (due process violated "when the State,

although not soliciting false evidence, allows it to go uncorrected when it appears");

Giglio v. United States, 405 U.S. 150, 154 (1972) ("prosecutor's office is an entity,"

with knowledge of anyone on prosecution team attributed to trial prosecutor).

### C.    Appellant's Constitutional Rights Were Violated

As stated in Appellant's Brief at 79, 81, the controlling law of this Circuit is

that, at least in "some situations, the Due Process Clause prohibits the government

from presenting mutually inconsistent theories of the same case against different

defendants."  United States v. Higgs, 353 F.3d 281, 326 (4th Cir. 2003).

> For example, due process may be violated if "an inconsistency exist[s]
> at the core of the prosecutor's cases against the defendants for the same
> crime," see Smith v. Groose, 205 F.3d 1045, 1052 (8th Cir. 2000)
> (finding due process violation where prosecution obtained two
> convictions for the same murder based on conflicting statements from
> the same cooperating codefendant) (emphasis added), or where the
> evidence used at the two trials is "factually inconsistent and
> irreconcilable," [United States v. ]Paul, 217 F.3d [989,] 998 [(8th Cir.
> 2000)] (holding that government's argument that both defendants were
> the triggerman and killed the victim was not inconsistent).

Higgs, 353 F.3d at 326.

Under this controlling standard, the government violated due process (and the

Eighth Amendment, because this is a capital case).  Appellant's case fits squarely into

42

both of the examples in <u>Higgs</u> of "situations" where due process is violated. First, given the importance of the identity of the actual killer in a capital sentencing decision, the government's inconsistency about the identity was "at the core of the prosecutor's case." <u>Higgs</u> (quoting <u>Smith</u>). Second, the prosecution's evidence in <u>Fulks</u> and <u>Basham</u> was "factually inconsistent and irreconcilable," <u>Higgs</u> (quoting <u>Paul</u>) – in <u>Fulks</u>, the prosecution represented that Basham named Fulks as the killer; in <u>Basham</u> the prosecution represented that Basham named himself as the killer.

Apart from its erroneous claim that the evidence was consistent in <u>Fulks</u> and <u>Basham</u>, the government makes no attempt to distinguish <u>Higgs</u> or explain why relief is not appropriate under <u>Higgs</u>. Nor does the government discuss the Eighth and Eleventh Circuit cases cited in Appellant's Brief at 80-82. Regarding <u>Bradshaw v. Stumpf</u>, 545 U.S. 175 (2005), <u>on remand</u>, <u>Stumpf v. Houk</u>, 2011 WL 3506101, 653 F.3d 426 (6th Cir. 2011), cited in Appellant's Brief at 80, 82, the government says the Sixth Circuit's opinion "is no longer valid" because the Sixth Circuit since granted rehearing *en banc*, which, under Sixth Circuit rules, automatically vacated the panel opinion. Gov. Br. at 90 n.27. Given the controlling Fourth Circuit law of <u>Higgs</u>, the "validity" *vel non* of <u>Stumpf</u> is a non-issue. The reasoning of the <u>Stumpf</u> Circuit, which the government does not address, remains convincing; the Supreme Court's remand in <u>Stumpf</u> confirms that <u>Higgs</u> still controls.

43

The government says "two courts of appeals have held that the government may present inconsistent arguments or theories at the separate trials of co-defendants as long as it does not present false evidence at any trial." Gov. Br. at 89-90. Given the controlling authority of Higgs, contrary rulings from other Circuits are inapposite. In any event, relief is appropriate even under the "false evidence" standard proposed by the government. In Fulks, the government represented that Basham named Fulks as the killer; in Basham, the government represented that Basham named himself as the killer. Both representations cannot be true.

**CONCLUSION**

For the reasons stated above and in Appellant's Brief, this Court should reverse and remand with directions that the District Court grant relief under § 2255.

Respectfully submitted,

/s/ Billy H. Nolas
Billy H. Nolas
Amy Gershenfeld Donnella
Assistant Federal Defenders
Federal Community Defender Office
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520

Attorneys for Petitioner-Appellant

44

## CERTIFICATE OF SERVICE

I, Billy H. Nolas, hereby certify that on this date I served the foregoing Reply Brief of Appellant on all parties or their counsel of record through the CM/ECF system, and I served six (6) paper copies of the foregoing upon the Clerk of the Court via United States Mail, postage prepaid.

s/ Billy H. Nolas
BILLY H. NOLAS

Counsel for Petitioner-Appellant

Dated:      February 24, 2012

45

## CERTIFICATE OF COMPLIANCE

I, Billy H. Nolas, hereby certify that the foregoing Reply Brief of Appellant contains 10,380 words, excluding the portions exempted by Fed. R. App. P. 32(a)(7)(C)(i). An appropriate motion will be filed forthwith.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using WordPerfect, version X4, in 14-point font, type style Times New Roman.

s/ Billy H. Nolas
BILLY H. NOLAS

Counsel for Petitioner-Appellant

Dated:    February 24, 2012

46